

The Law Office of
Elizabeth E. Macedonio

40 Fulton Street – 23rd Floor – New York, NY 10038
Office: 212-235-5494 • Fax: 212-480-4444 • Email: Elizabeth@MacedonioLaw.com

October 30, 2017

Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  United States v. Vincent Asaro
17 Cr. 00127 (ARR)

Dear Judge Ross:

This letter is submitted for Your Honor's consideration in the sentencing of Vincent Asaro in the above-referenced matter. This is Mr. Asaro's initial submission in which he sets forth the applicable considerations under Title 18 U.S.C. § 3553(a).  As a *Fatico* hearing is anticipated in this matter, Mr. Asaro respectfully reserves the right to submit an additional brief following the hearing in which he will address issues related to the application of the United States Sentencing Guidelines. As an initial matter, however, we ask the Court to consider the facts set forth below pursuant Title 18 U.S.C. § 3553(a) when determining the fair and just sentence in this case.

I.      **Facts of the Case**

On June 27, 2017, Mr. Asaro pled guilty to a single-count Information. The Information charges that on or about and between April 1, 2012 and April 4, 2012, Mr. Asaro, together with others, did knowingly and intentionally use one or more facilities in interstate and foreign commerce with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, to wit: arson, in violation of New York Penal Law Sections 150.10 and 20.00, and thereafter did perform and attempt to perform a crime of violence, to wit: arson affecting interstate and foreign commerce, in violation of Title 18 United States Code, Section 844(i), to further such unlawful activity.

The crime committed followed an incident of road rage between Mr. Asaro and an unknown individual.   That incident occurred on or about April 1, 2012. Following the incident, Mr. Asaro sought and received the registration information of the other party's vehicle.  Once he received this information Mr. Asaro requested that a third person ("CW-1") set fire to the vehicle.

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

Thereafter, on his own accord, CW-1 recruited John J. Gotti and Matthew Rullan to assist him with the arson. Mr. Asaro did not recruit these individuals, nor did he ask CW-1 to recruit them. (Exhibit A – P.35-37) Rather, Mr. Asaro sought out CW-1's assistance alone as CW-1 was known to have committed arsons on previous occasions with no assistance from other individuals. Given the simplicity of the crime, there was no reason for Mr. Asaro to assume that CW-1 would seek out assistance from any other party. Moreover, Mr. Asaro had never met either Gotti or Rullan. Rather, these two individuals were friends of CW-1. There is no evidence that Mr. Asaro had any relationship or independent contact with either Gotti or Rullan.

The crime in this case was purely a matter of road rage. It had no connection to the affairs of the Bonanno crime family. Mr. Asaro concedes that this incident was a tremendous error in judgment on his part. He has, however, accepted responsibility for his conduct. Notably, the guilty plea in this case came only three months after Mr. Asaro's arrest. Mr. Asaro quickly acknowledged his guilt and now awaits sentencing for this crime. Plea negotiations in this case were complex. Mr. Asaro's plea was part of a global disposition. Had Mr. Asaro, Gotti or Rullan elected to go to trial, the government would have taken all three defendants to trial on the arson charges. Recognizing both his guilt and the importance of his plea to his co-defendants, Mr. Asaro was the first defendant to plead guilty in this case. In exchange for his plea of guilty, the government agreed to allow Mr. Asaro to plead to a crime (the travel act) which does not carry the mandatory minimum sentence of sixty months required by the arson statute. And the government included in the plea agreement an appellate waiver of 46 months incarceration or below. Given all of these facts, the government agreed in both the plea agreement (Exhibit B) and at the time of the plea (Exhibit A) that Mr. Asaro was entitled to three-points for acceptance of responsibility. The remaining adjustments to the guidelines will be addressed in a subsequent submission.

## II.     The Law

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." This "parsimony clause" applies at every federal sentencing "except as otherwise specifically provided." *Id.* Indeed, the command of the parsimony clause defines the Court's "overarching duty." *Pepper v. United States*, 131 S. Ct. 1229, 1243 (2011).

