UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES,                                      :
                                                    :
              ,                                     :   17-CR-00127 (ARR)
                                                    :
-against –                                          :
                                                    :
VINCENT ASARO,                                      :
                                                    :
              Defendant.                            :
------------------------------------------------------------X

## MOTION TO REDUCE SENTENCE OR, IN THE ALTERNATIVE, FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

Vincent Asaro, by and through his counsel, respectfully moves pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) for an order reducing his sentence of imprisonment to time-served or, in the alternative, modifying it to home detention based on the "extraordinary and compelling reasons" discussed below.

Mr. Asaro is 85 years old, and physically, cognitively, and functionally impaired. He can no longer walk, go to the bathroom without assistance, speak in comprehensible sentences, perform basic life tasks, or remember the names of his children. While counsel was preparing this motion for compassionate release based on Mr. Asaro's rapidly declining health, including a serious, debilitating stroke he suffered in August 2019, the world dramatically changed. The onset of the coronavirus pandemic, which is spreading unabated throughout our country, has only heightened the urgency of this request. Mr. Asaro's gender, advanced age, and documented medical conditions make him uniquely vulnerable to COVID-19. The virus has already infiltrated numerous jails and prisons (including many Bureau of Prisons (BOP) facilities), and courts in this District and Circuit, as well as authorities across the country, have begun to release inmates who are at high risk of being infected with COVID-19, like Mr. Asaro.

1

Notably, the BOP does not dispute that Mr. Asaro is medically eligible for release under the First Step Act, even absent the imminent threat of COVID-19. Last year, Mr. Asaro requested that the Warden of his facility recommend that the BOP to reduce his sentence in light of his advanced age, deteriorating health, and extensive list of life-threatening medical conditions—including strokes, heart disease, kidney disease, Hepatitis C, high-blood pressure, high cholesterol, and physical incapacitation—which have left him bedridden at times, in debilitating pain, unable to perform simple life tasks, and requiring near total care in all aspects of his daily living. The Reduction in Sentence (RIS) Committee that reviewed his application and the BOP General Counsel's office both agreed that in light of his age, deteriorating health, and physical incapacitation, Mr. Asaro qualified for a reduction in sentence under the statute and the BOP's internal program guidance. However, the BOP denied his application in January of this year asserting "Mr. Asaro's release at this time would minimize the severity of his offense." (BOP Central Office Denial at 2, attached at Exhibit A).

That decision was incorrect when it was made. In light of Mr. Asaro's debilitating medical issues, which obviate any legitimate concerns that he is a danger to others, justice compels compassion and a reduction in his sentence. The BOP's decision, however, has become manifestly unjust at a time when Mr. Asaro's exposure to the novel coronavirus in prison—a petri dish of viral contagion—could easily terminate his life given his advanced age and significant medical conditions. As the world grapples with the new realities of this pandemic, it is even more incumbent upon the courts to grant compassionate release requests to elderly, sick inmates like Mr. Asaro who pose no threat to others or to the community and who are uniquely at risk of mortality from COVID-19. Not only will such sentence reductions protect vulnerable applicants,

they will also hopefully stem the spread of the coronavirus inside jails, prisons, and federal medical facilities, where social distancing and other best practices is impossible.

Accordingly, in keeping with the spirit of the First Step Act—and in light of this unprecedented moment and the fact that a significant portion of Mr. Asaro's sentence has already been served—we urge the Court to grant Mr. Asaro compassionate release and allow him to return home for his remaining days under whatever terms Your Honor and the U.S. Probation Office deem appropriate and safe.

**I.      Background**

1. *Procedural History*

The Government indicted Mr. Asaro in 2014 for alleged crimes related to a 1978 robbery at John F. Kennedy airport, a 1969 murder, and loansharking. After a four-week trial in November 2015, the jury acquitted Mr. Asaro of all charges.