Among the factors to be considered under § 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

As the Supreme Court reaffirmed in *Pepper*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 131 S. Ct. at 1240 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). While the Guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 128 U.S. 586, 596-97 (2007). The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008).

In this case, for several reasons, the Court is vested with broad authority to sentence Mr. Asaro to a below-Guidelines sentence, thereby complying with the purposes of sentencing, without unduly punishing the defendant in a manner inconsistent with the statutory scheme.

### III.  Mr. Asaro's Background and Personal Characteristics

Vincent Asaro is 82 years old. He is a lifelong resident of Queens County. He has an extensive work history which includes decades of work in the construction and restaurant industries. For nearly fifty years he was married to Theresa Myler. Mr. Asaro and his ex-wife have three children, several grandchildren and two great-grandchildren. Prior to his arrest in this case, he was unemployed and resided in the home of his long-term companion Michele Corollo. He had no assets or unexplained wealth and relied on his family for transportation and financial support.

Mr. Asaro is one of five children. He maintains a close and loving relationship with all of his family members. He was raised in an intact home where all of his needs were met. In addition to his parents and siblings, Mr. Asaro enjoyed the love and affection of extended family as well. Mr. Asaro continues this tradition of love and support within his immediate and extended family often being the center of family events during which he enjoys cooking the meals and telling comical or scary stories to the younger members of the family. (Exhibit C)



Mr. Asaro has had many jobs over the course of his life, primarily in the food and construction industries. After leaving school at the age of 16, Mr. Asaro went to work at various jobs with his father and other family members. His first job was as a messenger. He then worked as a plasterer with his uncle, Anthony Valenti. In his early years he also worked with his uncle Paul Mandoglia at his tire company and with his dad doing construction work.

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

Other individuals and companies he has worked for include: Montana Brothers (driving an oil truck); Christina Roofing; Esposito & Sons; Joe Zanka (homebuilders); Liberty Paint Co.; Jon Blade (feed company); Star Fence Company; Bronchara Fence Company; King Fence Company; Astro Fence Company; Standard Utilities (driving oil truck); Turner Construction; Planet Construction; Masden Construction.

In addition, inspired by his love of cooking, Mr. Asaro opened two restaurants. He owned and operated *The Great In-Pasta* restaurant from the 1990s until opening the *Triangle Luncheonette* from 2003-2004.

His employment at these various places spanned decades and allowed him to support his family. Mr. Asaro retired in 2006 at which time he began to collect social security benefits.

Mr. Asaro and his wife enjoyed a long marriage and were in fact married on two separate occasions. They raised three children; Noreen, Dawn, and Jerome. Mr. Asaro maintains a good relationship with all of his children and is a doting grandfather and great grandfather. Even subsequent to their divorce, Mr. Asaro continued to enjoy an amicable relationship with his wife. Together they continued to jointly maintain the marital residence (which she resided in alone), and accompany one another to medical appointments. In addition, they attended the weddings of their children and enjoyed the company of their grandchildren and great-grandchildren.

Attached for the Court's review are several letters from Mr. Asaro's family members and friends. (Exhibit C) These letters detail the type of family man Vincent Asaro is. He is a man that is there for his children, inspiring them to do their best and teaching them the importance of family. Mr. Asaro's grand-daughter Maxie Boccio describes his undying support for her and her family.

> Vincent is my grandfather, however, he has been the closest thing I have ever had to a real father. My mom and dad got divorced when I was in fourth grade. Since then, my grandfather has been a father figure to me by often providing guidance. He always stressed to me the importance of doing the right thing and being a good person, and continues to remind me of these virtues in my adulthood. Regardless of the circumstances, my grandfather has always been there for me and my family.

Letter to the Court from Maxie Boccio attached as part of Exhibit C.

Upon his release Mr. Asaro will continue to reside with Ms. Corollo in her home in Richmond Hill, Queens. Ms. Corollo is a long term employee of ▮▮▮▮▮▮▮▮▮▮ where she

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

works as an administrator. The simple life style Mr. Asaro leads at this point is best described by Ms. Corollo and Mr. Asaro's daughter Noreen.