Less than two years after his acquittal, the prosecutors again indicted Mr. Asaro, this time in connection with a 2012 road rage incident. The Government alleged that Mr. Asaro found the registration information for a driver who had cut him off in traffic and requested that one of his associates set fire to the car while it sat unoccupied in the owner's driveway. The Government alleged that this 2012 act of arson violated the Travel Act, 18 U.S.C. § 1952(a)(3)(B). (Indictment (Dkt. No. 1), attached at Exhibit B.) On June 27, 2017, Mr. Asaro pleaded guilty to this charge. (Pleading (Dkt No. 62), attached at Exhibit C.)

Before sentencing, the Government, the Probation office, and Mr. Asaro all agreed that his Sentencing Guidelines range was 33 to 41 months' imprisonment. However, notwithstanding the fact that a jury acquitted Mr. Asaro of all charges in his 2015 trial, the Government argued for a sentence three times higher than the Guidelines called for, relying on conduct for which Mr. Asaro

had been acquitted in 2015. (*See* AUSA Sentencing Mem (Dkt No. 108), attached at Exhibit D). On December 28, 2017, over Mr. Asaro's objection, the Court sentenced him to 96 months basing the length of Mr. Asaro's sentence in part on the acquitted conduct. (Sentencing Tr. (Dkt No. 164), attached at Exhibit E.)

Had Mr. Asaro been sentenced to a term of imprisonment within the Guidelines range, he would either have been released or on the verge of release or home confinement by this point. Instead, based on the sentence imposed, Mr. Asaro is presently not scheduled to be released until March 2022—if he manages to survive that long. Mr. Asaro has served more than 75% of his sentence.

2. *Mr. Asaro's Physical, Medical, and Cognitive Issues*

Prior to Mr. Asaro's sentencing, his counsel apprised the Court of the many life-threatening and/or debilitating ailments he faced at that time, including: significant heart disease; kidney disease; Hepatitis C; liver disease; high-blood pressure; high cholesterol; arthritis; and the continuing impacts he was experiencing from multiple surgeries including triple bypass surgery and subsequent double bypass surgery, and procedures involving his arms, lower back, hip, parathyroid gland, prostrate, and cataracts, as well as a March 2017 transient ischemic attack ("TIA"), sometimes referred to as a "mini-stroke." (Defendant's Dec. 11, 2017 Sentencing Mem. (Dkt No. 120), attached as Exhibit F); Defendant's Dec. 13, 2017 Sentencing Mem., (Dkt No. 123), attached as (Exhibit G); Defendant's Dec. 19, 2017 Sentencing Mem., (Dkt No. 126), attached as Exhibit H (collectively, "Defendant's Sentencing Memoranda").).

Mr. Asaro's counsel also informed the Court of multiple documented instances where Mr. Asaro's medical needs were ignored or inadequately treated by BOP medical staff, including untreated angina (a condition marked by severe pain in the chest caused by an inadequate blood

4

supply to the heart); kidney stones; conditions consistent with heart failure; high blood pressure; multiple falls; and complications relating to the foregoing that have resulted in his frequent hospitalization. (Defendant's Sentencing Memoranda, Exhibits G – I). The Court is familiar with the inadequate and negligent medical care Mr. Asaro received while at MDC, having intervened several times to assure that BOP staff were providing Mr. Asaro the treatment he needed. (Ex. F at 8.)  Even with the Court's intervention, Mr. Asaro was subjected to unannounced and unexplained transportation to medical appointments, at which he has been subjected to surgeries and other procedures of dubious benefit, while shackled to his medical bed, and all while being denied the ability to communicate to his family, even to inform them he was alive. (*See* Exhibits F – H.)

At sentencing, the Court acknowledged Mr. Asaro's "poor health and advanced age" and the fact that these factors "mean that each year of imprisonment will be harder on him than they would be on a younger and healthier man." (Ex. E at 23:17–22.)  The Court also noted that it could not "summarize the defendant's entire medical history," due to its length, but highlighted several of the life-threatening conditions identified above, including Mr. Asaro's "serious cardiac problems." (*Id.* at 23:23–24:7.)  Shortly after imposing Mr. Asaro's sentence, and in recognition of his declining health and acute medical needs, the Court requested that the BOP designate Mr. Asaro to a federal medical facility. (Req. for Medical Transfer from Richard Langone to Judge Ross, (Dkt No. 141), attached as Exhibit I.)