> It is the little things in life are what make us both happy. Whether it is having the kids over for breakfast or taking a drive or a movie that is what makes us both happy. I feel I have been very blessed to have him in my life. He is a loving, supportive and devoted partner. He has endured many health issues within the last years. At 82 years of age, his days are now filled with doctor appointments, tests etc. We try to make the best of the time we have together.

Letter to the Court from Michele Corollo attached as part of Exhibit C.

> He shares a quiet life with Michele. Basically hosing the yard and visiting family, going to doctor's appointments and spending time with his dog who has recently passed. He goes out of his way to have a kind ear to listen to people with a compassionate ear.

Letter to the Court from Noreen Asaro attached as part of Exhibit C.

In addition to telling stories and cooking meals, Mr. Asaro has proven to be there for his family and friends during life's most difficult times. His friend Lucille Gennaro remembers Mr. Asaro's compassion when she was dealing with several family hardships including her mother and sister's terminal illnesses.

> When my Mother became sick with Alzheimer's and I was caring for her, it was Vinny (not my own siblings) that offered to sit with her so that I could go out and have some fun. I remember his exact words, "Lu, you're young and you need to go out once in a while. Pick a night and I will sit with your Mother."

> Then when my sister, Antoinette Gennaro was so sick with cancer and she didn't have the strength to get up out of my car, it was Vinny that I called and without hesitation he was on his way to my house. He lifted her out of that car and carried her to the couch. This is the kind of man Vinny is.

Letter to the Court from Lucille Gennaro attached as part of Exhibit C.

In 2016, Mr. Asaro cared for Ms. Corollo's aging mother so that she could go to work. Ms. Corollo reports as follows:

5

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

> My mother was ill and lived with us for a while. While I was at work Vinny took care of her and made sure she had her breakfast and lunch every day. He also tended to the household chores so that I did not have to worry about it. He made dinner for us. My mom was 94 years old and had the onset of dementia and was not very mobile. The stress of seeing her decline was a lot for me. But Vinny tried to help me by taking care of the mundane things so that when I came home I could tend to her.

Letter to the Court from Michele Corollo attached as part of Exhibit C.

A reading of these letters makes clear that Mr. Asaro is a very dedicated and loved family man. But as the Court knows, he is also prone to outbursts. Noreen Asaro addressed this side of her father as follows:

> We have all seen his outbursts. That's just part of his personality. Your Honor heard a lot of recordings in which my father was carrying on. But just as soon as he started yelling, he stopped and he was on to the next topic. Often he says things in the heat of the moment which he doesn't mean at all.

Letter to the Court from Noreen Asaro attached as part of Exhibit C.

The Court was witness to some of Mr. Asaro's outbursts during the previous trial. But often just as quickly as Mr. Asaro became agitated, he was again calm, often forgetting what it was that upset him in the first place. These occasional outbursts however, should not overshadow who Vincent Asaro is at heart and who he has proven himself to be to his immediate and extended family. He is a dedicated father, grandfather and great-grandfather. He is a man who is respected and loved because of his ability to be there in a meaningful way not only in good times, but in life's lowest moments when he is needed the most. The letters drafted on his behalf demonstrate these qualities in Vincent Asaro.

### IV. Mr. Asaro's Fragile Health

As stated, Mr. Asaro is 82 years of age. He suffers from several life threatening ailments which include the following:

6

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

| **Heart Disease** | - triple bypass surgery in 2013<br>- bypass surgery in 2016<br>- preserved ejection fraction |
|---|---|
| **Kidney Disease** | history of painful kidney stones requiring six operations |
| **Hepatitis C** | |
| **Liver Disease** | |
| **High blood pressure** | |
| **High Cholesterol** | |
| **Arthritis** | |

In addition, he had surgery on the tendons of both of his arms in the 1990's. He had back surgery on discs L4 and L5 in the 1990's. He had a benign tumor removed from his hip in 1997. He underwent surgery for a double hernia in 2001. Surgical removal of his parathyroid gland in 2003. He was required to attend pain management for medical issues related to his neck from 2004 to 2006. He had cataract surgery in 2017. And in March of 2017, he suffered a transient ischemic attack ("TIA") which is sometimes referred to as a mini-stroke. A subsequent MRI revealed thickening of the brain.