Mr. Asaro's medical condition has rapidly and severely deteriorated since his sentencing. In 2017, Mr. Asaro was assigned to FCI Loretto, a low security federal correctional institution in Loretto, Pennsylvania.  While at FCI Loretto, his health precipitously declined: he continued to have cardiac pain and high blood pressure, complained of partial blindness, and he fell several

5

times. After Mr. Asaro fractured his right femur during a serious fall in May 2019, leading to hospitalization and rehabilitation, he was transferred to MCFP Springfield ("Springfield") in August 2019, a federal medical center in Springfield, Missouri—a facility located over a thousand miles away from his family and far from any major airport.

Upon arrival, Mr. Asaro was placed in administrative detention for approximately two weeks. About three days after being released from detention, he suffered a serious stroke and lost the ability to speak. He also experienced paralysis on the right side. Mr. Asaro's family was notified of the stroke about a week after it happened. At the time, his treating physician, Dr. Moose, explained to Mr. Asaro's fiancé, Michele Carollo, that he had residual bleeding in the brain but that it appeared to be under control.

Mr. Asaro returned to Springfield after a week in the hospital. In September 2019, the BOP issued a Progress Report, which noted that he was a "care 4 inmate," required "ongoing and chronic care," "remain[ed] in bed the majority of the time," and had "trouble speaking." (*See* September 25, 2019 Progress Report at 1, attached as Exhibit J). The Progress Report also noted that Mr. Asaro was unable to participate in any work assignments or education courses due to his "extensive healthcare needs." *Id.*

After numerous failed attempts to receive information from the BOP about Mr. Asaro's wellbeing, his family sought help from Kathleen Rice, the United States Representative for New York's Fourth Congressional District. Representative Rice's office reached out to Springfield and in October 2019, Representative Rice received a letter from Springfield Warden M.D. Smith who confirmed that Mr. Asaro had been placed in the "Nursing Care Center Unit due to his increased need for Activities of Daily Living (ADL) assistance following his right femur fracture surgical repair which occurred in May 2019." (USMC Springfield Letter to Representative Rice, attached

6

as Exhibit K.) The letter also stated that Mr. Asaro required physical therapy, occupational therapy, speech therapy, and help dressing, bathing, grooming, and moving around. (*Id.*)

After receiving this letter, Ms. Carollo and Noreen Asaro, Mr. Asaro's daughter, visited Mr. Asaro at Springfield on October 26, 2019. He was disheveled, in a wheelchair, shoeless, and had lost a considerable amount a weight. Ms. Carollo and Ms. Asaro were extremely concerned about his health and the care he was receiving at Springfield. While the facility reassured them that it would keep them apprised of Mr. Asaro's medical condition, it has failed to do so despite numerous attempts by the family to obtain this information. (See Carollo and Asaro Letters, attached as Exhibit L.)

Since October 2019, the family has found it increasingly difficult to obtain any information about Mr. Asaro's health, not only because the facility very infrequently returns emails and phone calls, but also because Mr. Asaro, himself, is unable to communicate. At night, an appointed "companion" in the facility helps him call Ms. Carollo. He is able to say "Hello" and "How are you" but nothing much beyond that, and he often stutters to the point of incomprehensibility. He also does not understand simple questions, fails to remember his children's names or that he even has children, and he remains in a wheelchair, with paralysis on the right side and at a high risk of falling. (*See id.*)

### 3. Mr. Asaro's Application for Compassionate Release

In the fall 2019, Mr. Asaro sought a reduction in his sentence from the Warden at Springfield pursuant to the compassionate release provisions of the First Step Act. (Asaro Application for Compassionate Release at 1, attached as Exhibit M.) The Reduction in Sentence (RIS) Committee determined that Mr. Asaro met the criteria for a reduction in sentence. (RIS Committee Decision at 2, attached as Exhibit N.). The RIS Committee observed that Mr. Asaro