Given his advanced age, and the degenerative nature of several of these conditions his short term prognosis is poor. These ailments, both individually and collectively place his life in jeopardy every day. Mr. Asaro has suffered several health setbacks that were exacerbated by the lack of proper medical care at the Metropolitan Detention Center ("MDC"). This will only be compounded by continued incarceration.

Moreover, as he suffers from so many serious health issues, treatment of one issue can adversely affect another. By way of example, Mr. Asaro suffers from Hepatitis C, a disease likely contracted the 1950's or 1960's. The Hepatitis C was not detected until the 1990's, and by that time it had caused liver damage. In order to treat the myriad of additional health issues that Mr. Asaro has, he is prescribed a battery of medications. He currently takes 18 medications a day. Many of these medications are processed by the liver and thus exacerbate his liver disease. The balancing

7

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

of medications, and the ability to closely monitor the interaction of his ailments, requires constant and vigilant medical care and a balanced diet. It is certain that he will not receive this care within the Bureau of Prisons.

During his prior and current terms of incarceration, his health had deteriorated rapidly in many ways. Despite consistent reports to medical staff, obvious life-threatening and painful ailments were outright ignored. The following are only a few examples.

A) <u>Mr. Asaro's Incarceration from 2014 to 2015</u>

1) Prior to his 2014 arrest, Mr. Asaro suffered a heart attack and underwent triple bypass surgery. Given his family history, his cardiac issues are of extreme concern, and thus this information was provided to the MDC upon his arrival. While last at the MDC, Mr. Asaro consistently complained to the staff of a deep and painful burning sensation in his chest and that his legs were swollen with water and painful to the touch. Although he repeatedly asked that testing be done to determine the cause of the pain, his requests were ignored for months and ultimately never addressed. Upon release, it was learned that Mr. Asaro was suffering from angina, a condition marked by severe pain in the chest caused by an inadequate blood supply to the heart.

In early 2016, after his release, Mr. Asaro underwent his second bypass surgery during which multiple stents were placed in his heart. It is only by the grace of god that he did not suffer further complications due to lack of medical care while in custody.

2) In the early morning hours of July 19, 2014, Mr. Asaro was taken from the MDC to the emergency room as he was in extreme pain and was urinating blood. He was told that he had numerous kidney stones that were too large to pass and that he should be seen by a urologist. Without any further treatment, he was then returned to the MDC.

Weeks later, and only after the Court made an inquiry as to when Mr. Asaro would be seen by a doctor, Mr. Asaro was taken to a urologist who again told him that he had several kidney stones that were too large to pass and that he needed an operation. Once again, he was returned to the MCD. While at the MDC, Mr. Asaro was forced to choose between taking prescription pain killers, even when he was not in immediate pain, or waiting for the pain to return and then having no relief at all.

Mr. Asaro was not taken to the hospital to remove the stones lodged in his kidney until September 5, 2014. This action was taken by the staff at the MDC only after the Court made two additional inquiries about Mr. Asaro's medical condition.

8

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

      To add to this traumatic ordeal, Mr. Asaro was unable to communicate with his family for a two-week period while he was in the hospital. They had no way of knowing if he was alive or if he had suffered surgical complications. What is most alarming is that while the 81 year old Vincent Asaro lie shackled to a hospital bed, he did allegedly experience complications from surgery. Mysteriously, not only did the doctors remove his kidney stones, they also removed his prostate without explanation. Given that his family was kept in the dark during the entire two weeks he was in the hospital, they were unable to participate in his medical care in any fashion. If they had been permitted to care for him, as is only human, perhaps his body would not have been mangled by a botched surgery.