7

had "been recovering from a May 2019 hip fracture" and had other medical diagnoses including "coronary artery bypass graft, hepatitis, hypertension, and cerebrovascular accident." *Id.* The RIS Committee also noted that, based on testing by the medical staff, Mr. Asaro received a 1 out of 6 on the Physical Self-Maintenance Scale (PSMS), and 3 out of 9 on the Instrumental Activities of Daily Living (IADL) Scale, with lower scores on each test indicating a higher need for assistance. *Id.* The Committee expedited Mr. Asaro's application, referring it to the BOP Office of General Counsel for consideration. *Id.*

On January 24, 2020, the BOP General Counsel's Office agreed that, because Mr. Asaro "requires assistance with his ADLs [activities of daily living] and instrumental ADLs and is experiencing deteriorating mental and physical health that substantially diminishes his ability to function in a correctional environment, he is considered to be an elderly inmate with medical conditions as defined by section 4(b)" of Program Statement 5050.50. (*See* Ex. A at 2.) The BOP summarized Mr. Asaro's many pressing health issues:

> He has a history of hyperlipidemia, hypertension, edema, atrial fibrillation, status post hip. fracture, and status post cerebrovascular accident (CVA) with right-side hemiplegia and expressive aphasia. . . . He uses a wheelchair and requires assistance with transfers and, when traveling outside of his housing unit, the assistance of a pusher. Mr. Asaro is considered to be at a high risk of falling due to post-CVA impulsivity. He requires assistance with the majority of his activities of daily living (ADLs) and instrumental ADLs such as toileting, transferring, setting up for meals and snacks, bathing, grooming, doing laundry, shopping, managing his medication, and navigating the correctional environment. Given his transition needs, he is housed on the inpatient unit with no plans to transition to the general population. As he requires assistance with his ADLs and instrumental ADLs and is experiencing deteriorating mental and physical health that substantially diminishes his ability to function in a correctional environment, he is considered to be an elderly inmate with medical conditions as defined by section 4(b).

(*Id.*) In view of these conditions, the BOP concluded that Mr. Asaro qualified for a reduction in sentence under Section 3582(c)(1)(A).

8

Despite agreement that Mr. Asaro met the medical criteria for a reduction in sentence, the General Counsel's office asserted that his release "would minimize the severity of his offense and pose a danger to the community." (*Id.*) The BOP thus denied his request, exhausting Mr. Asaro's administrative remedies.

4. *The COVID-19 Pandemic and the Unique Susceptibility of Elderly Inmates*

As of April 2, 2020, nearly one million people have been infected worldwide with the highly contagious coronavirus that causes COVID-19; at least 51,000 people have died.[1] The United States already has the highest rate of reported infections: 217,105 people have tested positive and the death toll already surpasses 5,000.[2] The State of Missouri, where Mr. Asaro is currently located, had its first confirmed case of COVID-19 on March 7, 2020.[3] Twenty-three days later, the state has more than 1,500 confirmed cases and twenty-one people have died.[4] Notably, over the last two weeks, the virus has spread rapidly through prisons and jails.[5] On March 30, 2020, for example, 167 inmates and 137 staff members had tested positive at New York City's jails, including the Rikers complex, and the first federal inmate died of COVID-19 in a facility in Louisiana where five other inmates have tested positive.[6] Since then seven more federal inmates

---

[1] Robert Frank et al., *Coronavirus live updates: Global cases near 1 million, Manhattan real estate grinds to a halt*, CNBC (Apr. 2, 2020), https://www.cnbc.com/2020/04/02/coronavirus-latest-updates.html.

[2] Niko Kommenda et al., *Coronavirus map of the US: latest cases state by state*, the Guardian (Apr. 2, 2020), https://www.theguardian.com/us-news/ng-interactive/2020/apr/02/coronavirus-map-of-the-us-latest-cases-state-by-state.

[3] N.Y. Times, Coronavirus in Missouri: Map and Case Count (Apr. 2, 2020, 1:10 PM EDT)https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html.