      Given the nature of the surgery, his advanced age and chronic medical condition, this procedure denied Mr. Asaro and his family any participation in his medical care. This is a likely that the Court will not be able to intervene and thus, as history has shown, Mr. Asaro's medical concerns will be ignored.

B)  <u>Mr. Asaro's Current Incarceration</u>

      1) On April 12, 2017, Mr. Asaro was placed in administrative detention at the MDC. On or about April 23, 2017, the undersigned visited with Mr. Asaro in the Special Housing Unit ("SHU"). When Mr. Asaro entered the attorney visiting area he was distraught. He had collapsed in the shower and was unable to get up. He was not coherent and was unable to effectively communicate. He clearly had lost a significant amount of weight and reported that he was having pain urinating. The temperature in the SHU was far below comfortable and Mr. Asaro was not provided with appropriate clothing. Upon consistent urging, Mr. Asaro was taken to the nurse and ultimately to the hospital. He was suffering from dehydration, dangerously high blood pressure and extreme weakness. All symptoms of heart failure. While in the hospital, Mr. Asaro was advised that his "heart was leaking."

      He was returned to the MDC and the SHU on April 25, 2017, without any further medical intervention. Remarkably, since Mr. Asaro was in 24 hour lockdown, if an emergency had occurred, he would have had no assistance whatsoever. While staff is on the floor, the inmates are routinely ignored. Had counsel not gone the MDC on this particular day, it is likely that Mr. Asaro would not have received any medical attention. Mr. Asaro was finally released from the SHU on or about May 2, 2017.

      2) Mr. Asaro was taken to the hospital during the first week of October 2017, when the staff at the MDC believed he was suffering a heart attack. This again came after Mr. Asaro consistently complained of the sensation of burning in his chest. He was returned to the MDC and provide with very little information regarding his medical condition. Counsel has requested these records but has been advise that in order to obtain them that I must file a FOIL request to obtain

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

> the documents. By the time these documents are received, it may be too late for his doctors to provide any meaningful input into his care.
>
> 3) Finally, on October 20, 2017, Mr. Asaro was taken for what has been described as cardiac testing. As of this writing Mr. Asaro has not yet been returned to the MDC. During this entire time, once again, the family has been provided with no additional information and has been unable to communicate with Mr. Asaro. Given his advanced age, and his health concerns, this practice is entirely unacceptable. We can only hope that his body is not once again mangled at the hospital. Once counsel is able to communicate with Mr. Asaro, she will update the Court with regard to this most recent hospitalization.

Mr. Asaro's life after his release from prison in 2015, was consumed with medical appointments. Just prior to his arrest in 2017, his doctor advised that Mr. Asaro is suffering from preserved ejection fraction. With preserved ejection fraction, the heart muscle contracts normally sending blood to the body. Thereafter, however, the heart's ventricle does not relax to allow the ventricular to properly fill with a renewed blood supply which the body needs. Thus the amount of blood to the body is less than normal. Preserved ejection fraction is also referred to as diastolic heart failure. A healthy diet and regular exercise are crucial for Mr. Asaro's survival. These are things that he will not get in BOP custody. Again, given his family history, cardiac issues are of extreme concern.

In addition, in the winter months of 2017, Mr. Asaro suffered from such a debilitating strain of the flu that he was homebound for twelve days. He was seen by his doctor on several occasions, and even underwent a chest x-ray to make certain he had not come down with the pneumonia.

More recently in March of 2017, when Mr. Asaro was celebrating his birthday with friends, he had to be escorted home as he was suffering from stroke like symptoms. It was determined that Mr. Asaro had had a transient ischemic attack ("TIA") which is sometimes referred to as a mini-stroke. A TIA produces similar symptoms to a stroke, but usually only lasts a few minutes and causes no permanent damage. About one in three people who have a transient ischemic attack will eventually have a stroke, with about half occurring within a year after the transient ischemic attack. Mr. Asaro reports that he has had two of these episodes in the past year. After the episode in March of 2017, Mr. Asaro underwent an MRI which revealed thickening of the brain. Mr. Asaro also currently suffers from unsteadiness.