[4] *Id.*

[5] *See, e.g.*, Timothy Williams, "Jails are Petri Dishes: Inmate Freed as the Virus Spreads," shttps://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html

[6] Jan Ransom and Alan Feuer, "'We're Left for Dead': Fears of Virus Catastrophe at Rikers Jail" (March 30, 2020), *available at* https://www.nytimes.com/2020/03/30/nyregion/coronavirus-rikers-nyc-jail.html.

have died.[7] Meanwhile, in Missouri, at least one inmate and one Department of Corrections officer has tested positive.[8]

Public health experts have recognized that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" because "infection control is challenging in these settings." Indeed, conditions of confinement create the ideal environment for the transmission of contagious disease:

> Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing. When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community. Spaces within jails and prisons are often also poorly ventilated, which promotes highly efficient spread of diseases through droplets. Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

Declaration of Dr. Jaimie Meyer, *Velesaca v. Wolf et. al,* 1:20-cv-01803-AKH (S.D.N.Y. Mar. 16, 2020) at ¶ 9.

Localities around the United States are already taking steps to reduce jail populations in light of the pandemic. Brooklyn District Attorney Eric Gonzalez, joined by public health experts, has asked the Governor of New York to grant emergency clemencies to elderly and sick prisoners.[9] In Cuyahoga County, Ohio the "judges, sheriff and prosecutor have agreed to hold mass plea and

---

[7] www.bop.gov/coronavirus

[8] Luke Nozicka and Katie Moore, Ticking Time Bombs: Missouri Doctors, Advocates Call for Release of Prisoners (March 31, 2020), *available at* https://www.kansascity.com/news/coronavirus/article241530616.html

[9] Sarah Lustbader, Coronavirus: Sentenced to COVID-19, The Daily Appeal (Mar. 12, 2020) at https://theappeal.org/sentenced-to-covid-19/).

bond reduction hearings to get as many people as possible out of the county's jail to lessen the impact of a potential outbreak of the novel coronavirus."[10] The Sheriff of Collin County, Texas, has asked police to consider issuing citations, rather than arresting, low-level, non-violent offenders.[11] And, after a prisoner and an employee of Rikers Island prison tested positive for coronavirus, the Mayor of New York has announced plans to identify and release high-risk inmates from the City's prisons.[12]

Numerous individuals and organizations—including medical professionals, the Missouri State Public Defender, the ACLU of Missouri, the state NAACP, professors and the sheriff of St. Louis—have urged the Missouri Supreme Court to order judges to immediately release certain detainees in county jails, including "those serving time for misdemeanor offenses, municipal or probation violations as well as inmates considered to be high-risk for serious illness or death." However, no such releases have occurred and notably, Governor Mark Parson has already indicated that he is not considering any sort of early release. As he stated, "People are incarcerated for a reason and that's what the law is."[13]

### II. Under the First Step Act, this Court has Broad Authority to Determine Whether Extraordinary and Compelling Circumstances Exist to Modify Mr. Asaro's Sentence and Release Him to Home Confinement

---

[10] Cory Shaffer, Cuyhoga County officials will hold mass plea, bond hearings to reduce jail population over coronavirus concerns www.cleveland.com/court-justice/2020/03/cuyahoga-county-officials-will-hold-mass-plea-hearings-to-reduce-jail-population-over-coronavirus-concerns.html (accessed March 18, 2020).

[11] Charles Scudder, Facing coronavirus concerns, Sheriff of Collin County asks police not to bring petty criminals to jail, available at www.dallasnews.com/news/public-health/2020/03/12/facing-coronavirus-concerns-collin-county-sheriff-asks-police-not-to-bring-petty-criminals-to-jail/).

[12] Julia Marsh and Ben Feuerhard, NCY to begin releasing inmates amid coronavirus outbreak, https://nypost.com/2020/03/18/nyc-to-begin-releasing-inmates-amid-coronavirus-outbreak/.

[13] "'Ticking time bombs': Missouri doctors, advocates call for release," available at https://www.kansascity.com/news/coronavirus/article241530616.html.