As stated, Mr. Asaro's life is tenuous. He suffers from a variety of serious ailments that both independently and collectively place his life in constant jeopardy. It is certain that he will not receive sufficient medical care in the Bureau of Prisons which will likely lead to his death. This is not a crime that requires a death sentence.

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

## V. Continued Incarceration Poses an Extreme and Life-Threatening Risk

The risk to Mr. Asaro if his incarceration is continued, is serious. First and foremost, the BOP cannot provide the comprehensive care Mr. Asaro requires.

Additionally, the harsh conditions of incarceration which negatively impact the healthy inmate, would be far more severe, and, in fact, especially dangerous for Mr. Asaro. Sleep disturbances, an unavoidable part of prison life, will harm Mr. Asaro's health. Due to crowded conditions, there are often multiple inmates per room sleeping on metal bunk beds that make noises with any movement. Some correctional facilities use a cubicle setup, where numerous inmates sleep in one large room. Regular "counts" that occur in the middle of the night or early morning also pose a significant disturbance to sleep. Further, prisons have a scheduled wake up time for inmates, usually as early as 5:00am. Even if inmates are not feeling well or have had a poor night's sleep, they cannot stay in bed and try to sleep in but must get up and out.

Indeed, the plight of elderly inmates is particularly bleak for all involved, the BOP, taxpayer, and the elderly inmate himself. A recent Office of the Inspector General ("OIG") report found that the physical infrastructure of BOP facilities provides inadequate accommodations for the elderly, the BOP lacks appropriate programs for elderly inmates, and fewer elderly inmates are eligible for early release programs due to BOP policies:

> The OIG found that aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs. We further found that limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates. The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates. Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates. We also determined that aging inmates engage in fewer misconduct incidents while incarcerated and have a lower rate of re-arrest once released; however, BOP policies limit the number of aging inmates who can be considered for early release and, as a result, few are actually released early.[1]

Elderly inmates such as Mr. Asaro will inevitably serve "harder time" than their more youthful counterparts. Furthermore, poor hygiene and living conditions exacerbate the spread of

---

[1] See "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons," Office of the Inspector General, U.S. Department of Justice, May 2015 (revised February 2016) available at https://oig.justice.gov/reports/2015/e1505.pdf (last accessed August 25, 2017)

11

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

infections. Due to his age and poor health Mr. Asaro is more susceptible to infection and may not be able to fully recuperate from certain illnesses he is exposed to. Mr. Asaro's age and fragile medical condition make his sentence one that he may not survive and therefore mitigate in favor of a below guidelines sentence.

## IV.    Conclusion

The crime for which Mr. Asaro is to be sentenced was committed five and a half years ago. After spending years in custody, and with his 83rd birthday rapidly approaching, Vincent Asaro is a very different man than he was in the spring of 2012. His health has deteriorated rapidly and his lifestyle has been severely curtailed. As reflected in the letters drafted on his behalf, when released from custody in November of 2015, Mr. Asaro's life largely consisted of attending doctor's appointments, cooking meals at home and caring for those in his family. He rarely left his home, and when he did he was at the mercy of others to provide him with transportation. Given his physical condition, the time he serves in custody will be much harder than that of the average inmate.

The sentence imposed upon Mr. Asaro must be one that is "sufficient, but not greater than necessary" to provide (1) "just punishment," (2) "adequate deterrence," (3) "protect[ion for] the public" and, (4) "the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a). Given all the factors under Section 3553(a) a further term of incarceration is not warranted and would only likely result in a life sentence, a result that is entirely unwarranted.

I thank Your Honor for her consideration in this matter.

Respectfully submitted,

*Elizabeth E. Macedonio*
Elizabeth E. Macedonio
*Counsel for the Defendant*
*Vincent Asaro*

cc:  All Parties Via ECF