11

Prior to the FSA, only the BOP could move for a sentence reduction under § 3582(c)(1)(A). However, it rarely did, and the BOP's decision not to grant compassionate release was judicially unreviewable. *See, e.g.*, *United States v. Bellamy*, No. CV151658JRTLIB, 2019 WL 3340699, at *1 (D. Minn. July 25, 2019). To rectify the BOP's failure to facilitate the compassionate release program, Congress transformed the process for seeking compassionate release by taking jurisdiction away from the BOP and giving it to the district courts. *See id.* at 2; *see also* First Step Act of 2018, PL 115-391, 132 Stat. 5194, 5239 (2018) ("Increasing the Use and Transparency of Compassionate Release.").

Under the FSA, a defendant may now move to reduce his or her term of imprisonment and seek compassionate release after either (1) the BOP declines to file such a motion or (2) there has been of lapse of 30 days from the warden's receipt of the defendant's request, whichever is earlier. *See* 18 U.S.C. § 3583(c)(1)(A)(i); P.L. 115-391, 132 Stat. 5194, § 603 (Dec. 21, 2018). Here, jurisdiction exists under the First Step Act because, as indicated above, Mr. Asaro exhausted his BOP administrative remedies when the BOP denied his request.[14]

"A court may then 'reduce the term of imprisonment' after finding that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Ebbers*, No. S402CR11443VEC, 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020). "In making its decision, a court must also consider "the [sentencing] factors set forth in section 3553(a) to the extent that they are applicable."" *Id.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

---

[14] *See U.S v. Elbert Johnson*, No. 4:00-CR-40023, 2020 WL 1434367 (W.D. Ark. Mar. 24, 2020) ("If the request is denied by the BOP's general counsel or director, that decision is considered a final administrative decision and the defendant's administrative remedies are exhausted at that time." (citing 28 C.F.R. § 571.63(b-c)).

12

Courts have noted that the Sentencing Commission's applicable policy statement on what constitutes "extraordinary and compelling reasons" to warrant a sentence reduction is anachronistic because it has not been updated since passage of the FSA; nonetheless, they continue to be guided by its descriptions of "extraordinary and compelling reason." *Id.* at *4. However, the Sentencing Commission's statements do not constrain the court's independent assessment of whether "extraordinary and compelling" reasons warrant a sentence reduction in light of the FSA's amendments. *United States v. Beck*, 2019 WL 2716505, at *5–6 (M.D.N.C. June 28, 2019); *see also Ebbers*, 2020 WL 91399, at *4. Indeed, "the district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) (collecting cases).

1. *Mr. Asaro's health issues and vulnerability to COVID-19 constitute extraordinary and compelling reasons that warrant a sentence reduction.*

Both Warden Smith and the BOP have independently concluded that Mr. Asaro's extensive medical needs constitute "extraordinary and compelling reasons" that warrant a sentence reduction. (*See* RIS Committee Decision at 1-2; January 24, 2020 BOP Denial.) As the BOP noted just two months ago in its denial of compassionate release, Mr. Asaro struggles with simple tasks, including "toileting, transferring, setting up for meals and snacks, bathing, grooming, doing laundry, shopping, managing his medication, and navigating the correctional environment." (*See* January 24, 2020 BOP Denial.) His extensive medical issues, which range from stroke-induced paralysis to serious cardiac problems, substantially diminish his ability to provide even a modicum of self-care in the facility and are not ailments from which he is expected to recover.[15] *See*

---

[15] Both Springfield and the BOP have failed to provide Mr. Asaro with current medical records to present to the Court, despite over 100 requests by family members to obtain these records since August 2019 when he was transferred to Springfield. (*See* Carollo Ltr. and Asaro Ltr., Ex. L.)

U.S.S.G. § 1B1.13 note 1 (noting that "extraordinary and compelling reasons" include circumstances whereby a defendant "is experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.")

Moreover, when Mr. Asaro initially requested compassionate release, the world was not fighting to contain a global pandemic that has now spread to jails and prisons. Conditions of confinement create an ideal environment for the transmission of highly contagious diseases like COVID-19. *See* Joseph A. Bick (2007). *Infection Control in Jails and Prisons. Clinical Infectious Diseases* 45(8):1047-1055, at https://academic.oup.com/cid/article/45/8/1047/344842 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"). Social distancing is nearly impossible in prison, and hand sanitizer is contraband. The BOP has announced a modified operations plan to mitigate its spread, but in fact, federal facilities are poorly equipped to respond, with BOP employees complaining that they lack masks and gloves, and even soap.[16] And courts in this Circuit and beyond, recognizing the grave risk of coronavirus spreading in jails and prisons, have

---

[16] BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp; *see also* Cassidy McDonald, "Federal Prison Workers Say Conflicting Orders on Coronavirus Response is Putting Lives at Risk," *CBS News* (March 19, 2020), https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/; Danielle Ivory, *'We Are Not a Hospital': A Prison Braces for the Coronavirus*, N.Y. Times (Mar. 17, 2020), https://www.nytimes.com/2020/03/17/us/coronavirusprisons-jails.html; Martin Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators.'"* NPR (March 13, 2020), https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worry-about-becoming-coronavirus-incubators.

already begun to release incarcerated and detained individuals from federal (and state) facilities. *See, e.g.*, *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020) (noting in a unanimous recent opinion that "[t]he impact of this recent emergency [COVID-19] on jail and prison inmates, their counsel . . . the United States Attorneys, and the BOP, including the individual Wardens and the personnel of each facility, is just beginning to be felt. Its likely course we cannot foresee. Present information strongly suggests, however, that it may be grave and enduring."); *United States v. Marin*, No. 15-cr-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020) ("[F]or the reasons stated in his motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."); *United States of Am., v. Dante Stephens*, Defendant., No. 15-CR-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) (Nathan, D.J.) (granting bail in part due to "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic" and the fact that "inmates may be at a heightened risk of contracting COVID-19 should an outbreak develop."); *United States v. Muniz*, Case No. 4:09-cr-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of vulnerability to COVID-19 and noting that "while the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."); *United States v. Bolston*, Case No. 1:18-cr-382-MLB, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19 outbreak justif[y] his immediate release from custody"); *United States v. Hector*, Case No. 2:18-cr-3-002,

Dkt. No. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to folks in prison).

This risk is heightened exponentially for elderly and infirm inmates like Mr. Asaro.[17] The CDC has issued guidance that individuals at higher risk of contracting COVID-19—adults over 60 years old and people with chronic medical conditions such as heart disease and diabetes and other conditions that weaken the immune system—take immediate preventive actions, including staying at home. Indeed, according to a much-cited study by the Chinese Center for Disease Control covering over 72,000 COVID-19 cases, the fatality rate for patients between 70-79 was nearly 10%.[18]

2. *Mr. Asaro is Too Sick to Pose a Danger to Others or to the Community*

Reducing Mr. Asaro's sentence is consistent with Sentencing Commission policy statements and the relevant § 3553(a) factors.

The Sentencing Guidelines "provide that compassionate release is appropriate only where the defendant is not a danger to the safety of any other person or to the community." *United States v. Wong Chi Fai*, No. 93-CR-1340 (RJD), 2019 WL 3428504, at *3 (E.D.N.Y. July 30, 2019) (internal quotations omitted). Here, however, there is no question that Mr. Asaro's medical needs and physical and cognitive realities obviate any concern that he will be a danger to others or the community if released. *See, e.g.*, *id.* (holding that defendant was not a danger to the community

---

[17] *See, e.g.*, The Justice Collaborative, Guidance on COVID-19 in Release Advocacy, http://thejusticecollaborative.com/wpcontent/uploads/2020/03/TJC_CoronavirusDefenseCourts_Onesheet_02.pdf.

[18] *See* Characteristics of and Important Lessons from the Coronavirus Disease 2019 Outbreak in China, Zunyou Wu, MD, JAMA, available at: http://jamanetwork.com/journals/jama/fullarticle/2762130.

16

because he was "frail" and "require[d] a walker" and could "barely eat on his own"); *Ebbers*, 2020 WL 91399, at *8 ("There is no dispute that Ebbers is not a danger or risk to society. He is sick, weak, disoriented, and bedridden. His ability to care for himself is nearly gone, his cognitive functions are impaired, and his body is wasting away. His remaining time on earth will be spent in end-of-life care, not fashioning fraudulent securities schemes."); *United States v. Bellamy*, No. CV151658JRTLIB, 2019 WL 3340699, at *6 (D. Minn. July 25, 2019) ("[T]he Court doubts that Bellamy presents a danger to any person or the community in his present state. He is wheelchair-bound and requires assistance to complete most of his daily activities."). Mr. Asaro is completely incapable of being violent, nor can he command others to engage in acts of violence, which was one of Your Honor's concerns at the time of sentencing. (*See* Sentencing Tr. at 25:1-5). He cannot speak beyond "Hello."

Moreover, the Sentencing Guidelines ask courts to consider "whether a term of supervised release would manage any potential risk to the community." *Wong Chi Fai*, 2019 WL 3428504, at *3. In this instance, the remote possibility of dangerousness is further mitigated by the fact that Mr. Asaro will be released to his fiancé's home, which has already been investigated and approved by U.S. Probation for home confinement. If released, he would be cared for by his fiancé and his children. (*See* Ex. L.) Second, the applicable § 3553(a) factors do not prevent the Court from concluding that Mr. Asaro's deteriorating health and advanced age compel compassionate release. While the conduct on which the Court relied when sentencing Mr. Asaro was undoubtedly serious, courts have granted compassionate release to individuals convicted of large-scale drug conspiracies, *United States v. Spears*, No. 3:98-CR-0208-SI-22, 2019 WL 5190877, at *1 (D. Or. Oct. 15, 2019), multiple murders, *Wong Chi Fai*, 2019 WL 3428504, at *1, and tragically wide-ranging fraud, *Ebbers*, 2020 WL 91399, at *8. Thus, while it may appropriate to consider the

17

seriousness of the crime for which a defendant has been convicted, the FSA's compassionate release provisions apply equally to all.

While the Court's previous analysis of the § 3553(a) factors at the time of sentencing remain unchanged in certain respects, keeping Mr. Asaro in prison is no longer "necessary to protect the public." Additionally, and at this point, Mr. Asaro has served the majority of his sentence "while seriously ill and in physical discomfort" such that releasing him would not undermine the seriousness of the offense nor respect for the law. *United States v. McGraw*, No. 202CR00018LJMCMM, 2019 WL 2059488, at *5 (S.D. Ind. May 9, 2019). "This [also] means that his sentence has been significantly more laborious than that served by most inmates . . . . and that further incarceration in his condition would be greater than necessary to serve the purposes of punishment set forth in § 3553(a)(2)." *Id.* And he has already served more than the high end of his guidelines sentence.

For the foregoing reasons, Mr. Asaro respectfully requests that the Court grant compassionate release pursuant to the FSA.

### III. Conclusion

For the foregoing reasons, Mr. Asaro respectfully requests that the Court modify his sentence under 18 U.S.C. § 3582(c)(1)(A)(i) and release him to home confinement or hold a hearing as soon as possible. Should the Court wish to hold a hearing, counsel waives Mr. Asaro's appearance and asks that Client be allowed to appear telephonically, if feasible.

Dated: New York, New York
April 3, 2020

Respectfully submitted,

 /s/ *Margaux Poueymirou*
Margaux Poueymirou
Constantine Cannon LLP
335 Madison Avenue
New York, NY 10017
Tel: (212) 350-2700
Fax: (212) 350-2701
Email: mpoueymirou@constantinecannon.com

/s *Deirdre von Dornum*
Deirdre D. von Dornum
Attorney-in-Charge
Federal Defenders of New York
(718) 330-1210
Deirdre_vondornum@fd.org

*Attorneys for Vincent Asaro.*

Cc: AUSA Lindsay Gerdes

AUSA Keith Edelman

Deputy Chief U.S. Probation Officer Richard James (by email)