# EXHIBIT A



U.S. Department of Justice

Federal Bureau of Prisons

Washington, DC 20534

JAN 2 4 2020

MEMORANDUM FOR M. D. SMITH, WARDEN
U.S. MEDICAL CENTER FOR FEDERAL PRISONERS
SPRINGFIELD, MISSOURI

FROM:        Ken Hyle
             Assistant Director/General Counsel

SUBJECT:     ASARO, Vincent
             Federal Register No. 83223-053
             Request for Reduction in Sentence

Please be advised that Mr. Asaro's request for a reduction in
sentence (RIS) pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and
PS 5050.50, Compassionate Release/Reduction in Sentence:
Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and
4205(g), section 4(b) ("Elderly Inmates with Medical
Conditions") is denied. We have carefully reviewed the
documentation accompanying this request and have consulted with
the BOP's Medical Director and with the Assistant Director for
the Correctional Programs Division.

Section 4(b) of PS 5050.50 provides that an inmate who meets the
following criteria may be considered for a RIS: (1) is age 65
and older; (2) suffers from chronic or serious medical
conditions related to the aging process; (3) is experiencing
deteriorating mental or physical health that substantially
diminishes his ability to function in a correctional facility;
(4) conventional treatment promises no substantial improvement
to his mental or physical condition; and (5) has served at least
50 percent of his sentence.

In addition, section 7 requires consideration of factors such as
the nature and circumstances of the inmate's offense; his
criminal history, including any supervised release violations;
his institutional adjustment, including any disciplinary
infractions; and whether release would minimize the severity of
the offense or pose a danger to the safety of any other person
or to the community.

Mr. Asaro is 84 years old and has served 58 percent of his term
of imprisonment.  He has a history of hyperlipidemia,
hypertension, edema, atrial fibrillation, status post hip
fracture, and status post cerebrovascular accident (CVA) with
right-side hemiplegia and expressive aphasia.  He has been
working with physical therapy to improve his mobility, strength,
range of motion, and speech.  However, he has refused six of his
eleven most recent visits.  He uses a wheelchair and requires
assistance with transfers and, when traveling outside of his
housing unit, the assistance of a pusher.  Mr. Asaro is
considered to be at a high risk of falling due to post-CVA
impulsivity.  He requires assistance with the majority of his
activities of daily living (ADLs) and instrumental ADLs such as
toileting, transferring, setting up for meals and snacks,
bathing, grooming, doing laundry, shopping, managing his
medication, and navigating the correctional environment.  Given
his needs, he is housed on the inpatient unit with no plans to
transition to the general population.  As he requires assistance
with his ADLs and instrumental ADLs and is experiencing
deteriorating mental and physical health that substantially
diminishes his ability to function in a correctional
environment, he is considered to be an elderly inmate with
medical conditions as defined by section 4(b).

However, in light of the nature and circumstances of Mr. Asaro's
offense and his criminal and disciplinary histories, his release
at this time would minimize the severity of his offense and pose
a danger to the community.  Accordingly, although he meets the
criteria for a RIS under section 4(b), his RIS request is
denied.

Please provide Mr. Asaro with a copy of this decision.


cc:  J. E. Krueger, Regional Director, North Central Region

2

# EXHIBIT B

SA:NMA:LKG/KDE
F.#2017R00242

MAUSKOPF, J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

REYES, M.J.

– – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -

VINCENT ASARO,
JOHN J. GOTTI,
MICHAEL GUIDICI and
MATTHEW RULLAN,
    also known as "Fat Matt,"

        Defendants.

I N D I C T M E N T

CR 17 – 00127

(T. 18, U.S.C., §§ 371, 844(c), 844(i),
844(n), 981(a)(1)(C), 982(a)(2),
982(b)(1), 2113(a), 2 and 3551 et seq.;
T. 21, U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c))



– – – – – – – – – – – – –X

THE GRAND JURY CHARGES:

<u>COUNT ONE</u>
(Arson Conspiracy)

    1.    On or about and between April 1, 2012 and April 4, 2012, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants VINCENT ASARO, JOHN J. GOTTI and MATTHEW RULLAN, also known as

"Fat Matt," together with others, did knowingly and willfully conspire to maliciously damage

and destroy, by means of fire and an explosive, a vehicle used in interstate and foreign

commerce and in an activity affecting interstate and foreign commerce, contrary to Title 18,

United States Code, Section 844(i).

    (Title 18, United States Code, Sections 844(n) and 3551 et seq.)

2

## COUNT TWO
### (Arson)

2.      On or about and between April 1, 2012 and April 4, 2012, both dates

being approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants VINCENT ASARO, JOHN J. GOTTI and MATTHEW RULLAN, also known as

"Fat Matt," together with others, did knowingly, intentionally and maliciously damage and

destroy, and attempt to damage and destroy, by means of fire and an explosive, a vehicle

used in interstate and foreign commerce and in an activity affecting interstate and foreign

commerce.

(Title 18, United States Code, Sections 844(i), 2 and 3551 et seq.)

## COUNT THREE
### (Bank Robbery Conspiracy)

3.      On or about and between March 15, 2012 and April 18, 2012, both

dates being approximate and inclusive, within the Eastern District of New York, the

defendants JOHN J. GOTTI, MICHAEL GUIDICI and MATTHEW RULLAN, also known

as "Fat Matt," together with others, did knowingly and willfully conspire to take by force,

violence and intimidation, from the person and presence of one or more employees of

Maspeth Federal Savings and Loan Association, 56-18 69th Street, Maspeth, New York (the

"Bank"), money in the care, custody, control, management and possession of said savings

and loan association, the deposits of which were insured by the Federal Deposit Insurance

Corporation, contrary to Title 18, United States Code, Section 2113(a).

4.      In furtherance of the conspiracy and to effect its objects, within the

Eastern District of New York, the defendants JOHN J. GOTTI, MICHAEL GUIDICI and

MATTHEW RULLAN, also known as "Fat Matt," together with others, did commit and cause to be committed, among others, the following:

<div align="center">OVERT ACTS</div>

    a.  On or about April 18, 2012, the defendants JOHN J. GOTTI, MICHAEL GUIDICI and MATTHEW RULLAN, also known as "Fat Matt," drove to the Bank; and

    b.  On or about April 18, 2012, the defendant MICHAEL GUIDICI entered the Bank and presented to a bank teller a note that, among other things, demanded money and stated "I HAVE A BOMB."

    (Title 18, United States Code, Sections 371 and 3551 <u>et seq.</u>)

<div align="center">COUNT FOUR<br>(Bank Robbery)</div>

    5.  On or about April 18, 2012, within the Eastern District of New York, the defendants JOHN J. GOTTI, MICHAEL GUIDICI and MATTHEW RULLAN, also known as "Fat Matt," together with others, did knowingly and intentionally take by force, violence and intimidation, from the person and presence of one or more employees of Maspeth Federal Savings and Loan Association, 56-18 69th Street, Maspeth, New York, money in the care, custody, control, management and possession of said savings and loan association, the deposits of which were insured by the Federal Deposit Insurance Corporation.

    (Title 18, United States Code, Sections 2113(a), 2 and 3551 <u>et seq.</u>)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS ONE AND TWO

6. The United States hereby gives notice to the defendants charged in Counts One and Two that, upon their conviction of either such offense, the government will seek forfeiture in accordance with (a) Title 18, United States Code, Section 844(c), which requires any person convicted of such offense to forfeit any explosive materials involved or used or intended to be used in any violation of such offenses, or any other rule or regulation promulgated thereunder or any violation of any criminal law of the United States; and (b) Title 18, United States Code, Section 982(a)(2), which requires any person convicted of such offenses to forfeit any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense.

7. If any of the above-described forfeitable property, as a result of any act or omission of such defendants:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third party;

(c)    has been placed beyond the jurisdiction of the court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any

other property of such defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 844(c), 982(a)(2) and 982(b)(1); Title 21, United States Code, Section 853(p)).

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS THREE AND FOUR

8.　The United States hereby gives notice to the defendants charged in Counts Three and Four that, upon their conviction of either such offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

9.　If any of the above-described forfeitable property, as a result of any act or omission of such defendants:

　　　(a)　cannot be located upon the exercise of due diligence;

　　　(b)　has been transferred or sold to, or deposited with, a third party;

　　　(c)　has been placed beyond the jurisdiction of the court;

　　　(d)　has been substantially diminished in value; or

　　　(e)　has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

6

to seek forfeiture of any other property of such defendants up to the value of the forfeitable

property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States

Code, Section 853(p); Title 28, United States Code, Section 2461(c))

A TRUE BILL

FOREPERSON

_____
ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY: _____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. O.136

F.#2017R00242

FORM DBD-34
JUN. 85

No. _____

# UNITED STATES DISTRICT COURT

## EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

### THE UNITED STATES OF AMERICA

*vs.*

*VINCENT ASARO, JOHN J. GOTTI, MICHAEL GUIDICI and MATTHEW RULLAN,*

Defendants.

# INDICTMENT

(T. 18, U.S.C., §§ 371, 844(c), 844(i), 844(n), 981(a)(1)(C), 982(a)(2), 982(b)(1), 2113(a), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c))

*A true bill.* _____

Foreperson

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____   Clerk

*Bail, $* _____

*Nicole M. Argentieri, Lindsay K. Gerdes, Keith D. Edelman*
*Assistant U.S. Attorneys, (718) 254-6232/6155/6328*

CR 17 - 00127

# INFORMATION SHEET

MAUSKOPF, J.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

REYES, M.J.

1.   Title of Case: <u>United States v. Vincent Asaro, et al.</u>

2.   Related Magistrate Docket Number(s): _____

3.   Arrest Date:

4.   Nature of offense(s):   ☒  Felony
                             ☐  Misdemeanor

5.   Related Cases - Title and Docket No(s). (Pursuant to Rule 50.3.2 of the Local
     E.D.N.Y. Division of Business Rules):_____

6.   Projected Length of Trial:   Less than 6 weeks   ☒
                                  More than 6 weeks   ☐

7.   County in which crime was allegedly committed: <u>Queens</u>
     (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8.   Was any aspect of the investigation, inquiry and prosecution giving rise to the case
     pending or initiated before March 10, 2012.[1]        ☒ Yes  ☐ No

9.   Has this indictment/information been ordered sealed?   ☒ Yes  ☐ No

10.  Have arrest warrants been ordered?                     ☒ Yes  ☐ No

11.  Is there a capital count included in the indictment?   ☐Yes  ☒ No

ROBERT L. CAPERS
UNITED STATES ATTORNEY

By: _____
Nicole M. Argentieri
Keith D. Edelman
Lindsay K. Gerdes
Assistant U.S. Attorneys
(718) 254-6232/6155/6328

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ MAR - 8 2017 ★
BROOKLYN OFFICE

_____

[1]   Judge Brodie will not accept cases that were initiated before March 10, 2012.

Rev. 10/04/12

TO: Clerk's Office
**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

MAUSKOPF, J.

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR - 8 2017 ★

REYES, M.J.

BROOKLYN OFFICE

**APPLICATION FOR LEAVE**
**TO FILE DOCUMENT UNDER SEAL**

A) If pursuant to a prior Court Order:
Docket Number of Case in Which Entered:_____
Judge/Magistrate Judge:_____
Date Entered:_____

**CR 17- 00127**

-v.-

Vincent Asaro et al

Docket Number

B) If a <u>new</u> application, the statute, regulation, or other legal basis that authorizes filing under seal

SUBMITTED BY: Plaintiff____ Defendant____ DOJ ____
Name: _Gerds___
Firm Name: _USAO_
Address: _271 Cadman Plaza East_
_Bklyn NY_
Phone Number: _718 254 6155_
E-Mail Address: _Chase.Gerds@usdoj.gov_

ORDERED SEALED AND PLACED IN THE CLERK'S OFFICE, AND MAY **NOT** BE UNSEALED UNLESS ORDERED BY THE COURT.

DATED: _3/8/17_ _____ NEW YORK

INDICATE UPON THE PUBLIC DOCKET SHEET: YES____ NO____
If yes, state description of document to be entered on docket sheet:

_____

_____

_____

U.S. ~~DISTRICT~~ JUDGE/U.S. MAGISTRATE JUDGE

RECEIVED IN CLERK'S OFFICE_____
DATE

<u>MANDATORY CERTIFICATION OF SERVICE:</u>
A.) ____ A copy of this application either has been or will be promptly served upon all parties to this action, B.) ____ Service is excused by 31 U.S.C. 3730(b), or by the following other statute or regulation:_____; or C.) _✓_ This is a criminal document submitted, and flight public safety, or security are significant concerns. (Check one)

_3/8/17_
DATE

_____
SIGNATURE

# EXHIBIT C

**CRIMINAL CAUSE FOR PLEADING:**

BEFORE: ALLYNE R. ROSS, U.S.D.J.   DATE:6/27/2017     TIME:10:30am
CR-17-127( ARR )

DEFT NAME: Vincent Asaro                              #
    X  present      ___ not present    x  cust.      ___ bail

DEFENSE COUNSEL: Elizabeth Macedonio
    X  present      ___ not present    x CJA    RET.      LAS

**A.U.S.A.**: N. Argentieri & K. Edelman ___    CLERK: D. La Salle

Rep. Stacy Mace                                   OTHER:
INT:  (LANG.- ___ ) ___

x__  CASE CALLED.  ___  DEFENDANT'S FIRST APPEARANCE.
DEFT x__  SWORN    ___  ARRAIGNED x__  INFORMED OF RIGHTS
    ___  WAIVES TRIAL BEFORE DISTRICT COURT

___  WAIVER OF INDICTMENT EXECUTED FOR DEFT.
___  SUPERSEDING INDICTMENT / INFORMATION FILED.
___  DEFT FAILED TO APPEAR,  BENCH WARRANT ISSUED.
___  DEFT ENTERS A PLEA OF NOT GUILTY TO ALL CTS.

___  DEFT ENTERS  **GUILTY PLEA** TO CTS._____ O  F
(Superseding) INDICTMENT/INFORMATION.
_X__  DEFT **WITHDRAWS** NOT GUILTY PLEA AND ENTERS **GUILTY PLEA** TO CTS._
    _____ One _____ Of the superseding information.
X__  COURT FINDS FACTUAL BASIS FOR THE PLEA.
x__  SENTENCING SET FOR 10/24/17 @ 11:00am

___  DEFT ENTER **NOT GUILTY PLEA.**
___  BAIL ___ SET ___ CONTINUED FOR DEFT.
_X__  DEFT CONTINUED IN CUSTODY.
___  CASE ADJOURNED TO_____  FOR _____
___  JURY SELECTION SET FOR _____  ___ BY MAG.
___  TRIAL SET FOR _____
___  **SPEEDY TRIAL** INFO FOR DEFT  ___  STILL IN EFFECT
    CODE TYPE_____    START_____    STOP_____

    _____ORDER / WAIVER EXECUTED & FILED.  ___ ENT'D ON RECORD.

OTHER: Plea agreement marked as government exhibit one; Plea
agreement returned to A.U.S.A. Argentieri. The Court appoints
counsel pursuant to United States v. Curcio, 680 F.2d 881 (2d Cir.
1982), and conducts required inquiry. Defendant waives
potential conflict on the record.

# EXHIBIT D



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NMA/LKG/KDE        *271 Cadman Plaza East*
F. #2017R00242        *Brooklyn, New York 11201*

November 20, 2017

By Hand and ECF

The Honorable Allyne R. Ross
United States District Judge
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:     United States v. Vincent Asaro
                Criminal Docket No. 17-127 (S-1) (ARR)

Dear Judge Ross:

       The government respectfully submits this letter in anticipation of sentencing in the above-captioned case. The government respectfully submits that in determining what sentence to impose, this Court should consider, among other things, the defendant's lifelong allegiance to a dangerous criminal organization, his extensive participation in heinous criminal acts, including murder and obstruction of justice, and the nature of the charged crime, an arson he directed as a result of road rage. Taken all together, these factors demonstrate that the defendant has earned, and deserves, a sentence in excess of fifteen years' imprisonment.

<div align="center">

BACKGROUND

</div>

I.     Procedural History

       On March 8, 2017, a grand jury sitting in the Eastern District of New York returned an indictment in the above-captioned case charging the defendant and two co-defendants with, variously, knowingly, intentionally and maliciously damaging, by means of fire and an explosive, a vehicle used in interstate and foreign commerce, and conspiracy to do the same, in violation of 18 U.S.C. §§ 844(i) and 844(n).[1] See Docket Entry No. 1. The defendant was arrested on March 22, 2017 by the Federal Bureau of Investigation ("FBI") and made no post-arrest statements. See Pre-Sentence Investigation Report dated September 21, 2017 ("PSR") ¶ 13. The defendant moved for bail pending trial, which this Court denied

---

       [1] The indictment also charged a fourth defendant with bank robbery and bank robbery conspiracy.

finding that the government had proven that the defendant's post-arrest conduct, including threats of violence directed at a prosecutor and his cousin (a cooperating witness) were "convincing and persuasive evidence of just how volatile, dangerous and violent the defendant remains, notwithstanding his advanced age." See Transcript of May 18, 2017 Bond Hearing, at 15, attached as Exhibit A. Less than a month later, on June 13, 2017, the defendant pled guilty, pursuant to a plea agreement, to a single-count superseding information, alleging the defendant's participation in directing an arson of a car, in violation of the Travel Act (18 U.S.C. § 1952). Id. ¶ 1.

        In 2015, the defendant stood trial before the Court on a racketeering conspiracy spanning forty-five years and was acquitted. See United States v. Asaro, Criminal Docket No. 14-26 (ARR), Docket Entry No. 328. At trial, the government introduced evidence of the defendant's rise to power in the Bonanno organized crime family of La Cosa Nostra (the "Bonanno family" and "LCN," respectively), including his participation in decades of crimes of violence, not limited to the 1969 murder of Paul Katz, the 1978 robbery of over $6 million in United States currency from the Lufthansa Airlines Terminal at John F. Kennedy Airport and loansharking and extortion up to the time of his 2014 arrest. The defendant was incarcerated from his arrest in January 2014 to his acquittal in November 2015. As set forth in the PSR, the defendant will receive credit for this period of incarceration, meaning that twenty-two months of incarceration will be deducted from whatever sentence the Court imposes on this case. PSR ¶ 83.

## II.    Applicable Law

        In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure that sentencing courts must follow in light of United States v. Booker, 543 U.S. 220, 258-60 (2005):

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

        Section 3553(a) directs the sentencing court to consider the following factors, among others, when imposing a particular sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to

provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

When imposing sentence pursuant to 18 U.S.C. § 3553, a district court may consider a wide range of facts. As the Second Circuit has observed, "Section 3553(a)(1), in particular, is worded broadly, and it contains no express limitations as to what 'history and characteristics of the defendant' are relevant." United States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006). In order to rely on conduct at sentencing, the court must find it proven by a preponderance of the evidence. United States v. Beardsley, 691 F.3d 252, 274 (2d Cir. 2012); see also United States v. Cordoba-Murgas, 233 F.3d 704, 709 (2d Cir. 2000) (holding that the preponderance standard is "mandated"); United States v. Concepcion, 983 F.2d 369, 388 (2d Cir. 1992) (holding that disputed sentencing factors need only be proved by a preponderance of the evidence).

For example, a district court may rely upon acquitted conduct when making a sentencing determination. United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) (holding that after Booker, 543 U.S. 200 (2005), district courts "may continue to find facts relevant to sentencing by a preponderance of the evidence . . . [and] may also continue to take into account acquitted conduct when sentencing by a preponderance of the evidence . . . [and] may also continue to take into account acquitted conduct when sentencing defendants without violating the Due Process Clause.") In fact, the Second Circuit has explicitly held, "[a] district court may treat acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of the evidence that the defendant committed the conduct." United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012); United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005) ("with the mandatory nature of the Guidelines excised, the traditional authority of a sentencing judge to find all facts relevant to sentencing will encounter no Sixth Amendment objection").

In considering whether to rely on acquitted conduct at sentencing, the Supreme Court's decision in United States v. Watts, 519 U.S. 148 (1997), underscores the difference between the government's burden at trial and at sentencing and the pitfalls in trying to draw meaning from a jury's verdict. In Watts, the Supreme Court held that a jury cannot be said to have "necessarily rejected" any facts when it returned a verdict of not guilty. Id. At 150, 155 (quotation marks omitted). The Court emphasized the "significance of the different standards of proof that govern at trial and sentencing," explaining that an "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." Id. at 155 (quoting United States v. One Assortment of 89 Firearms, 465 U.S. 354, 361 (1984)). The Supreme Court explained:

> [I]t is impossible to know exactly why a jury found a defendant not guilty on a certain charge. "[A]n acquittal is not a finding of any fact. An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt. Without specific jury findings, no

one can logically or realistically draw any factual finding inferences."

Id. (quoting United States v. Putra, 78 F.3d 1386, 1394 (9th Cir. 1996) (dissenting opinion)).

Accordingly, this Court may rely at sentencing on the conduct underlying the conviction in the above-captioned case, as well as any facts it finds beyond a preponderance of the evidence, including acquitted conduct proven by evidence introduced at the defendant's 2015 trial on racketeering charges.

III.   Guidelines Analysis

As set forth in the PSR, pursuant to U.S. Sentencing Guidelines ("Guidelines") § 2K1.4(a)(2), the base offense level for the crime of conviction is a 20 because the arson of the vehicle created a substantial risk of death or serious bodily injury to the responding firefighters.  PSR ¶ 26.  In addition, based upon the defendant's role in the offense, he qualifies as an organizer, leader, manager or supervisor of criminal activity, such that Guidelines § 3B1.1(c) applies, adding two points.  PSR ¶ 29.  Finally, as set forth in greater detail below, the defendant willfully attempted to obstruct and impede the administration of justice with respect to the investigation and prosecution of the instant offense of conviction; pursuant to Guidelines § 3C1.1, an additional two levels are added.  PSR ¶ 30.  The total offense level is a 24.  PSR ¶ 34.

Based upon a Criminal History Category of II and a total offense level of 24, the defendant faces a Guidelines range of imprisonment of 57 to 71 months.[2]

---

[2] Although the plea agreement contemplated awarding the defendant three points for acceptance of responsibility, the Probation Department is correct that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant had not accepted responsibility for his criminal conduct[,]" absent extraordinary circumstances.  See Application Note 4 to § 3E1.1.  The government's calculation in the plea agreement was thus in error, which was contemplated by the plain terms of the plea agreement in paragraph 3, and the Court should find the correct Guidelines range of 57 to 71 months.  However, even if the Court does not find the obstruction of justice enhancement, should the defendant persist in denying his conduct relevant to the charged offense, he may otherwise be ineligible for a reduction for acceptance of responsibility.  See Application Note 1 to § 3E1.1.  ("In determining whether a defendant qualifies" for a two-point reduction for acceptance of responsibility pursuant to § 3E1.1(a), the Court can appropriately consider whether the defendant "truthfully admit[ted] the conduct comprising the offense(s) of conviction, and truthfully admit[ted] or not falsely den[ied] any additional relevant conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).")

IV.    Section 3553(a) Factors Weigh in Favor of a Significant Custodial Sentence

      A.    Nature and Circumstances of the Offense

          The crime of conviction perhaps best demonstrates the need for a significant sentence of incarceration in excess of fifteen years. On April 1, 2012, the defendant, then a soldier in the Bonanno family[3] was involved in a road rage incident in Howard Beach, New York. PSR ¶ 1. Asaro was traveling in a car, which was cut off by another car driven by John Doe. Id. Asaro's car began to follow John Doe aggressively through Howard Beach, and a car chase ensued for ten minutes. Id. John Doe described the incident, in sum and substance, saying [Asaro's] car was trying to drive him off the road and cut him off.[4] John Doe drove into Ozone Park, while trying to call the police and describe where he was. When John Doe arrived in an area he knew to contain a red light camera, he intentionally circled the block trying to set off the cameras in an attempt to alert the police to his location. John Doe believed a second car arrived on the scene to coordinate with Asaro's car and to try to box him in. Eventually, police responded, but the two cars that had been chasing John Doe were gone.

          Significantly, John Doe's account of the incident where Asaro and others chased him through Howard Beach, specifically their aggressive behavior and his fear, are corroborated by New York City Police Department records. Those records indicate that on April 1, 2012, John Doe called 911 and reported a car kept following him and trying to hit his car and that there were four guys in the car.

          On April 2, 2012, toll records indicate that Asaro contacted an associate of the Gambino organized crime family of La Cosa Nostra (the "Gambino family") who he knew to have access to local law enforcement databases. PSR ¶ 2. On April 3, 2012, a local law enforcement database accessed the license plate information for the plate of the car John Doe

---

    [3] At the time of the arson, the defendant had been a soldier in the Bonanno family for over thirty years. See infra, Section 4B1. Shortly after the arson, during an August 25, 2012 recording, the defendant bragged, "[t]hey made me a captain" and that he was on the "panel." GX 249, 249-T. All transcript pages of testimony of the prior trial proceeding are attached as Exhibit B and all exhibits admitted at the prior proceeding are attached as Exhibit C by exhibit number.

    [4] At the defendant's prior trial, the government introduced a November 7, 2011 consensual recording of another road rage incident involving the defendant, during which the defendant became incensed when a tow truck driver parked the tow truck "blocking a car wash on Cross Bay Boulevard." GX 234, 234-T. T 1224-26. During the interaction which took place approximately six months before the charged conduct, the defendant exited the car he was in and demanded the driver exit the two truck, screaming, "I'll kick your fucking head in you motherfucker you!" GX 234-T at 2. He also screamed, "Tell Charlie Vinny Asaro said it! Ronnie's uncle! I know where yous live you cocksuckers!" GX 234-T at 3.

was in on April 1, 2012, which revealed John Doe's address. Id. Toll records indicate that the defendant was in contact with the Gambino family associate within minutes of the license plate search. Video surveillance confirms that the defendant then met with the Gambino family associate at Tuscany Deli, whereupon the Gambino family associate provided the defendant with a piece of paper containing John Doe's address.

        On April 3, 2012, the defendant met with a then-Bonanno family associate at Tuscany Deli ("CW-1") and directed CW-1 to burn John Doe's car. Id. Video footage corroborates the defendant's meeting with CW-1 and depicts them getting into a car together and leaving the area of Tuscany Deli. The defendant then took CW-1 to show him where John Doe resided and to point out the car that had cut him off.

        In the early morning hours of April 4, 2012, CW-1, along with two individuals he recruited to help him burn the car (co-defendants John Gotti and Matthew Rullan) went back to John Doe's house and set his car on fire, as Asaro directed him to do. PSR ¶¶ 3-4. CW-1 set fire to the car by pouring gasoline on its hood as defendant Rullan threw lit matches on top of it. PSR ¶ 3. After the arson, CW-1 and the defendant reconvened at Tuscany Deli, and CW-1 advised the defendant that he had burned the car as directed. Id. ¶ 5.

        For John Doe, the arson of his car was a continuation of the nightmarish car chase he had been caught up in days earlier. He immediately linked the arson of his car with the road rage incident and felt fearful for his safety. In sum and substance, John Doe believed that based upon the timing and circumstances of the rage incident and the arson, he had angered individuals associated with organized crime and the arson was retribution for the incident on the road. The images of the arson of his car provide ample justification for his fear. See Exhibit D (photographs of John Doe's burned car).

        The defendant attempts to sanitize his crime, claiming that he "requested" CW-1 to set fire to the car after seeking and receiving the registration information of the other party's vehicle. See Def.'s Ltr. dated October 30, 2017 at 1, not filed on ECF. As an initial matter, the defendant's version of events omits his request to another LCN associate to search a law enforcement database for the registration information, a fact extremely salient to the nature of the charged offense and indicative of the defendant's reach within LCN.

        Next, the defendant characterizes his contact with CW-1 as a "request" to an individual "known to have committed arsons on previous occasions with no assistance from other individuals." Id. at 2. The defendant's claim that he "sought [] assistance," rather than directed CW-1, ignores the very nature of the organized crime hierarchy that the defendant operated in and benefitted from for his entire life, and oddly seeks to place more blame on CW-1, as if it were incumbent upon CW-1 to either refuse or, at the very least, burn the car on his own.[5] In fact, as the Court is well aware, at the time of the arson, the defendant had

---

[5] In rejecting the defendant's bail application, this Court stated:

been an inducted member of organized crime for over 30 years, having also inducted into the crime family his son Jerome Asaro and his nephew Ronald Giallanzo, who CW-1 was on record with at the time of the arson. Not only was the defendant a longtime inducted soldier of the Bonanno family in 2012, in the time period surrounding his purported "request" to CW-1, his star was again on the rise in the crime family, given waves of arrests that had decimated the leadership of the family. On August 17, 2012, just after the arson, the defendant was consensually recorded talking about his meeting with the new Bonanno family boss, who asked the defendant to be consigliere, one of the top three power positions in the Bonanno family. GX 240, 240-T at 3. In late 2011, before the arson, the defendant was recorded saying, "I think I'm the only wiseguy left in the neighborhood. Me, Jackie and uh, Noffi. That's three, who else does he got?" CW-2 responded, "The kid Mike," to which the defendant responded, "Yeah, but you know I'm saying people of substance." GX 219, 219-T at 8.

        The defendant approached CW-1 to commit the charged arson because he was aware of CW-1's status as an associate around Giallanzo, CW-1's desire to be inducted into the Bonanno family and CW-1's willingness to be involved in criminal activity. Consensual recordings demonstrate that prior to the arson, the defendant was aware of CW-1 and his status as an associate assigned to his nephew Ronald Giallanzo. T 1117-18, 1201. Indeed, a September 2011 consensual recording captured Bonanno family soldier Michael Palmaccio telling the defendant that Giallanzo and CW-1 had opened a club, which the defendant then went to and gambled at. GX 242, 242-T; GX 231, 231-T at 1. Moreover, in the defendant's opposition to the government's detention memorandum, the defendant characterized CW-1 as a "one man crime wave" whose crimes included murder conspiracy, narcotics distribution, weapons possession, multiple home invasions, three armed robberies, loansharking, arson and robbery. See Def.'s Bail Mem. at 13-14, not filed on ECF, attached at Exhibit E. Those statements are perhaps the best evidence of his knowledge of CW-1, whose criminal history and Giglio has, to date, not been disclosed by the government.[6]

---

        I am convinced that defendant is a long-time and powerful member of the Bonanno family. He was inducted into the family more than 30 years ago and held the position of Captain in the 1990s. Although he thereafter lost the Captain position, he remained a member of the family and approximately five years ago became a member of its administration or leading body.

See Exhibit A at 13-14.

[6] Again the defendant's denial of all of these facts relevant to the circumstances of the offense, including that he used his position in organized crime to effect the arson may jeopardize his eligibility for a reduction for acceptance of responsibility as set forth, supra, at footnote 2 on page 4.

B.  **History and Characteristics of the Defendant**

1.  **The Defendant is a Lifelong Criminal**

The defendant has lived a literal life of crime and, for most of his life, evaded punishment.  His background puts the charged crime in context and explains how this defendant came to have the power, authority and arrogance to seek revenge for a minor traffic incident by having an organized crime associate burn the offending party's car to a crisp.  As an eighty-year old man who has participated in racketeering, murder, robbery, extortion, loansharking, gambling and other illegal conduct, he has served less than eight years in jail.  PSR ¶¶ 36-57.  In his own words on an August 21, 2012 recording, the defendant told a cooperating witness ("CW-2"), "I'm a fucking friend 37 fucking years, a wiseguy.  And another 50 years before that.  Cocksuckers never did shit what I done in my life."  GX 248, 248-T at 12.  During a November 28, 2011 recording, the defendant explained himself even more clearly, while comparing himself to Antonio "Na Na" Bonventre, another inducted member of the Bonanno family, saying:

> He's probably—you don't even know he's straightened out.  Never did a fucking piece of work in his entire life.  Never fucking did nothing, fucking.  He was in this life, and fucking that was it, by name only.  Never did a fucking thing, never stole, never fucking had to steal. A lot of guys like that, god bless them.  My whole life I had to steal, I had to do everything.  I had to do everything.  He never cracked an egg in his fucking life.  He never did nothing illegitimate in his fucking life.  Never.

GX 236, 236-T at 11).  In his own words, the defendant acknowledged that he has earned his spot in organized crime by doing "everything," including stealing and murder ('cracking an egg').

Indeed, among the worst crimes committed by this defendant, in addition to the charged arson, are the 1969 murder of Paul Katz, the 1978 robbery of over $6 million in United States currency and jewelry from the Lufthansa Airlines Terminal at John F. Kennedy Airport and his lifetime of loansharking.  As set forth in brief below, the government has previously presented the Court with evidence of these crimes consisting of the defendant's recorded statements, cooperating witness testimony, physical evidence and eyewitness testimony, among other evidence, that proves the defendant's guilt by a preponderance of the evidence.  The Court should consider these crimes when sentencing the defendant for the charged offense because it is within this background of life experience that in 2012, he had the power and authority to order CW-1 to commit the arson.

a.    The Murder of Paul Katz

Lawrence Katz was five years old when his father disappeared. T 3039-69. His father, Paul Katz, was a truck driver who participated in truck hijackings and brought home different stolen merchandise, including electronics and fur coats. T 3044-36. He recalled his father unloading merchandise from trucks through the bedroom window of their home. T 3044-45. Lawrence Katz also recalled that in 1969, his father was arrested and then started having meetings with police officers, which caused his parents to argue. T 3045-50. On December 6, 1969, Paul Katz received a phone call and left his house, leaving his wife in a panic and his five children waiting in the dark. T 3064-65. Paul Katz was twenty-eight years old when he disappeared. T 3040. For over forty-five years, until the FBI recovered his remains in a house on 102nd Road in Queens, New York (the "Queens Residence"), Lawrence Katz's family had no idea what had happened to him or whether he was dead or alive.

Paul Katz was murdered and his body hidden away by the defendant and his good friend, criminal partner and notorious Lucchese family associate Jimmy Burke. CW-2 testified in detail about the defendant's request to meet secretly with Jimmy Burke at houses CW-2 was building on 102nd Road. T 718-719. When CW-2 met Burke and the defendant at the Queens Residence, they backed a car into the driveway of the Queens residence, went into the basement and asked CW-2 to keep watch. T 720. CW-2 described the basement floor as concrete poured over rebar and remembered as he waited, he heard a sledgehammer hitting the concrete. Id. When Burke and the defendant were done, the defendant took CW-2 to the defendant's fence company to get materials to cover the hole Burke and the defendant had dug. T 721. The defendant told CW-2 that he and Burke had strangled Paul Katz to death with a dog chain because Katz was a "rat," perceived to be cooperating with law enforcement. T 721-22. The defendant further told CW-2 that he had hit a water pipe with a breaking bar, indenting the pipe. T 722. CW-2 described how he covered the hole, which was oblong, with lime and cement. T 723.

CW-2 also testified that in the 1980s, the defendant called him to his fence company business and directed CW-2 to take his son Jerry Asaro and get rid of the body of Paul Katz. T 728-29. CW-2 went back to the Queens Residence with Jerry Asaro, which he accessed with a key provided by the defendant, and dug up Katz's remains, including corduroy material, and described how the body had seemed to be slumped forward into the hole. T 729-30, 1347-48.

CW-2's testimony was corroborated in every respect. First, the defendant's son Jerome Asaro pled guilty before Your Honor to moving Paul Katz's body on October 10, 2014. See Transcript of J. Asaro Guilty Plea, attached as Exhibit F. After being placed under oath, Jerry Asaro stated:

> From January 1968 to December 1987 I was associated with an
> enterprise whose activities affected interstate commerce and
> participated in the enterprise through a pattern of racketeering

9

> activity, that in fact knowing that a murder had been committed,
> I assisted persons in moving the body of that person after the
> fact."

Id.  In addition, forensic anthropologist and expert witness Bradley Adams testified that he went to the Queens Residence to execute a court-ordered search warrant and recovered human remains, including a fully articulated hand and teeth, as well as large pieces of concrete and fabric.  T 3119-3129, GX-143-1.  Based upon his review, the bones were consistent with an adult male and he submitted certain of the remains for DNA analysis.  T 3133-3139.  Frances Rue, a Criminalist with the Office of the Chief Medical Examiner, testified that she compared a DNA profile developed from the bones recovered from the FBI search of the Queens Residence to DNA samples from Paul Katz's family members and, based upon her analysis, concluded the DNA belonged to Paul Katz.  T 3143-3160.

Finally, on June 17, 2013, as the FBI began its search for the remains of Paul Katz at the Queens Residence, CW-2 made his last recording, during which he told the defendant, "[t]he feds are all over Liberty Avenue."[7]  GX 244, 244-T.  In the moment where the defendant understood that CW-2 was referring to the location of Paul Katz's body, he understood CW-2 was an informant and looked at CW-2 with disgust and hatred.  T 1353-54.  The defendant's last words to CW-2 were "Don't call me."  T 1354.

b.  The Lufthansa Heist

In 1978, the defendant planned and oversaw the robbery of millions of dollars in United States currency from the Lufthansa Airlines Terminal.  T 768-819.  CW-2 testified in detail about the planning and execution of the robbery, which was masterminded by the defendant's close criminal associate Jimmy Burke.  T 783.  CW-2 carried out the robbery with Burke's son Frankie Burke, who drove the black van that was used, and the rest of the robbery team, while the defendant and Burke waited nearby as the "crash car."  T 783-84.  CW-2 testified how he cut the chain link fence, letting the van carrying the robbery team into the warehouse area where he and Frankie Burke subdued several different employees who happened upon the robbery, including one who was pistol-whipped and one who was stopped at gunpoint and who were both then placed into the van and driven into the warehouse.  T 788-791.  CW-2 testified how the employees were kept in the lunchroom and a worker opened the vault door, which contained fifty boxes of cash in one hundred dollar denominations, sacks of jewelry and gold chains and foreign money that was all packed into the van.  T 791-92.  The robbery team took the money to CW-2's house, where certain of the team remained behind to count up the money and inventory the jewelry.  T 795-97.  They had successfully stolen over $6 million dollars and entrusted their "end" to close friends including "Johnny Tags" and "Ronnie."  T 804-11.  Jewelry, including gold chains, watches

---

[7] CW-2's testimony is corroborated down to the smallest detail.  For example, in the course of the FBI search, the agents observed a dented pipe, just as CW-2 described, in the course of their own search.  GX 142G, T 3085-86.

and rings, were given in tribute to members of organized crime, including Bonanno captain
Joseph Massino, and sold to Gambino soldier Tony Lee, who owned a gold store. T. 814-17.

        CW-2 was again corroborated in detail as to the manner of the robbery and the
division and storage of its proceeds. For example, Rolf Rebmann, who was a Lufthansa
Airlines employee present at the time of the robbery, confirmed that he was one of the
workers outside of the warehouse who was forced at gunpoint into a van. T 1745-49. John
Tagliaferro testified that he was a friend of the defendant's family and once while playing
cards at the defendant's social club observed the defendant with Jimmy Burke. T 1798-99.
Mr. Tagliaferro further testified that at some point between July 1977 and 1980, CW-2
brought him a small case and asked him to hide it in his house, which Mr. Tagliaferro did. T
1800-01. He also recalled that CW-2 came back and took money from the case and gave Mr.
Tagliaferro $100. T 1801. Eventually the defendant himself came to collect the case from
Mr. Tagliaferro's house. Id. Likewise, Ronald Ceschini testified that sometime before 1981,
CW-2 asked him to hold a bag he believed to contain paper for him. T 2429-30. Mr.
Ceschini held it at his parent's house until his parents found it and then he asked CW-2 to
pick up the package, which CW-2 did. T 2432-34. Mr. Ceschini felt obligated to hold the
bag because of CW-2's relationship with the defendant and specifically because, in sum and
substance, shortly before CW-2 requested he hold the bag, the defendant had helped Ceschini
when Ceschini felt threatened by someone he had a dispute with in the neighborhood. T
2427-32.

        In addition to the corroboration provided by Ceschini, Rebmann and
Tagliaferro, three additional cooperating witnesses testified about the defendant's
involvement in the Lufthansa Heist. See T 495-98 (testimony of cooperating witness
Salvatore Vitale) (In the 1970s, he drove then-Bonanno family captain Joseph Massino to
meet the defendant, who gave Massino gold jewelry, specifically gold chains, from the
Lufthansa Heist); T 2016-18 (testimony of cooperating witness Peter Zuccaro) (Frankie
Burke told Zuccaro that he drove the van in the robbery, that CW-2 participated for the
defendant and that, after the robbery, the defendant stole CW-2's "end" and blamed Burke);
T 2556-58 (testimony of Anthony Ruggiano) (Ruggiano's father told him that the defendant
and Burke brought jewelry from the Lufthansa Heist to him and "Tony Lee" at the gold
store).

        Recordings of the defendant also confirm his participation in this massive and
notorious armed robbery. For example, during a June 15, 2012 recording, the defendant had
the following exchange with CW-2 about the wake of Henry Hill, who had died:

        CW-2:        That's one last left of Lufthansa.

        ASARO:      Who?

        CW-2:        I said he's one less left of Lufthansa.

        ASARO:      Fuck him. Cocksucker.

| CW-2: | He made a big thing like he was there with us. |
| ASARO: | Yeah. |
| CW-2: | Fucking scumbag. |
| ASARO: | Piece of shit. |

GX 238, 238-T.  During a February 17, 2011 recording, the defendant spoke of the Lufthansa Heist again, saying, "It's life, we did it to ourselves, it's a curse with this fucking gambling. We never got our right money, what we were supposed to get, we got fucked all around, got fucked all around, that fucking Jimmy kept everything."  GX 218, 218-T.

c.  Loansharking

At the 2015 trial, the Court also heard ample evidence of the defendant's lifelong participation in loansharking and extortion and other organized crime-related rackets, specifically consensual recordings of the defendant's statements, cooperating witness testimony, victim witness testimony and other evidence.  For example, during a December 9, 2010 recording, the defendant described a confrontation with a Lucchese soldier and former captain; in his own words, the defendant told him:

The fucking motherfucker.  I said, "Who the fuck are you talking to, you cocksucker?"  "Oh, you can't talk to me like that."  "Who the fuck are you?"  He says, "I'm a friend."  "You ain't my friend."  "Fuck you, you cocksucker, you gotta learn the fucking rules.  I'm here thirty-five years. The only thing I got is my fucking age and you ain't gonna fucking bust my chops."

GX 216, 216-T.  This recording is compelling evidence of the defendant's power and prestige in organized crime in 2010, attending a sit-down with inducted members of organized crime and essentially cursing them out without repercussions.

On December 6, 2011, the defendant was consensually recorded going to collect money owed by a car business, saying:

I said, "Tell him not to be a fucking tough guys with me."  I says, "Listen to me, if I don't get my fucking money, I'll take it out on the cars."

GX 239, 239-T at 6.  Neither the defendant's age nor his health issues prevented him from seeking out the debtor and threatening his business.  He warned them against being "tough guys" and threatened to hurt the cars if the money was not paid.  This recording also

demonstrates that even before the arson, as a result of his years of participation in organized crime, the defendant had the means to carry out violence through his association with the Bonanno family, an enterprise he has been a member of since the late 1970s, and he was not hesitant to use those means and threaten others with them.

During a June 11, 2013 consensual recording, the defendant talked about a dispute he had with the acting boss of the Bonanno family, as follows:

> I had a big fight with him the other day. We had $30,000 coming, he took $15,000 of it. I want to kill this motherfucker. We had $30,000 coming, me, Jackie and Jerry. All right? He says, "Well without us we wouldn't have collected it." So we went for the money, gave me five, they gave him 15. He says, "You owe me two." Forget about the four, I owed him another two. All right? "I'm taking the two" I said, "Tom, I ain't got nothing, man" I says, "you're taking 15?" "Yeah, without me," he says, "you wouldn't a got nothing." GX 243, 243-T at 7.

The Court also heard from other witnesses about the defendant's lifetime participation in loansharking and extortion, including from some of his victim's themselves. See, e.g. T 750-54, 841-51, 945-52 (trial testimony of CW-2), T 2018-20 (trial testimony of Peter Zuccaro), T 2393-2407 (testimony of John Zaffarano).

### 2. The Defendant Continued His Conduct While Incarcerated

Even after being arrested in this case, the defendant persisted in his criminality, enlisting a co-defendant in a plot to murder a prosecutor in this case. The government intends to prove this conduct by a preponderance of the evidence, as required by the case law, through the presentation of evidence related to a confidential source and corroborating evidence, including video surveillance and Bureau of Prisons records.

A confidential source ("CS-1") was housed with the defendant at the MDC and certain of his co-defendants.[8] Over the course of a few days, the defendant told CS-1, among other things, about his prior case that resulted in an acquittal. See United States v. Asaro, 14-CR-26 (ARR) (E.D.N.Y.). According to CS-1, the defendant stated that his "rat cousin" showed law enforcement agents where the body of Paul Katz was buried. The defendant also threatened that, if he ever saw his cousin again, he would kill him.[9]

---

[8] CS-1 has previously felony convictions, including making a false statement.

[9] As the Court is aware, in the defendant's prior case, the defendant's cousin (CW-2) testified at trial as a cooperating witness about, among other things, the defendant's admissions regarding his participation in the murder of Paul Katz and the robbery of the Lufthansa Airlines terminal.

In addition to threatening his cousin, the defendant also made numerous threats about his prosecutor.[10]  Specifically, according to CS-1, the defendant told one of his co-defendants, who is a Bonanno associate, "We need to do something about this bitch [referring to the prosecutor], and not fuck it up like Vinny.  We need to handle this."  When the Bonanno associate told the defendant that they should talk about it later, the defendant continued to argue for the murder of the prosecutor, saying that for him, even a few years in prison could be a life sentence.  The Bonanno associate stated that "Vinny" was Vincent Basciano, also known as "Vinny from the Bronx."  Basciano, the former acting boss of the Bonanno crime family, is currently serving a life sentence for murder.  See United States v. Basciano, 05-CR-060 (E.D.N.Y.).  During the penalty phase of Basciano's death penalty trial, cooperating witnesses described how Basciano solicited and tried to direct the murder of his federal prosecutor.  See id., Gov't. Mot. Regarding Uncharged Penalty Phase Evidence, Dkt. No. 1200, at 14-19; see id., Penalty Phase Tr., at 8800-8806 (testimony of Joseph Massino), attached as Exhibit G.  According to CS-1, on another occasion, the defendant said to the Bonanno associate, "We need to handle this and do something about this bitch [a reference to the prosecutor]."  At that point, the Bonanno associate pulled the defendant aside and they spoke privately.

Accordingly, on at least two occasions since his incarceration, the defendant discussed having his prosecutor murdered, knowing that he was speaking to loyal Bonanno associates with an incentive to please him and the means to carry out such a heinous crime.  The defendant's words themselves are chilling, suggesting that he and the Bonanno associate "not fuck it up like Vinny," referring to Basciano's failed plot to murder his prosecutor.  This conduct, occurring within the last year, shows that despite the claims of ill health and agedness, the defendant remains a danger to the community and persists in his criminality, making time-served or a minimal jail sentence inconsistent with the aims of Section 3553(a) and inappropriate.

3.    The Defendant's Arguments Are Unavailing

In arguing for the equivalent of a time-served sentence, the defendant argues that (1) the crime was unrelated to the Bonanno family, (2) the defendant is a "very dedicated and loved family man," (Def.'s Ltr. at 6), and (3) the Bureau of Prisons ("BOP") cannot provide the health care the defendant requires.  Id. at 11.

First, the government has described, supra at Section VI.A, that the defendant was a well-known member of organized crime who asked a Bonanno associate, then assigned to the defendant's nephew Ronald Giallanzo, to burn the victim's car.  The Court should

---

[10] The defendant also bragged to CS-1 about being charged with the Lufthansa Heist and "beating" the case, saying, "We did it and got away with it."  The defendant spoke about committing crimes with Jimmy Burke and thirteen people that were killed after the Heist.  The defendant said that he had put in "work" (referring to carrying out a murder) but Burke was a stone-cold killer.

reject the defendant's thin attempt to word-smith his guilty plea to avoid responsibility for using his status in organized crime to carry out this serious crime. The defendant also chalks up the incident to "purely a matter of road rage." Id. at 2. However, the arson was not committed immediately in the hour after the incident or during the incident or by a random acquaintance of his. Rather, the defendant directed a Bonanno associate to burn the victim's car <u>days</u> later, evidencing his cold, calculating criminality.

Next, while there is no doubt that the defendant has the support of his family, his loyalty to his blood family has not been the governing principle of his life. During the defendant's trial, the Court heard the defendant talk about his induction of his own son Jerry Asaro into the Bonanno crime family and his relationship with J. Asaro, who he tapped to move the body of Paul Katz in the 1980s, a crime to which J. Asaro pled guilty and for which the Court sentenced him to seven and half-years in jail. Using his son to cover up a murder is perhaps the best example of the regard the defendant bears his blood family.[11]

Finally, while the defendant has suffered from health problems to be sure, none of the problems described by the defendant are untreatable within the Bureau of Prisons. <u>See</u> Exhibit H, Letter from John Manenti, Northeast Regional Medical Director. Additionally, certain of the facts proffered by the defendant about unnecessary surgery during his prior period of incarceration should have been addressed with the Court and the government during the period of his prior incarceration if they, in fact, occurred and should not be considered evidence that the defendant's medical concerns will be ignored.[12]

C.      Other Section 3553 Factors

In addition to considering the defendant and the crime, Section 3553(a) directs the Court to consider the need for the sentence imposed: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant." All of these factors counsel in favor of a significant custodial sentence for this defendant, even at his age and with his described-health.

---

[11] While the defendant makes much of the businesses he owned and his lifelong employment, his reported earnings to the government for the years 1970 through 2016 (excluding the short time he was incarcerated) averages just over $5,000 per year. In fact, the information provided by the defendant regarding his employment demonstrates the alternatives the defendant had to the life of crime he chose. Had he put the same time and energy into lawful business pursuits, including his fence companies, he would not be in the position he now finds himself.

[12] As of this date, the government does not have sufficient information to respond to the allegations raised by the defendant related to his treatment during the prior period of incarceration.

The offense is inherently quite serious- a crime in which an organized crime family member used a local law enforcement database to facilitate the arson of a car who had cut him off in traffic. Were the Court to do what the defendant asks – and sentence him to time served – or even a sentence within the advisory Guidelines range, given the credit the defendant will receive for his prior period of incarceration, such leniency would not promote respect for the law or provide just punishment for the offense.[13] At a July 2009 sentencing of a Colombo family captain, the Honorable Jack B. Weinstein imposed a sentence of 120 months, significantly above the Guidelines range of 63 to 78 months, and observed the following:

> I believe that under these circumstances, ten years is a sentence
> that is appropriate, not too long, not too great, and anything less
> would not send a message. The people, the youngsters in this
> city have to understand that they cannot join this organization
> and that when they do they destroy their lives.

United States v. Uvino, 07 CR 725 (JBW). Here, given both the crime of conviction and the defendant's decision post-arrest to attempt to obstruct his prosecution for a violent offense by harming his prosecutor, a sentence of less than fifteen years' imprisonment will not deter this defendant or others from engaging in similar conduct.

---

[13] In that case, the defendant would serve significantly less time than his son, who remains incarcerated on a 90-month sentence for helping his father move the body of Paul Katz, which seems especially unjust.

V.    Conclusion

      For the reasons set forth herein, the government respectfully submits that the defendant be sentenced to a term of incarceration in excess of fifteen years.

<div style="margin-left:40%">

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney

By:        /S/
       Nicole M. Argentieri
       Lindsay K. Gerdes
       Keith D. Edelman
       Assistant U.S. Attorney
       (718) 254-7000

</div>

cc:    Defense counsel (by ECF and Email)
       Clerk of Court (by Email)

# EXHIBIT E

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,      : 17-CR-127 (AR)
                               :
           Plaintiff,          :
                               : United States Courthouse
      -against-                : Brooklyn, New York
                               :
VINCENT ASARO,                 :
                               : Friday, December 28, 2017
           Defendant.          : 2:00 p.m.
- - - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE ALLYNE ROSS
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:        BRIDGET ROHDE, ESQ.
                           Acting United States Attorney
                           Eastern District of New York
                           271 Cadman Plaza East
                           Brooklyn, New York 11201
                           BY:  NICOLE M. ARGENTIERI, ESQ.
                                LINDSAY K. GERDES, ESQ.
                                KEITH DANIEL EDELMAN, ESQ.
                                Assistant United States Attorney

For the Defendant:         ELIZABETH E. MACEDONIO, P.C.
                           40 Fulton Street, 23rd Floor
                           New York, New York 10038
                           BY:  ELIZABETH E. MACEDONIO, ESQ.

                                        AND

                           CARLA SANDERSON LAW
                           260 Madison Avenue, Floor 22
                           New York, New York 10016
                           BY:  CARLA M. SANDERSON, ESQ.

Court Reporter:            DAVID R. ROY, RPR
                           225 Cadman Plaza East/Brooklyn, NY 11201
                           drroyofcr@gmail.com

Proceedings recorded by Stenographic machine shorthand,
transcript produced by Computer-Assisted Transcription.

```
                    Proceedings                    2
```

1           (In open court.)

2           THE COURTROOM DEPUTY:  United States of America

3  against Vincent Asaro, Docket Number CR-17-127.

4           Counsel, please state your name for the record.

5           MS. ARGENTIERI:  Good afternoon, Judge.  Nicole

6  Argentieri, Lindsay Gerdes, and Keith Edelman for the

7  United States.  With us at counsel table are special agents,

8  FBI Special Agents Robert Ypelaar, Y-P-E-L-A-A-R, and Adam

9  Mininni.  And also present is Probation Office Kristen

10 McKeown, which is M-C-K-E-O-W-N -- yes?

11          MS. MCKEOWN:  Yes.

12          MS. ARGENTIERI:  Okay.

13          MS. MCKEOWN:  Good afternoon, Your Honor.

14          THE COURT:  Good afternoon.

15          MS. MACEDONIO:  Good afternoon, Your Honor.

16 Elizabeth Macedonio and Carla Sanderson.

17          THE COURT:  Good morning.

18          MS. MACEDONIO:  As the Court is aware,

19 Ms. Sanderson is participating in the mentoring program here

20 in the Eastern District.  And with the Court's permission,

21 she will be speaking in part today.

22          THE COURT:  Yes, that would be lovely, Counsel.

23          MS. MACEDONIO:  Thank you.

24          THE COURT:  I have received the presentence

25 report; two addenda to the presentence report; a submission

Proceedings                                  3

1   dated October 30th from you, Ms. Macedonio, which annexes a

2   great number of exhibits; a December 13th letter from you; a

3   December 13th letter from the Government.  There is the

4   lengthy -- I am sorry, I did not bring it up -- but

5   the Government's addenda to its sentencing letter; another

6   letter dated December 19th from you, Ms. Macedonio.  I did

7   not bring the volume up.  There is a volume in the letter

8   that was not brought up.

9           Is that the complete sentencing record?

10          MS. MACEDONIO:  There is also a letter from me

11  dated December 20th.

12          THE COURT:  Is that what related to the bail

13  issue?

14          MS. MACEDONIO:  Yes.

15          THE COURT:  The health issues?

16          MS. MACEDONIO:  Yes.

17          THE COURT:  I read that.

18          Is that a complete sentencing record?

19          MS. MACEDONIO:  For Defense, yes.

20          MS. ARGENTIERI:  And, Your Honor, just a note for

21  the record, the date of our lengthy sentencing submission

22  was November 20, 2017.

23          THE COURT:  Yes.

24          MS. ARGENTIERI:  Okay.

25          THE COURT:  Okay.  I have read that.

```
                        Proceedings                    4
```

1          Ms. Macedonio, I am sure you reviewed all of that

2    with your client; is that correct?

3          MS. MACEDONIO:  That's correct, Judge.

4          THE COURT:  Okay.

5          Mr. Asaro, are you satisfied that you have had

6    enough time to go over with Ms. Macedonio everything that I

7    just mentioned and everything else that you believe is

8    related to your sentence?

9          THE DEFENDANT:  Yes.

10         THE COURT:  Okay.

11         All right.  Ms. Macedonio, why don't you go ahead

12   or with assistance, go ahead.

13         MS. MACEDONIO:  Judge, I'm going to begin and then

14   I'm going to have Ms. Sanderson make some comments on the

15   law.

16         THE COURT:  Okay.

17         MS. MACEDONIO:  I know that this case has been

18   fully briefed and I know Your Honor has studied it

19   carefully, so I am not going to repeat every ailment of

20   Mr. Asaro.  I certainly had a log in my submission.  But

21   what it comes down to, Judge, is Mr. Asaro is here today to

22   be sentencing for an arson.  He is sentenced for an arson

23   that occurred five and a half years ago, a crime which

24   occurred on a public street in which no one was hurt.  This

25   is a crime for which he quickly accepted responsibility for.

Proceedings                                5

1   The parties now agree that his guideline range is 33 to 41

2   months, but as he approaches his 83rd birthday and his

3   health is rapidly deteriorating, the Government is asking

4   for a sentence in excess of 15 years.  What they are really

5   asking for, Judge, is a life sentence for an arson.

6            The Government is not asking you to consider

7   acquitted conduct.  They are not asking you to sentence --

8   they are not asking you to consider the acquitted conduct of

9   3553(a) factors.  Really what they are asking you to do,

10  Judge, is to sentence him for the acquitted conduct.  They

11  are not asking you to sentence him for the crime of

12  conviction.  They are asking you to sentence him purely to

13  crimes that he was acquitted of which allegedly occurred 50

14  and 60 years ago.

15           The law calls for the sentence to be imposed upon

16  Mr. Asaro to be sufficient, but not greater than necessary

17  for the crime of conviction.  His sentence must be

18  reasonable under all of the factors, but under no test,

19  under no test can what the Government -- for what the

20  Government is asking for can be deemed to be reasonable, and

21  there is a reason for that.  In essence what the Government

22  is asking you to do, Judge, is to take the American Justice

23  System and turn it on its head.  They are asking that when a

24  defendant is acquitted of conduct, the Government can then,

25  years later, indict him for something else and then have him

Proceedings                                                    6

1   sentenced for all of the crimes that he was acquitted of.

2   What they are asking for is simply unprecedented, and they

3   cite you no case which allows for such an outcome.

4          With the Court's permission, Ms. Sanderson is

5   going to address the law.

6          MS. SANDERSON:  Yes, Judge.  In the *Watts* case and

7   all the cases of precedence, those are cases having to do

8   with calculation of relevant conduct under the guidelines,

9   and under *Watts*, which is a specific case that permits that,

10  the conduct is permitted to be included as relevant conduct,

11  not for punishment for that acquitted conduct --

12         THE COURT:  No, right.  But as it relates to the

13  individual and --

14         MS. SANDERSON:  As it relates --

15         THE COURT:  -- as it relates to the sentencing

16  factor --

17         MS. SANDERSON:  Correct.

18         Specifically in *Watts* with regard to manner of

19  commission of the crime to relevant conduct that was

20  acquitted with relevance in that case and a line of cases,

21  such as in *Vaughn*, increasing a drug resource, for example,

22  which is -- it is really distinct from what the Government

23  is asking the Court to do in this case, which is to consider

24  acquitted conduct from a past trial, a past case that has

25  nothing to do with the manner in which the arson crime was

1  committed.

2        THE COURT:  But that was not exactly how I

3  understood the Government's argument, honestly.  But I will

4  let them speak for themselves.

5        Anything further from the lawyers?

6        MS. SANDERSON:  No, Your Honor.

7        MS. MACEDONIO:  But I would just like to turn to

8  the 3553(a) factors.

9        THE COURT:  Yes.

10        MS. MACEDONIO:  I mean, I think it is very clear

11  that Mr. Asaro is an ill man.  I have brought with me just

12  the medical records that I have received from the MDC since

13  his March incarceration.  Just for the record, there is

14  probably eight inches of medical documents here.  I did not

15  submit them as part of my sentencing submission.  They are

16  here if anybody wants to review them, but that is what they

17  are.

18        He has been to the hospital five times since

19  March.  Since his incarceration in 2014, it is clear that

20  the Bureau of Prisons, despite what they say, they are

21  simply incapable of caring for him.  He had kidney stones,

22  and they botched it to such a degree that -- they shackled

23  him to a bed for a week and removed his prostate instead of

24  just the kidney stone.  He then was sent to the hospital

25  during a discharge of incarceration for what was called

1  cardiac testing.  Again, an 82-year-old man shackled to a

2  bed with no participation from his family for a week, and

3  then he had a stent put in.  After that extremely dangerous

4  surgery --

5          THE COURT:  Did you ever confirm -- when you said

6  presumably the stent was put in, did you ever confirm that?

7          MS. MACEDONIO:  I was unable to confirm that

8  because the medical records are just unclear.  He underwent

9  some --

10          THE COURT:  I assumed there was a reason you did

11  not give me the records.

12          MS. MACEDONIO:  Yes.

13          And he then returned to the MDC and put in the SHU

14  with no medical care at all.  I mean, their idea of medical

15  care is let's test his pressure.  If it's dangerously low,

16  we will either ignore it, or maybe we will send him to the

17  hospital, or they will adjust his medication to make it

18  dangerously low.  He is not receiving medical care, Judge.

19  There is just no other way to describe it.  Again, yesterday

20  his blood pressure was tested.  It is dangerously high.

21  It's at stroke level, and they just sent him back to the

22  unit.  They are not caring for him; I mean, certainly not in

23  any medical standard that is appropriate in this country.

24          I think in looking forward what we need to

25  consider is not only his medical condition, but his advanced

Proceedings                                          9

1   age and what was going on in his life between his acquittal

2   in November of 2015 and his re-arrest in March of 2017, what

3   was Vincent Asaro doing?  Well, there was no big welcome

4   home party.  There was no indication that he was caught up

5   in the ongoing investigation of the Bonanno crime family

6   that clearly was going on since there were subsequent

7   indictments.  He was home cooking meals for his family,

8   going to medical appointments.  He had no unexplained

9   wealth.  He didn't even have a car.  Whatever his life was

10  in the past, it was over.  He was home taking care of what a

11  man at 82-year-old -- at 82 years of age needs to take care

12  of, his health.

13          Quite frankly, Judge, I think that the guideline

14  sentence in this case is more than appropriate.  I think

15  that is what is called for in this case, and that is what he

16  should be sentenced to.

17          Unless the Court wants to hear something else?  I

18  just don't want to keep repeating everything that I have --

19          THE COURT:  No, I understand, because it was all

20  within your papers.

21          MS. MACEDONIO:  And we have briefed this fully.  I

22  think the guideline sentence is appropriate.

23          Thank you, Judge.

24          THE COURT:  Mr. Asaro, is there anything you would

25  like to say?

1          THE DEFENDANT:  I have a piece of paper.

2          THE COURT:  You can read something, sure.

3          THE DEFENDANT:  I would like to apologize for the

4   car that was burned.  It was a stupid thing I did.  I'm

5   terribly sorry.  I was on my way home, it happened.  It just

6   got out of hand.  I was two blocks from my house and was,

7   you know, cut off, and I'm terribly sorry, all right?

8          What my life was in the past, I honestly have to

9   say it's over.  I'm going to be 83 in two months.  And

10  that's it.  I would like to apologize to the Court, and

11  thank you for this speaking opportunity.

12         THE COURT:  Ms. Argentieri?

13         MS. ARGENTIERI:  Judge, on the law, I'm not sure

14  if you want to just hear from us on the law.  But we cited

15  *Watts* for the proposition that basically the Court is not

16  bound by the jury's verdict.  It can considered acquitted

17  conduct.

18         THE COURT:  I understand that.  I think the law,

19  however it is, is very clear.

20         MS. ARGENTIERI:  Okay.

21         THE COURT:  And it will remain quite clear.

22         MS. ARGENTIERI:  Okay.  So I'm not going to -- I'm

23  not going to belabor that.

24         THE COURT:  Okay.

25         MS. ARGENTIERI:  So, Judge, you know, in speaking

1    about today, you know, what is the sentencing?  What is the

2    Court supposed to consider at sentencing?  And I think that

3    what you've just heard from the defendant and defense

4    counsel is they want you to take a snapshot of Mr. Asaro

5    today and say sentence him as he sits here in this chair.

6    And that's not what a 3553(a) or Congress really directs us

7    to do.  What it says quite clearly is you're supposed to

8    look at the history and characteristics of the defendant.

9    That's in their statue.  Who is this defendant?  What

10   choices has he made?  How did he live his life?  And you

11   know, Judge, you know better than anyone, it wasn't as a

12   working man or working legitimate jobs supporting his

13   family.  That's absurd.

14          You know, and it's true that today he is elderly

15   and he is sick, but he is not beyond the care of the

16   Bureau of Prisons.  I spoke to them today.  They gave me a

17   quite a different picture of his blood pressure yesterday,

18   and they said that, in fact, and this was attached to our

19   filings, there are four levels of care that are required by

20   defendants in custody, 4 being the worst.  They had assessed

21   him at a Level 2.  So they are more than qualified to care

22   for his medical needs.  And while he may be -- prefer at

23   this point in his life -- it would be more comfortable for

24   him to be treated by a private physician, that's just not

25   the standard at sentencing.

1        This defendant has dedicated his life to crime and

2    a crime family.  And, Judge, you've heard that on recording

3    after recording in his own words.  Those were crimes that

4    paid for his life, his children's lives, his gambling habit.

5    Crime, quite simply, has paid for this defendant.  And you

6    heard him on recording after recording.  His age, he was --

7    it was not a handicap for him in organized crime.  It wasn't

8    when he committed this arson a couple years ago, and it

9    hasn't been for the years before that.  You heard him on

10   recording after recording saying, I'm here for 30 years.  I

11   am only -- all I got left is my age.  I'm only -- the only

12   wise guy left in the neighborhood.

13        And, you know, while it's true that having the

14   defendant be in jail is sad for his blood family, and that

15   is a difficult thing, that's true for all families, and it's

16   really a result of his own choices.  You know, if you look

17   at the choices he made, he inducted his own son into the

18   crime family.  He taught him the life.  It's because of his

19   choices that his son sits in jail serving a 90-month

20   sentence that you give him, Judge, for moving the body of

21   Paul Katz.  That's who the defendant is.  That's his history

22   and characteristics.  Not only did he induct his son into

23   the crime family, he directed him to move the body, and his

24   son is serving that time for what he asked him to do, for

25   what he taught him.  And that is not even getting into the

Proceedings                                              13

1    impact of what the defendant did to the Katz family.  And I

2    think that that is a murder that everyone knows that he

3    committed.  We proved it at trial through recordings,

4    witnesses, and expert testimony, and his son stood in the

5    courtroom and told you that he moved that body.

6              This defendant has never been held accountable for

7    his history and characteristics.  History and

8    characteristics that empowered him, emboldened him at the

9    age of almost 80 to commit the crime he committed in this

10   case.  That's why it's relevant.  That's why at almost 80

11   years old, he could commit this arson, which wasn't

12   something that happened in a flash of anger.  It wasn't he

13   was on his way home and all of a sudden, the car was burned.

14   It happened over the next few days.  What happened in

15   this -- and that leads us to the nature the circumstances of

16   the effect, the other thing that 3553(a) directs us to look

17   at:  How did he come to be 80 years old and able to order an

18   organized crime associate to burn a car of a civilian?  How

19   did that happen?  You know, this is something that happened

20   within the last couple of years.  It's not an ancient crime

21   we're asking you to sentence him for.  He used his position

22   and reputation as a respected wise guy in the neighborhood,

23   a reputation earned through years of committing crimes, the

24   lure that is Vincent Asaro, the Lufthansa heist, loan

25   sharking, bookmaking, all of it.  And someone cuts him off

1    in traffic, and what does the defendant do?  He chased him

2    through the neighborhood.  The man was in fear for his life.

3    He called 911.  His started trying to activate the red light

4    cameras because he wanted the police to come, and he was

5    terrified and he should have been.

6           What did the defendant do next?  He called upon

7    the means of his crime family, means that were available to

8    him because of his position.  He contacted a Gambino

9    associate with ties to the NYPD.  He had the license plate

10   run of the person who cut him off in traffic.  Think about

11   that.  He is corrupting our institutions that are there to

12   protect people, and he can do that because of who he is,

13   because of his life of crime.

14          And then -- you know, and that just shows how

15   dangerous he is, even -- I know it's, like, laughable.  He's

16   80, he's not dangerous.  He accomplished this crime at a

17   very severe age, and it's a very dangerous crime.  It's a

18   dangerous crime.  And he reaches out to CW Number 1, who

19   this defense counsel has referred to in another case as a

20   one-man crime wave.  He's -- and -- and he's a benign

21   associate at the time.  He's just started out in organized

22   crime.  He's building his representation.  He's in robbery,

23   bookmaking.  He's a young Vincent Asaro in the making.  And

24   the defendant trades on his street cred and association with

25   the crime family and the desire of CW 1 to be just like him,

Proceedings                                                    15

1    to be a made guy.  And he tells him, Go burn the car.  And

2    that's just what CW 1 does.  And that is the circle of

3    organized crime, Judge.  It goes round and round and round,

4    generation after generation.

5           And that brings us to deterrence.  That's the

6    other thing that 3553(a) directs us to do.  This defendant

7    was incarcerated from his arrest in January of 2014 to his

8    acquittal in November of 2015.  The defendant is going to

9    received credit for that 22 months that he was in jail and

10   for the seven months or eight months he had been on the

11   case.  If you sentenced him to time served for four to five

12   years, the guideline sentence, he is going to walk out that

13   door.  And, Judge, that is not justice in this case.  It is

14   just not.  This is a notorious crime figure.  He has engaged

15   in a lifetime of crime, and he has served in his entire life

16   less than nine years in jail.

17          At the time, LCNs, they're watching, all the

18   people who are about to be the next generation who revered

19   this defendant, it's time to send a message.  It's time to

20   break the circle.  This defendant walked out of the

21   courtroom in November of 2015.  He walked out to cameras and

22   press attention, and what did he say?  He joked about a body

23   being in the trunk of the car.  He was a hero to everyone in

24   his neighborhood.  And it's time for you today, Judge, to

25   send a message.  General deterrence in this case, the

Proceedings                                            16

1    importance of it, cannot be understated.

2              And then finally, Judge, you know, Congress

3    mandated that for the crimes that the defendant committed --

4    for the crimes he pled guilty to, sometimes no time would be

5    appropriate, and sometimes 20 years would be appropriate.

6    And that causes you to question, in what cases did they

7    think 20 years would be appropriate?  And, Judge, this is

8    that case.  He's got associates in the region for the

9    violent criminal organization, the only family he ever cared

10   about.  You know that from recording after recording.  He is

11   not worrying about his family.  You know, he is complaining

12   about his son constantly who is now serving a 90-month

13   sentence for something he asked him to do.  This is a crime

14   in which he used the sophisticated means.  He used a law

15   enforcement database to victimize a civilian.  If not in

16   this case, a sentence above 15 years, then when?

17             And so, Judge, I think that what we are asking you

18   today is just to hold him accountable for who he is now, for

19   the choices that he has made that gave him the power he had

20   to commit the crime he pled guilty to, which is the life he

21   has lived and the lives that he has ruined.

22             Thank you.

23             MS. MACEDONIO:  May I respond briefly?

24             THE COURT:  Sure.

25             MS. MACEDONIO:  I think the Government's

Proceedings                                    17

1    presentation really brings it home that it is not about the

2    arson.  It's merely about the acquittal, you know, what he

3    said when he left the courtroom.

4              THE COURT:  I do not think she is saying -- I am

5    just telling you how I understand her.  I understand her to

6    be referring to the statutory factors, the history and

7    characteristics of the defendant.  That is how I understand

8    it.

9              MS. MACEDONIO:  When she makes the comment such

10   as, He -- quote, He killed Paul Katz, and everybody knows

11   it, clearly that is not the case.  And so as the Government

12   sits there, and he just -- take Mr. Edelman out and put

13   Ms. Cooley there, it is the same group of people that have

14   brought this case again.  The arson that he is going to be

15   sentenced for and the time that he receives for that should

16   be reasonable under the standard set forth by the sentence

17   served.  We also cannot have a situation where we are

18   creating a complete disparity in sentencing between the

19   other two defendants that are going to be sentenced for

20   this.

21             I ask that Your Honor sentence him to the

22   guidelines in the sentence given all the 3553(a) factors,

23   including his health.

24             THE COURT:  Vincent Asaro is before me for

25   sentencing after pleading guilty to a travel act violation

1    under 18 U.S.C. Section 1952(a)(3)(b).  Specifically, he

2    allocuted to using a telephone in interstate commerce to

3    direct that Bonanno Family associates set fire to a car.

4    This case does not mark the first time that Mr. Asaro has

5    been in my courtroom.  I was the judge who presided over his

6    trial in October to November of 2015 for numerous *Rico*

7    violations that occurred over the course of 45 years,

8    between 1968 and 2013.  The testimony and other evidence at

9    that trial, which I will discuss further later, was that the

10   defendant was a long-time member of the Bonanno Family, who

11   committed numerous violent acts, rose to the level of

12   captain, and eventually acted as a member of the commission.

13            The guidelines range in this case is undisputed.

14   Both parties, as well as the Department of Probation, now

15   agree that the defendant has a criminal history category of

16   2 and an adjusted offense level of 19, with a base offense

17   level of 20, a two-point increase for an aggravating role,

18   and a three-point decrease for acceptance of responsibility.

19   This makes his guidelines range of imprisonment from 33 to

20   41 months.  I agree with the calculations.

21            But this is not the end of the sentencing inquiry.

22   Under *Booker and Gall*, I also must consider the various

23   factors enumerated in Section 3553(a) in order to fix an

24   appropriate sentence in this case.

25            First among these factors are the nature and

1  circumstances of the offense and the history and

2  characteristics of the defendant.  Both weigh heavily toward

3  granting the upward variance requested by the Government.

4  The facts of this case are simple and largely undisputed.

5  While driving in Howard Beach on April 1st, 2012 Vincent

6  Asaro got into a road rage incident with another motorist.

7  Mr. Asaro followed the other man's car for a protracted

8  period, got his license plate, had a Bonanno Family associate

9  run the plate in a law enforcement database to determine the

10 other motorist's home address, and then directed a Bonanno

11 Family associate to set fire to the motorist's car.  The

12 defendant says in his sentencing memorandum that he requested

13 that the car be burned as opposed to directing it, and he did

14 not know that Matthew Rullan and John Gotti would be involved

15 in the arson.  But these are distinctions without a

16 meaningful difference.  The relevant conduct is that the

17 defendant asked that a car be set on fire solely because its

18 driver had cut him off in traffic, and someone else carried

19 out his will.  And the defendant was able to command others

20 to do this deed for him because he was a high-level member of

21 the Bonanno Family who has been active in mob-related

22 activities for over forty years.

23          I see no mitigating circumstances to this crime.

24 The arson was a senseless act of violence that suggests that

25 the defendant poses a significant and ongoing threat to the

Proceedings                                                    20

1   general public.  I find it troubling that Mr. Asaro nursed

2   enough of a grudge from simply being cut off in traffic that

3   he not only followed a member of the public for an extended

4   period, terrorizing him, but also had an associate find out

5   his home address and then ordered the man's car to be burned

6   to a crisp days later.  I also find concerning that, despite

7   his relatively advanced age and supposed infirmities, the

8   defendant continued to wield the power to direct or request

9   other people to carry this act out.  This act shows that as

10  recently as 2012, Mr. Asaro not only had an explosive temper,

11  but he also had the ability to carry out his threats and the

12  desire to carry out revenge after the heat of the moment had

13  passed.  Defense counsel argues that Mr. Asaro has

14  "outbursts" but quickly becomes calm again.  This crime shows

15  that his anger does not always soon subside.

16          None of this is surprising, however, when viewed in

17  the context of the history and characteristics of the

18  defendant.  The testimony and other evidence introduced at

19  his 2015 trial showed not only just by a preponderance of the

20  evidence but by overwhelming evidence that Mr. Asaro has

21  lived a life of violence.  As trial judge, I had the

22  opportunity to observe the demeanor of the witnesses and to

23  make first-hand assessments of their credibility.  And I have

24  since reviewed my notes and the transcript from the trial.  I

25  was particularly impressed by the testimony of Mr. Asaro's

1   cousin, Gasper Valenti.  Although Mr. Valenti was a

2   cooperating witness for the Government, his testimony was

3   forthright, credible, and corroborated in numerous details.

4   I also note that the testimony of the Government's witnesses

5   in the 2015 trial were corroborated not only by other

6   witnesses, but also by audio recordings of the defendant by

7   Mr. Valenti, who wore a wire, among other things.  In these

8   recordings, the defendant boasted of being a "wise guy" for

9   numerous years and of the dirty deeds he had done to earn his

10  place in the mob.

11          I give particular weight to two crimes committed by

12  the defendant, the murder of Paul Katz and the Lufthansa

13  heist.

14          Mr. Valenti testified that the defendant said that

15  he and Jimmy Burke had strangled Paul Katz to death because

16  Katz was cooperating with law enforcement.  Mr. Valenti

17  described standing watch as the defendant buried Katz's body,

18  and how he later poured lime and cement over the hole.  He

19  also testified that the defendant had told him and the

20  defendant's son, Jerome Asaro, to move the body in the 1980s

21  and that they did so.  This testimony was corroborated by

22  Jerome Asaro's guilty plea before me where he admitted to

23  moving the body of a person he knew to have been murdered.

24          Valenti's testimony was also corroborated by

25  significant physical evidence.  A forensic anthropologist,

1  Bradley Adams, testified that he recovered human remains of

2  an adult male from where Valenti said they buried the body.

3  And a criminalist, Frances Rue, who testified that based on a

4  comparison of the DNA of Katz's family members, the DNA

5  profile that she developed from these remains appeared to be

6  that of Paul Katz.

7          As for the Lufthansa heist, Mr. Valenti credibly

8  testified that the defendant played a leading role.  Again,

9  this testimony was amply corroborated.  For example,

10  cooperating witnesses Salvatore Vitale and Anthony Ruggiano

11  testified that the defendant had jewelry from the

12  Lufthansa heist.  And most damningly, the defendant himself

13  corroborated his involvement in his comments about the wake

14  of Henry Hill, whose life was the basis for the film

15  *Goodfellas*.  In a recorded conversation with Valenti, the

16  defendant implicitly admitted, in highly profane terms, his

17  involvement in the Lufthansa heist.  These are but the two

18  most dramatic incidents in a long life of crime, but two are

19  enough to make the point.

20          I also note that, while these two incidents took

21  place many years ago, the testimony at the defendant's 2015

22  trial established that he remained involved in loansharking

23  up until 2013.  And his guilty plea in this case showed that

24  he remained a powerful player within the Bonanno Family,

25  capable of orchestrating violent acts as of 2012.

Proceedings                                23

1        Although the defense is correct that I am not
2    required to consider this acquitted conduct in sentencing
3    Mr. Asaro, I will exercise my discretion to do so. I am
4    mindful of the weight that I must give to the jury's verdict
5    of acquittal, but I nonetheless am firmly convinced that
6    the Government proved Mr. Asaro's conduct by more than a
7    preponderance of the evidence. And I can imagine few things
8    that are more relevant to the factors that I must consider
9    under Section 3553(a) than the defendant's lifelong history
10   of violent crime. This conduct also shows that the
11   guidelines significantly underestimate Mr. Asaro by assigning
12   him to a criminal history category of 2.
13        Given Defendant's history, I do not credit the
14   defense's assertion that Mr. Asaro has become a changed man
15   since this crime took place in 2012. He is now 82, but he
16   was already 77 years old at the time of this offense.
17        On the other side of the ledger, Mr. Asaro's poor
18   health and advanced age are significant mitigating personal
19   characteristics. I must give these factors considerable
20   weight because they mean that each year of imprisonment will
21   be harder on him than they would be on a younger and
22   healthier man.
23        I will not summarize the defendant's entire medical
24   history, but the list of medications he takes is long.
25   Alongside the aches and pains and indignities of aging, he

1    also suffers from more serious health conditions, including

2    hepatitis C, hypertension, and serious cardiac problems.  He

3    underwent a triple bypass in 2013, and then had another heart

4    surgery in 2016.  Heart problems run in his family.  His

5    father and only brother both died at a relatively young age

6    of heart attacks.  His mother died of an aneurysm in her

7    heart, and his three sisters all have heart problems.

8           Although counsel has not provided any recent

9    medical records, I credit her assertions that defendant's

10   health has been deteriorating during his time at the

11   Metropolitan Detention Center.  But I do want to indicate

12   that my staff has been in communication with officials at

13   MDC.  We were informed them that defendant's recent

14   hospitalizations have been due to trouble with his blood

15   pressure medications, that they have adjusted his medication

16   regimen, and that his most recent blood pressure readings

17   were normal.  I don't know what happened today, but I am

18   speaking about the time that I was notified, which was

19   several days ago.  I do have confidence that he will receive

20   better medical care at a federal correctional institution.

21          As for the letters from friends and family

22   submitted with the defense sentencing memorandum, I do give

23   them some but marginal weight.  Mr. Asaro may well be a

24   loving man to his family, but that has not stopped him from

25   inflicting violence on others who have families of their own.

1   These letters depict him as a frail grandfather, but as long

2   as the defendant can command the loyalty of lower-ranking

3   members of La Cosa Nostra, he remains a danger to the public.

4   It does not matter if he can no longer personally carry out

5   violent acts.

6            Having laid out the relevant considerations, I must

7   now weigh them against one another in considering the

8   purposes of punishment including retribution, deterrence,

9   incapacitation, and rehabilitation.

10           The defense urges me to impose a sentence of time

11  served based on Mr. Asaro's age and state of health, arguing

12  that any lengthy period of incarceration will likely amount

13  to a death sentence.  The Government, on the other hand, asks

14  me to impose a sentence of over 15 years of imprisonment

15  based on Mr. Asaro's personal characteristics and criminal

16  history focusing, in particular, on the acquitted conduct.

17           I have no illusions that Mr. Asaro will be

18  rehabilitated by a prison stint.  Nor do I believe that a

19  prison sentence, however long, will deter him from future

20  criminal acts, given his life-long career as a member of the

21  mafia.  If he had not aged out of violent crime by the age of

22  77, I see little hope that he will ever do so.

23           Further, the other sentencing factors that I must

24  consider all militate in favor of a substantial prison

25  sentence.  Although I am sympathetic to Mr. Asaro's ill

1  health, I find that the seriousness of the offense, promoting

2  respect for the law, general deterrence, and protecting the

3  public from the defendant's crimes, all require me to impose

4  a significant period of imprisonment.

5          It is necessary to send a message that members of

6  organized crime cannot threaten members of the general public

7  or destroy their property with impunity.  It is necessary to

8  deter others from a life of crime by showing that there will

9  be real consequences to their crimes.  I note here that,

10  although I am relying on acquitted conduct in sentencing the

11  defendant, had he been found guilty at the trial in 2015, he

12  would have been facing far more than the statutory maximum of

13  20 years of imprisonment he faces here.

14          Finally, and most importantly, a substantial prison

15  sentence is necessary to protect the public.  I see no other

16  way to do so.  I also note that had the defendant pleaded

17  guilty to the underlying substantive offense of conspiracy to

18  commit arson, rather than to a violation of the travel act,

19  he would likely have faced a mandatory minimum sentence of

20  five years of imprisonment, with a maximum of 20 years.

21          Balancing all the pertinent sentencing factors, I

22  conclude that a sentence of 96 months of incarceration in

23  conjunction with the other aspects of his sentence is

24  sufficient but not unduly severe to accomplish the sentencing

25  goals set forth in Section 3553(a).  In my view, eight years

1  of imprisonment is an undeniably serious punishment that

2  reflects the gravity of the defendant's offense and criminal

3  history and serves the functions of both general deterrence

4  and incapacitation, while also taking into account the

5  defendant's advanced age and his poor health.

6          Accordingly, I sentence the defendant to the

7  custody of the Attorney General for a term of 96 months of

8  imprisonment on the sole count of the superseding

9  information.

10          I also issue an order of restitution in the amount

11  of $21,276 due immediately and payable at a rate of $25 per

12  quarter while in custody and 10 percent of gross monthly

13  income while on supervised release, and I will impose a

14  period of three years to supervised release with special

15  conditions that he not associate in person, through mail,

16  through electronic mail, or telephone with any individual

17  with any affiliation to any organized crime group, gangs, or

18  any other criminal enterprise; nor shall the defendant

19  frequent any establishment or other locale where these groups

20  may meet pursuant, but not limited to, a prohibition list

21  provided by the probation department.  The defendant shall

22  comply with the restitution order.

23          Upon request, the defendant shall provide the

24  United Stated Probation Department with a full disclosure of

25  his financial records, including commingled income, expenses,

Proceedings                                    28

1  assets, and liabilities, to include yearly income tax

2  returns, with the exception of the financial accounts

3  reported and noted within the presentence report.  The

4  defendant is prohibited from maintaining and/or opening any

5  additional individual and/or joint checking, savings, or

6  other financial accounts for either personal or business

7  purposes without the knowledge and approval of the

8  United Stated Probation Department.  The defendant shall

9  cooperate with the probation officer in the investigation,

10  his financial dealings and to provide truthful monthly

11  statements as income and expenses.  He shall cooperate in the

12  signing of any necessary authorizations, release information

13  forms permitting the U.S. Probation Department access to his

14  financial information or records.

15         I will not impose a fine, but I will impose the

16  mandatory $100 special assessment.

17         Mr. Asaro, as you know, you have a right to appeal

18  the sentence.  A notice of appeal -- I am sure Ms. Macedonio

19  will continue to represent you.  A notice of appeal must be

20  filed within 14 days.

21         I also recommend that you be designated to an

22  appropriate medical facility.  I do not know if you have any

23  requests?

24         THE DEFENDANT:  I would like to go to Danbury or

25  Fort Dix.

```
                          Proceedings                        29

 1           THE COURT:  I'm sorry.  I did not hear you.

 2           MS. MACEDONIO:  He said he's requesting that the

 3    Court recommend either Danbury or Fort Dix so that he will

 4    be able to see him family.

 5           THE DEFENDANT:  Otherwise, I will never see my

 6    family again.

 7           THE COURT:  Neither Danbury nor Fort Dix has

 8    particular medical --

 9           THE DEFENDANT:  I don't care if I die there.

10           THE COURT:  You do not need the medical facility?

11           MS. MACEDONIO:  I don't think so.

12           THE DEFENDANT:  I don't care what happens to me at

13    this point, Your Honor.  What you sentenced me for is a

14    death sentence anyway, so it doesn't make any difference.

15           THE COURT:  All right.  I am going to recommend

16    that he be designated to a facility as close as possible to

17    the New York metropolitan area, but I also recommend that he

18    be designated to a facility that has ample medical

19    facilities for Mr. Asaro.

20           THE DEFENDANT:  Your Honor, may I say something?

21           THE COURT:  You should speak to

22    Ms. Macedonio before you speak --

23           THE DEFENDANT:  I don't understand --

24           THE COURT:  Mr. Asaro --

25           THE DEFENDANT:  Yes.
```

 1          THE COURT:  Mr. Asaro, I think the sentence is

 2   concluded.

 3          THE DEFENDANT:  Okay.  Can I say anything?

 4          MS. ARGENTIERI:  Judge, we --

 5          THE COURT:  Speak with Ms. Macedonio.  You have an

 6   attorney and she will speak for you.

 7          THE DEFENDANT:  Okay.

 8          MS. ARGENTIERI:  We move to dismiss the underlying

 9   indictment, Judge.

10          THE COURT:  The underlying indictment is

11   dismissed.

12          MS. MACEDONIO:  Your Honor, the Government has

13   placed a number of separation orders that would necessarily

14   move this defendant to a facility that's further away than

15   necessary.  I would ask the Government consider lifting

16   those separation orders in light of the fact that the

17   defendant has now been sentenced.

18          THE COURT:  I have nothing --

19          MS. MACEDONIO:  I understand.

20          THE COURT:  -- to do with that, so...  And I

21   appreciate it.  You can talk about it in with your client.

22          (Pause in proceedings.)

23          THE COURT:  Obviously, Mr. Asaro is prohibited

24   from the possession of any firearm or other destructive

25   device.

Proceedings                                        31

1          MS. MACEDONIO:  Judge, may I get a copy of today's

2    sentence, please.

3          THE COURT:  Certainly.

4          MS. MACEDONIO:  Thank you.

5          MS. ARGENTIERI:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7          (Matter concluded.)

8                        --ooOoo--

9

10

11

12

13

14

15

16

17

18

19

20    *I (we) certify that the foregoing is a correct transcript*
      *from the record of proceedings in the above-entitled matter.*
21
           */s/ David R. Roy*              *5th Day of January, 2018*
22          *DAVID R. ROY*                      *Date*

23

24

25

# EXHIBIT F



The Law Office of
Elizabeth E. Macedonio

40 Fulton Street – 23rd Floor – New York, NY 10038
Office: 212-235-5494 • Fax: 212-480-4444 • Email: Elizabeth@MacedonioLaw.com

October 30, 2017

Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: <u>United States v. Vincent Asaro</u>
17 Cr. 00127 (ARR)

Dear Judge Ross:

This letter is submitted for Your Honor's consideration in the sentencing of Vincent Asaro in the above-referenced matter. This is Mr. Asaro's initial submission in which he sets forth the applicable considerations under Title 18 U.S.C. § 3553(a). As a *Fatico* hearing is anticipated in this matter, Mr. Asaro respectfully reserves the right to submit an additional brief following the hearing in which he will address issues related to the application of the United States Sentencing Guidelines. As an initial matter, however, we ask the Court to consider the facts set forth below pursuant Title 18 U.S.C. § 3553(a) when determining the fair and just sentence in this case.

## I.    <u>Facts of the Case</u>

On June 27, 2017, Mr. Asaro pled guilty to a single-count Information. The Information charges that on or about and between April 1, 2012 and April 4, 2012, Mr. Asaro, together with others, did knowingly and intentionally use one or more facilities in interstate and foreign commerce with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of unlawful activity, to wit: arson, in violation of New York Penal Law Sections 150.10 and 20.00, and thereafter did perform and attempt to perform a crime of violence, to wit: arson affecting interstate and foreign commerce, in violation of Title 18 United States Code, Section 844(i), to further such unlawful activity.

The crime committed followed an incident of road rage between Mr. Asaro and an unknown individual. That incident occurred on or about April 1, 2012. Following the incident, Mr. Asaro sought and received the registration information of the other party's vehicle. Once he received this information Mr. Asaro requested that a third person ("CW-1") set fire to the vehicle.

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

Thereafter, on his own accord, CW-1 recruited John J. Gotti and Matthew Rullan to assist him with the arson. Mr. Asaro did not recruit these individuals, nor did he ask CW-1 to recruit them. (Exhibit A – P.35-37) Rather, Mr. Asaro sought out CW-1's assistance alone as CW-1 was known to have committed arsons on previous occasions with no assistance from other individuals. Given the simplicity of the crime, there was no reason for Mr. Asaro to assume that CW-1 would seek out assistance from any other party. Moreover, Mr. Asaro had never met either Gotti or Rullan. Rather, these two individuals were friends of CW-1. There is no evidence that Mr. Asaro had any relationship or independent contact with either Gotti or Rullan.

The crime in this case was purely a matter of road rage. It had no connection to the affairs of the Bonanno crime family. Mr. Asaro concedes that this incident was a tremendous error in judgment on his part. He has, however, accepted responsibility for his conduct. Notably, the guilty plea in this case came only three months after Mr. Asaro's arrest. Mr. Asaro quickly acknowledged his guilt and now awaits sentencing for this crime. Plea negotiations in this case were complex. Mr. Asaro's plea was part of a global disposition. Had Mr. Asaro, Gotti or Rullan elected to go to trial, the government would have taken all three defendants to trial on the arson charges. Recognizing both his guilt and the importance of his plea to his co-defendants, Mr. Asaro was the first defendant to plead guilty in this case. In exchange for his plea of guilty, the government agreed to allow Mr. Asaro to plead to a crime (the travel act) which does not carry the mandatory minimum sentence of sixty months required by the arson statute. And the government included in the plea agreement an appellate waiver of 46 months incarceration or below. Given all of these facts, the government agreed in both the plea agreement (Exhibit B) and at the time of the plea (Exhibit A) that Mr. Asaro was entitled to three-points for acceptance of responsibility. The remaining adjustments to the guidelines will be addressed in a subsequent submission.

## II.   The Law

Section 3553(a) of Title 18 provides that "[t]he court shall in every case impose a sentence sufficient, but not greater than necessary to comply with the purposes set out in paragraph (2) of this subsection." This "parsimony clause" applies at every federal sentencing "except as otherwise specifically provided." *Id.* Indeed, the command of the parsimony clause defines the Court's "overarching duty." *Pepper v. United States*, 131 S. Ct. 1229, 1243 (2011).

Among the factors to be considered under § 3553(a) are (1) the nature and circumstances of the offense, (2) the history and characteristics of the defendant, and (3) "the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from future crimes of the defendant." 18 U.S.C. § 3553(a).

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

As the Supreme Court reaffirmed in *Pepper*, the sentencing judge is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." 131 S. Ct. at 1240 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). While the Guidelines are the "starting point and the initial benchmark," the Court "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 128 U.S. 586, 596-97 (2007). The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008).

In this case, for several reasons, the Court is vested with broad authority to sentence Mr. Asaro to a below-Guidelines sentence, thereby complying with the purposes of sentencing, without unduly punishing the defendant in a manner inconsistent with the statutory scheme.

## III.  Mr. Asaro's Background and Personal Characteristics

Vincent Asaro is 82 years old.  He is a lifelong resident of Queens County. He has an extensive work history which includes decades of work in the construction and restaurant industries. For nearly fifty years he was married to Theresa Myler. Mr. Asaro and his ex-wife have three children, several grandchildren and two great-grandchildren. Prior to his arrest in this case, he was unemployed and resided in the home of his long-term companion Michele Corollo. He had no assets or unexplained wealth and relied on his family for transportation and financial support.

Mr. Asaro is one of five children.  He maintains a close and loving relationship with all of his family members. He was raised in an intact home where all of his needs were met.  In addition to his parents and siblings, Mr. Asaro enjoyed the love and affection of extended family as well. Mr. Asaro continues this tradition of love and support within his immediate and extended family often being the center of family events during which he enjoys cooking the meals and telling comical or scary stories to the younger members of the family. (Exhibit C)



Mr. Asaro has had many jobs over the course of his life, primarily in the food and construction industries. After leaving school at the age of 16, Mr. Asaro went to work at various jobs with his father and other family members. His first job was as a messenger. He then worked as a plasterer with his uncle, Anthony Valenti. In his early years he also worked with his uncle Paul Mandoglia at his tire company and with his dad doing construction work.

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

Other individuals and companies he has worked for include: Montana Brothers (driving an oil truck); Christina Roofing; Esposito & Sons; Joe Zanka (homebuilders); Liberty Paint Co.; Jon Blade (feed company); Star Fence Company; Bronchara Fence Company; King Fence Company; Astro Fence Company; Standard Utilities (driving oil truck); Turner Construction; Planet Construction; Masden Construction.

In addition, inspired by his love of cooking, Mr. Asaro opened two restaurants. He owned and operated *The Great In-Pasta* restaurant from the 1990s until opening the *Triangle Luncheonette* from 2003-2004.

His employment at these various places spanned decades and allowed him to support his family. Mr. Asaro retired in 2006 at which time he began to collect social security benefits.

Mr. Asaro and his wife enjoyed a long marriage and were in fact married on two separate occasions. They raised three children; Noreen, Dawn, and Jerome. Mr. Asaro maintains a good relationship with all of his children and is a doting grandfather and great grandfather. Even subsequent to their divorce, Mr. Asaro continued to enjoy an amicable relationship with his wife. Together they continued to jointly maintain the marital residence (which she resided in alone), and accompany one another to medical appointments. In addition, they attended the weddings of their children and enjoyed the company of their grandchildren and great-grandchildren.

Attached for the Court's review are several letters from Mr. Asaro's family members and friends. (Exhibit C) These letters detail the type of family man Vincent Asaro is. He is a man that is there for his children, inspiring them to do their best and teaching them the importance of family. Mr. Asaro's grand-daughter Maxie Boccio describes his undying support for her and her family.

> Vincent is my grandfather, however, he has been the closest thing I have ever had to a real father. My mom and dad got divorced when I was in fourth grade. Since then, my grandfather has been a father figure to me by often providing guidance. He always stressed to me the importance of doing the right thing and being a good person, and continues to remind me of these virtues in my adulthood. Regardless of the circumstances, my grandfather has always been there for me and my family.

Letter to the Court from Maxie Boccio attached as part of Exhibit C.

Upon his release Mr. Asaro will continue to reside with Ms. Corollo in her home in Richmond Hill, Queens. Ms. Corollo is a long term employee of ████████ where she

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

works as an administrator. The simple life style Mr. Asaro leads at this point is best described by
Ms. Corollo and Mr. Asaro's daughter Noreen.

> It is the little things in life are what make us both happy. Whether it is
> having the kids over for breakfast or taking a drive or a movie that is
> what makes us both happy. I feel I have been very blessed to have him
> in my life. He is a loving, supportive and devoted partner. He has
> endured many health issues within the last years. At 82 years of age,
> his days are now filled with doctor appointments, tests etc. We try to
> make the best of the time we have together.

Letter to the Court from Michele Corollo attached as part of Exhibit C.

> He shares a quiet life with Michele. Basically hosing the yard and
> visiting family, going to doctor's appointments and spending time with
> his dog who has recently passed. He goes out of his way to have a kind
> ear to listen to people with a compassionate ear.

Letter to the Court from Noreen Asaro attached as part of Exhibit C.

In addition to telling stories and cooking meals, Mr. Asaro has proven to be there for his
family and friends during life's most difficult times. His friend Lucille Gennaro remembers Mr.
Asaro's compassion when she was dealing with several family hardships including her mother and
sister's terminal illnesses.

> When my Mother became sick with Alzheimer's and I was caring for
> her, it was Vinny (not my own siblings) that offered to sit with her so
> that I could go out and have some fun. I remember his exact words,
> "Lu, you're young and you need to go out once in a while. Pick a night
> and I will sit with your Mother."

> Then when my sister, Antoinette Gennaro was so sick with cancer and
> she didn't have the strength to get up out of my car, it was Vinny that I
> called and without hesitation he was on his way to my house. He lifted
> her out of that car and carried her to the couch. This is the kind of man
> Vinny is.

Letter to the Court from Lucille Gennaro attached as part of Exhibit C.

In 2016, Mr. Asaro cared for Ms. Corollo's aging mother so that she could go to work. Ms.
Corollo reports as follows:

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

> My mother was ill and lived with us for a while. While I was at work Vinny took care of her and made sure she had her breakfast and lunch every day. He also tended to the household chores so that I did not have to worry about it. He made dinner for us. My mom was 94 years old and had the onset of dementia and was not very mobile. The stress of seeing her decline was a lot for me. But Vinny tried to help me by taking care of the mundane things so that when I came home I could tend to her.

Letter to the Court from Michele Corollo attached as part of Exhibit C.

A reading of these letters makes clear that Mr. Asaro is a very dedicated and loved family man. But as the Court knows, he is also prone to outbursts. Noreen Asaro addressed this side of her father as follows:

> We have all seen his outbursts. That's just part of his personality. Your Honor heard a lot of recordings in which my father was carrying on. But just as soon as he started yelling, he stopped and he was on to the next topic. Often he says things in the heat of the moment which he doesn't mean at all.

Letter to the Court from Noreen Asaro attached as part of Exhibit C.

The Court was witness to some of Mr. Asaro's outbursts during the previous trial. But often just as quickly as Mr. Asaro became agitated, he was again calm, often forgetting what it was that upset him in the first place. These occasional outbursts however, should not overshadow who Vincent Asaro is at heart and who he has proven himself to be to his immediate and extended family. He is a dedicated father, grandfather and great-grandfather. He is a man who is respected and loved because of his ability to be there in a meaningful way not only in good times, but in life's lowest moments when he is needed the most. The letters drafted on his behalf demonstrate these qualities in Vincent Asaro.


IV.   **Mr. Asaro's Fragile Health**

As stated, Mr. Asaro is 82 years of age. He suffers from several life threatening ailments which include the following:

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

| | |
|---|---|
| **Heart Disease** | - triple bypass surgery in 2013<br>- bypass surgery in 2016<br>- preserved ejection fraction |
| **Kidney Disease** | history of painful kidney stones requiring six operations |
| **Hepatitis C** | |
| **Liver Disease** | |
| **High blood pressure** | |
| **High Cholesterol** | |
| **Arthritis** | |

In addition, he had surgery on the tendons of both of his arms in the 1990's. He had back surgery on discs L4 and L5 in the 1990's. He had a benign tumor removed from his hip in 1997. He underwent surgery for a double hernia in 2001. Surgical removal of his parathyroid gland in 2003. He was required to attend pain management for medical issues related to his neck from 2004 to 2006. He had cataract surgery in 2017. And in March of 2017, he suffered a transient ischemic attack ("TIA") which is sometimes referred to as a mini-stroke. A subsequent MRI revealed thickening of the brain.

Given his advanced age, and the degenerative nature of several of these conditions his short term prognosis is poor. These ailments, both individually and collectively place his life in jeopardy every day. Mr. Asaro has suffered several health setbacks that were exacerbated by the lack of proper medical care at the Metropolitan Detention Center ("MDC"). This will only be compounded by continued incarceration.

Moreover, as he suffers from so many serious health issues, treatment of one issue can adversely affect another. By way of example, Mr. Asaro suffers from Hepatitis C, a disease likely contracted the 1950's or 1960's. The Hepatitis C was not detected until the 1990's, and by that time it had caused liver damage. In order to treat the myriad of additional health issues that Mr. Asaro has, he is prescribed a battery of medications. He currently takes 18 medications a day. Many of these medications are processed by the liver and thus exacerbate his liver disease. The balancing

7

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

of medications, and the ability to closely monitor the interaction of his ailments, requires constant and vigilant medical care and a balanced diet. It is certain that he will not receive this care within the Bureau of Prisons.

During his prior and current terms of incarceration, his health had deteriorated rapidly in many ways. Despite consistent reports to medical staff, obvious life-threatening and painful ailments were outright ignored. The following are only a few examples.

A) Mr. Asaro's Incarceration from 2014 to 2015

1) Prior to his 2014 arrest, Mr. Asaro suffered a heart attack and underwent triple bypass surgery. Given his family history, his cardiac issues are of extreme concern, and thus this information was provided to the MDC upon his arrival. While last at the MDC, Mr. Asaro consistently complained to the staff of a deep and painful burning sensation in his chest and that his legs were swollen with water and painful to the touch. Although he repeatedly asked that testing be done to determine the cause of the pain, his requests were ignored for months and ultimately never addressed. Upon release, it was learned that Mr. Asaro was suffering from angina, a condition marked by severe pain in the chest caused by an inadequate blood supply to the heart.

In early 2016, after his release, Mr. Asaro underwent his second bypass surgery during which multiple stents were placed in his heart. It is only by the grace of god that he did not suffer further complications due to lack of medical care while in custody.

2) In the early morning hours of July 19, 2014, Mr. Asaro was taken from the MDC to the emergency room as he was in extreme pain and was urinating blood. He was told that he had numerous kidney stones that were too large to pass and that he should be seen by a urologist. Without any further treatment, he was then returned to the MDC.

Weeks later, and only after the Court made an inquiry as to when Mr. Asaro would be seen by a doctor, Mr. Asaro was taken to a urologist who again told him that he had several kidney stones that were too large to pass and that he needed an operation. Once again, he was returned to the MCD. While at the MDC, Mr. Asaro was forced to choose between taking prescription pain killers, even when he was not in immediate pain, or waiting for the pain to return and then having no relief at all.

Mr. Asaro was not taken to the hospital to remove the stones lodged in his kidney until September 5, 2014. This action was taken by the staff at the MDC only after the Court made two additional inquiries about Mr. Asaro's medical condition.

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

To add to this traumatic ordeal, Mr. Asaro was unable to communicate with his family for a two-week period while he was in the hospital. They had no way of knowing if he was alive or if he had suffered surgical complications. What is most alarming is that while the 81 year old Vincent Asaro lie shackled to a hospital bed, he did allegedly experience complications from surgery. Mysteriously, not only did the doctors remove his kidney stones, they also removed his prostate without explanation. Given that his family was kept in the dark during the entire two weeks he was in the hospital, they were unable to participate in his medical care in any fashion. If they had been permitted to care for him, as is only human, perhaps his body would not have been mangled by a botched surgery.

Given the nature of the surgery, his advanced age and chronic medical condition, this procedure denied Mr. Asaro and his family any participation in his medical care. This is a likely that the Court will not be able to intervene and thus, as history has shown, Mr. Asaro's medical concerns will be ignored.

B) <u>Mr. Asaro's Current Incarceration</u>

1) On April 12, 2017, Mr. Asaro was placed in administrative detention at the MDC. On or about April 23, 2017, the undersigned visited with Mr. Asaro in the Special Housing Unit ("SHU"). When Mr. Asaro entered the attorney visiting area he was distraught. He had collapsed in the shower and was unable to get up. He was not coherent and was unable to effectively communicate. He clearly had lost a significant amount of weight and reported that he was having pain urinating. The temperature in the SHU was far below comfortable and Mr. Asaro was not provided with appropriate clothing. Upon consistent urging, Mr. Asaro was taken to the nurse and ultimately to the hospital. He was suffering from dehydration, dangerously high blood pressure and extreme weakness. All symptoms of heart failure. While in the hospital, Mr. Asaro was advised that his "heart was leaking."

He was returned to the MDC and the SHU on April 25, 2017, without any further medical intervention. Remarkably, since Mr. Asaro was in 24 hour lockdown, if an emergency had occurred, he would have had no assistance whatsoever. While staff is on the floor, the inmates are routinely ignored. Had counsel not gone the MDC on this particular day, it is likely that Mr. Asaro would not have received any medical attention. Mr. Asaro was finally released from the SHU on or about May 2, 2017.

2) Mr. Asaro was taken to the hospital during the first week of October 2017, when the staff at the MDC believed he was suffering a heart attack. This again came after Mr. Asaro consistently complained of the sensation of burning in his chest. He was returned to the MDC and provide with very little information regarding his medical condition. Counsel has requested these records but has been advise that in order to obtain them that I must file a FOIL request to obtain

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

the documents. By the time these documents are received, it may be too late for his doctors to provide any meaningful input into his care.

3) Finally, on October 20, 2017, Mr. Asaro was taken for what has been described as cardiac testing. As of this writing Mr. Asaro has not yet been returned to the MDC. During this entire time, once again, the family has been provided with no additional information and has been unable to communicate with Mr. Asaro. Given his advanced age, and his health concerns, this practice is entirely unacceptable. We can only hope that his body is not once again mangled at the hospital. Once counsel is able to communicate with Mr. Asaro, she will update the Court with regard to this most recent hospitalization.

Mr. Asaro's life after his release from prison in 2015, was consumed with medical appointments. Just prior to his arrest in 2017, his doctor advised that Mr. Asaro is suffering from preserved ejection fraction. With preserved ejection fraction, the heart muscle contracts normally sending blood to the body. Thereafter, however, the heart's ventricle does not relax to allow the ventricular to properly fill with a renewed blood supply which the body needs. Thus the amount of blood to the body is less than normal. Preserved ejection fraction is also referred to as diastolic heart failure. A healthy diet and regular exercise are crucial for Mr. Asaro's survival. These are things that he will not get in BOP custody. Again, given his family history, cardiac issues are of extreme concern.

In addition, in the winter months of 2017, Mr. Asaro suffered from such a debilitating strain of the flu that he was homebound for twelve days. He was seen by his doctor on several occasions, and even underwent a chest x-ray to make certain he had not come down with the pneumonia.

More recently in March of 2017, when Mr. Asaro was celebrating his birthday with friends, he had to be escorted home as he was suffering from stroke like symptoms. It was determined that Mr. Asaro had had a transient ischemic attack ("TIA") which is sometimes referred to as a mini-stroke. A TIA produces similar symptoms to a stroke, but usually only lasts a few minutes and causes no permanent damage. About one in three people who have a transient ischemic attack will eventually have a stroke, with about half occurring within a year after the transient ischemic attack. Mr. Asaro reports that he has had two of these episodes in the past year. After the episode in March of 2017, Mr. Asaro underwent an MRI which revealed thickening of the brain. Mr. Asaro also currently suffers from unsteadiness.

As stated, Mr. Asaro's life is tenuous. He suffers from a variety of serious ailments that both independently and collectively place his life in constant jeopardy. It is certain that he will not receive sufficient medical care in the Bureau of Prisons which will likely lead to his death. This is not a crime that requires a death sentence.

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

**V.      Continued Incarceration Poses an Extreme and Life-Threatening Risk**

The risk to Mr. Asaro if his incarceration is continued, is serious.  First and foremost, the BOP cannot provide the comprehensive care Mr. Asaro requires.

Additionally, the harsh conditions of incarceration which negatively impact the healthy inmate, would be far more severe, and, in fact, especially dangerous for Mr. Asaro. Sleep disturbances, an unavoidable part of prison life, will harm Mr. Asaro's health. Due to crowded conditions, there are often multiple inmates per room sleeping on metal bunk beds that make noises with any movement. Some correctional facilities use a cubicle setup, where numerous inmates sleep in one large room. Regular "counts" that occur in the middle of the night or early morning also pose a significant disturbance to sleep.  Further, prisons have a scheduled wake up time for inmates, usually as early as 5:00am.  Even if inmates are not feeling well or have had a poor night's sleep, they cannot stay in bed and try to sleep in but must get up and out.

Indeed, the plight of elderly inmates is particularly bleak for all involved, the BOP, taxpayer, and the elderly inmate himself. A recent Office of the Inspector General ("OIG") report found that the physical infrastructure of BOP facilities provides inadequate accommodations for the elderly, the BOP lacks appropriate programs for elderly inmates, and fewer elderly inmates are eligible for early release programs due to BOP policies:

> The OIG found that aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs. We further found that limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates. The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates. Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates. We also determined that aging inmates engage in fewer misconduct incidents while incarcerated and have a lower rate of re-arrest once released; however, BOP policies limit the number of aging inmates who can be considered for early release and, as a result, few are actually released early.[1]

Elderly inmates such as Mr. Asaro will inevitably serve "harder time" than their more youthful counterparts. Furthermore, poor hygiene and living conditions exacerbate the spread of

---

[1] See "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons," Office of the Inspector General, U.S. Department of Justice, May 2015 (revised February 2016) available at https://oig.justice.gov/reports/2015/e1505.pdf (last accessed August 25, 2017)

Honorable Allyne R. Ross
United States District Judge
October 30, 2017

infections. Due to his age and poor health Mr. Asaro is more susceptible to infection and may not be able to fully recuperate from certain illnesses he is exposed to. Mr. Asaro's age and fragile medical condition make his sentence one that he may not survive and therefore mitigate in favor of a below guidelines sentence.

## IV.    **Conclusion**

The crime for which Mr. Asaro is to be sentenced was committed five and a half years ago. After spending years in custody, and with his 83rd birthday rapidly approaching, Vincent Asaro is a very different man than he was in the spring of 2012. His health has deteriorated rapidly and his lifestyle has been severely curtailed. As reflected in the letters drafted on his behalf, when released from custody in November of 2015, Mr. Asaro's life largely consisted of attending doctor's appointments, cooking meals at home and caring for those in his family. He rarely left his home, and when he did he was at the mercy of others to provide him with transportation. Given his physical condition, the time he serves in custody will be much harder than that of the average inmate.

The sentence imposed upon Mr. Asaro must be one that is "sufficient, but not greater than necessary" to provide (1) "just punishment," (2) "adequate deterrence," (3) "protect[ion for] the public" and, (4) "the defendant with needed educational or vocational training." 18 U.S.C. § 3553(a). Given all the factors under Section 3553(a) a further term of incarceration is not warranted and would only likely result in a life sentence, a result that is entirely unwarranted.

I thank Your Honor for her consideration in this matter.

Respectfully submitted,

*Elizabeth E. Macedonio*
Elizabeth E. Macedonio
*Counsel for the Defendant*
*Vincent Asaro*

cc: All Parties Via ECF

# Exhibit A

1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK
 2
        - - - - - - - - - - - - - X
 3
        UNITED STATES OF AMERICA,      :  17-CR-00127(ARR)
 4                                     :
                                       :
 5                                     :
             -against-                 :  United States Courthouse
 6                                     :  Brooklyn, New York
                                       :
 7                                     :
                                       :  Tuesday, June 27, 2017
 8      VINCENT ASARO,                 :  10:30 a.m.
                                       :
 9              Defendant.             :
                                       :
10      - - - - - - - - - - - - - X

11            TRANSCRIPT OF CRIMINAL CAUSE FOR PLEADING
                 BEFORE THE HONORABLE ALLYNE R. ROSS
12               UNITED STATES SENIOR DISTRICT JUDGE

13                  A P P E A R A N C E S:

14      For the Government:   BRIDGET M. ROHDE, ESQ.
                              Acting United States Attorney
15                            Eastern District of New York
                              271 Cadman Plaza East
16                            Brooklyn, New York 11201
                        BY:  NICOLE M. ARGENTIERI, ESQ.
17                           LINDSAY GERDES, ESQ.
                             KEITH DANIEL EDELMAN, ESQ.
18
                              Assistant United States Attorneys
19
        For the Defendant:   ELIZABETH E. MACEDONIO, P.C.
20                           40 Fulton Street
                             23rd Floor
21                           New York, New York 10038
                        BY:ELIZABETH E. MACEDONIO, ESQ.
22

23      Court Reporter:  Stacy A. Mace, RMR, CRR
                         Official Court Reporter
24                       E-mail:  SMaceRPR@gmail.com

25      Proceedings recorded by computerized stenography.  Transcript
        produced by Computer-aided Transcription.
```

SAM     OCR     RMR     CRR     RPR

1              (In open court.)

2              THE COURTROOM DEPUTY:  United States of America

3    against Vincent Asaro, docket number CR-17-127.

4              Counsel, please state your name for the record.

5              MS. ARGENTIERI:  Nicole Argentieri and Keith Edelman

6    for the United States.  Good morning, Judge.

7              THE COURT:  Good morning.

8              MS. MACEDONIO:  Good morning, Your Honor.  Elizabeth

9    Macedonio for Mr. Asaro.

10             THE COURT:  Good morning.

11             THE COURTROOM DEPUTY:  Do you want to state your

12   name for the record?

13             MR. EPSTEIN:  Yes.  Lloyd Epstein, Your Honor.  I

14   think the Court asked me to come here to speak with Mr. Asaro.

15             THE COURT:  I did.

16             MR. EPSTEIN:  I spoke to him already and I am

17   prepared to place on the record the content of our

18   conversation.

19             THE COURT:  Okay.  I think we are going to give him

20   another opportunity to talk to you after I speak with him.

21             MR. EPSTEIN:  Okay.

22             THE COURT:  Well, let me ask you this:  Is it

23   Mr. Asaro's view that he would like to continue to be

24   represented by Ms. Macedonio at this point in time?

25             MR. EPSTEIN:  Yes.

Proceedings 3

1          THE COURT:  Okay.

2          Mr. Asaro.

3          THE DEFENDANT:  Yes.

4          THE COURT:  Could we push you close to a microphone

5   so I could hear everything you say?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Okay.  Now, I know that Ms. Macedonio

8   has been representing you in this proceeding, and I gather

9   that you wish to continue to have her represent you.

10         As I believe you already know, Ms. Macedonio is also

11  representing Ronald Giallanzo who is currently being

12  prosecuted in this court in another proceeding before another

13  judge.  According to the government's charges, both you and

14  Mr. Giallanzo are members of the Bonanno organized crime

15  family and Mr. Giallanzo is also a blood relative.  You are

16  his uncle and he is your nephew, as I understand it.

17         Now, because Ms. Macedonio represents Mr. Giallanzo,

18  she owes him a duty of loyalty.  As a result of that duty of

19  loyalty, she may not be able to do what is in your best

20  interest in the case before me.  This means that she has, at

21  least, a potential and, quite possibly, an actual conflict of

22  interest in her representation of you in this proceeding

23  before me.

24         I want you to know that you have a right to counsel

25  who is free from any possible conflict of interest, who will

SAM     OCR     RMR     CRR     RPR

Proceedings                                                    4

1    see to it that your interests and only your interests are

2    protected.  So to help you understand the importance of this

3    right, I have asked you already to consult with independent

4    counsel, Mr. Epstein, and I am going to ask you to do that

5    again after I have spoken with you so that you can reach an

6    informed decision about how you want to proceed in this case.

7              I also want to make clear to you that in my view a

8    defendant is always better off represented by counsel who is

9    wholly independent of anyone with whom there may be a conflict

10   of interest.  And obviously, if you chose to do that, I would

11   appoint another attorney to represent you in this case.

12             So what I am going to do now is tell you a little

13   bit about some of the risks that are likely to come up when

14   you are represented by a lawyer who, like Ms. Macedonio, has

15   divided loyalties because of other representation.  I cannot

16   see what all of those risks are, no one can, but I will tell

17   you at least one major one that I am cognizant of.  This is a

18   very serious matter for you.  If you do not understand me or

19   if you have any doubt at all as to what I mean, I want you to

20   stop me and I will reword or express myself differently until

21   you understand everything that I say.  All right?

22             THE DEFENDANT:  Okay.

23             THE COURT:  And then after I am finished, I will

24   give you some time to go over in your own mind what I have

25   spoken about and to talk further with Mr. Epstein.  And then

1    after you have had plenty of time to consider, and only when

2    you tell me you are ready, I will ask you to tell me what your

3    decision is.  When you do that, I will ask you to tell me in

4    your own words what you understand the potential conflict of

5    interest to be if you have Ms. Macedonio continue to represent

6    you in this proceeding.

7            And then if you decide that despite that you wish to

8    run that risk and other potential risks and you want to give

9    up your right to a lawyer who is under no conflict of

10   interest, you may do that provided that I am satisfied that

11   you are acting of your own free will, without pressure or

12   coercion by anyone, and that you have made a knowing and

13   intelligent decision.  All right?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  Dennis, would you please swear

16   Mr. Asaro?

17           (Defendant sworn.)

18           THE COURTROOM DEPUTY:  Please state your name for

19   the record?

20           THE DEFENDANT:  Vincent Asaro.

21           THE COURTROOM DEPUTY:  Thank you.

22           THE COURT:  Mr. Asaro, do you understand that having

23   been sworn, now that you are under oath, your answers to my

24   questions would be subject to another prosecution for perjury

25   or false statement if you did not answer them truthfully?

1              THE DEFENDANT:  Right.

2              THE COURT:  Okay.  How old are you?

3              THE DEFENDANT:  82.

4              THE COURT:  Okay.  And how far did you go in school?

5              THE DEFENDANT:  I quit when I was 16.

6              THE COURT:  Okay, so you were in high school?

7              THE DEFENDANT:  Yes.

8              THE COURT:  Okay.  Had you had about a year of high

9     school?

10             THE DEFENDANT:  Excuse me, ma'am?

11             THE COURT:  Did you complete a year of high school

12    or not yet?

13             THE DEFENDANT:  It's so many years ago, I'm not --

14             THE COURT:  I understand.

15             In the last twenty-four hours have you taken any

16    drugs or medicine or pills of any kind or drunk any alcoholic

17    beverage?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  Okay.  And what have you taken?

20             THE DEFENDANT:  Metoprolol -- I take a lot of drugs,

21    Your Honor.  I can't remember.  Bis -- Bisoprolol for the

22    heart.

23             THE COURT:  Right.

24             THE DEFENDANT:  Liver disease -- I take about 10, 12

25    pills a day.

Proceedings                                                    7

1          THE COURT:  Okay.  Let me ask you this:  Are either

2   the side effects of those pills or the effects of the ailments

3   that the pills are used to treat in any way affecting your

4   ability to understand what is going on in this proceeding or

5   to make up your mind about what you want to do?

6          THE DEFENDANT:  No, Your Honor.

7          THE COURT:  Okay.

8          Are you under treatment by a doctor or a

9   psychiatrist?

10         THE DEFENDANT:  Well, just the medication that I am

11  taking.

12         THE COURT:  Okay, so just a physician, not a

13  psychiatrist?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Okay.  And it is the physician who has

16  prescribed the medication that you have told us about?

17         THE DEFENDANT:  It was my heart doctor.  I had two

18  triple bypasses.

19         THE COURT:  Right, okay.  And I think you told us

20  that your physical conditions are not interfering with your

21  ability to understand or your judgment?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  Okay.  Is your mind clear now?

24         THE DEFENDANT:  Excuse me?

25         THE COURT:  I'm sorry, is your mind clear now?

1           THE DEFENDANT:  Yes, yes.

2           THE COURT:  You you understand what is going on in

3    this proceeding?

4           THE DEFENDANT:  Yes.

5           THE COURT:  Now, I know you have had some prior

6    experience with the criminal justice system, is that correct?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  I know there was a proceeding before me.

9           Have there been other proceedings where you have

10   either been a defendant or a witness?

11          THE DEFENDANT:  In years -- years ago?

12          THE COURT:  Years ago?

13          THE DEFENDANT:  Yeah.

14          THE COURT:  Okay.  Has anyone ever made any promise

15   or threat to you that has influenced you in your decision to

16   have Ms. Macedonio represent you in this case?

17          THE DEFENDANT:  No, Your Honor.

18          THE COURT:  Okay.

19          Ms. Macedonio.

20          MS. MACEDONIO:  Yes, Your Honor.

21          THE COURT:  Did you speak with your client regarding

22   his waiver of right to conflict-free counsel?

23          MS. MACEDONIO:  I have, Your Honor.

24          THE COURT:  Okay.  Have you done that on a number of

25   occasions?

1          MS. MACEDONIO:  No, it hasn't been raised until most

2     recently, but I have spoken to him about it.

3          THE COURT:  Have you spoken to him thoroughly?

4          MS. MACEDONIO:  Yes.

5          THE COURT:  Are you satisfied that he understands

6     it?

7          MS. MACEDONIO:  Yes, I am.

8          THE COURT:  Okay.  And what is your view with

9     respect to whether or not there actually exists a conflict of

10    interest as a result of your representation of Mr. Giallanzo?

11         MS. MACEDONIO:  I do not believe there is any

12    conflict of interest that is the result of my representation

13    of Mr. Giallanzo.

14         THE COURT:  Okay.

15         Mr. Asaro, now I am going to tell you about the risk

16    that I think that you are running by having Ms. Macedonio

17    represent you.  I cannot really fully foresee all the risks or

18    problems that could arise, nobody can do that, but you should

19    understand that you may be inviting dangers that no one can

20    anticipate at this time and no one can tell you about at this

21    time.

22         As I explained, Ms. Macedonio, as Mr. Giallanzo's

23    lawyer, owes a duty of loyalty to him and this includes an

24    obligation to do nothing at all that would harm or incriminate

25    him or cast suspicion on him, whether or not refraining from

1    doing that might be harmful to you.

2          Do you understand that?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Okay.  For example, it is possible that

5    it may be in your best interest to cooperate with the

6    government against Mr. Giallanzo in his proceeding in hopes of

7    securing a sentencing benefit in your case.

8          Do you understand that?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  Okay.  But because Ms. Macedonio

11   represents Mr. Giallanzo, she would be prevented from seeking

12   to persuade you to do so because your cooperation, which may

13   be in your best interest, would be harmful to the interests of

14   Mr. Giallanzo.

15         Do you understand that?

16         THE DEFENDANT:  Yes.

17         THE COURT:  She actually would be ethically barred

18   from trying to persuade you to pursue such a strategy.

19         Do you understand that?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  Okay.  And do you understand that what I

22   have just said is strictly by way of example, other things

23   could well come up that would make it much better for you if

24   you had a lawyer who has solely your interests in mind?

25         THE DEFENDANT:  Yes, I understand.

                 SAM      OCR      RMR      CRR      RPR

1          THE COURT:  Okay.  Have you fully understood

2     everything that I have said?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  Okay.  Do you understand that you may be

5     running a serious risk by continuing with her representation?

6          THE DEFENDANT:  Yes, I understand.

7          THE COURT:  Okay.  And do you understand that if you

8     choose to continue to have her represent you, you cannot

9     complain about it later, you could not argue that

10    Ms. Macedonio failed to provide you with effective assistance

11    of counsel in your case because she labored under the conflict

12    of interest?  Do you understand that?

13         THE DEFENDANT:  I understand.

14         THE COURT:  Do you have any questions at all that

15    you want to ask me?

16         THE DEFENDANT:  No, Your Honor.

17         THE COURT:  Okay.  So I want you to think seriously

18    about what I have just said.  Speak further with Mr. Epstein

19    and discuss all of that again with him, and when you have done

20    that and when you have made up your mind and you are ready to

21    tell me what your decision is, we will resume this proceeding

22    and I will ask you to tell me.

23         But, again, remember I am going to ask you to

24    explain in your own words what type of risk you think you may

25    be running by having an attorney who is saddled by the

1  conflict of dual representation.  Okay?

2          THE DEFENDANT:  Okay.

3          THE COURT:  So, Mr. Epstein, I do not know if you

4  want to go in the back.

5          MR. EPSTEIN:  Yes, I think that is probably the

6  best.

7          THE COURT:  Go ahead, we will wait.  And whatever

8  time you want, you just let us know.

9          (Mr. Epstein and the defendant exit the courtroom.)

10          (Pause in the proceedings.)

11          MR. EPSTEIN:  I think we're ready.

12          THE COURT:  Okay.

13          (Defendant re-enters the courtroom.)

14          THE COURT:  Mr. Asaro, have you had a full

15  opportunity to discuss with Mr. Epstein what you want to do in

16  this case with respect to representation?

17          THE DEFENDANT:  Yes, I have, Your Honor.

18          THE COURT:  Okay.

19          Mr. Epstein, are you satisfied that Mr. Asaro fully

20  understands the situation?

21          MR. EPSTEIN:  Yes.

22          THE COURT:  And, Mr. Asaro, what is it that you want

23  to do?

24          THE DEFENDANT:  I want to stay with Ms. Macedonio.

25  I've used her before.  I was more than satisfied with her

1    performance, and I feel she has the best interests at heart

2    for me.

3              Also I'd like to say, Your Honor, I would never

4    cooperate, not only against my nephew.  I would never

5    cooperate against anyone.  That's it.

6              THE COURT:  Okay.  And I take it that that's why you

7    think that, for example, the potential danger that I expressed

8    to you, that you are not in any way affected by that by

9    continuing to have Ms. Macedonio represent you?

10             THE DEFENDANT:  Right.

11             THE COURT:  Okay.

12             Well, I make a finding that Mr. Asaro's waiver of

13   conflict-free counsel is knowing and voluntary and

14   intelligent, and I will accept that waiver.

15             THE DEFENDANT:  Thank you, Your Honor.

16             THE COURT:  Let me just ask, Ms. Argentieri, is

17   there anything that I neglected in that?

18             MS. ARGENTIERI:  No, Judge.

19             THE COURT:  Okay.

20             Ms. Macedonio, what does your client wish to do?

21             MS. MACEDONIO:  My client wishes to --

22             THE COURT:  Thank you very much for your service,

23   Mr. Epstein.

24             MR. EPSTEIN:  You're welcome.

25             (Lloyd Epstein, Esq. exits the courtroom.)

1          MS. MACEDONIO:  -- withdraw his previous plea of not

2    guilty and enter guilty pursuant to a written plea agreement

3    with the government.

4          THE COURT:  Okay.

5          Mr. Asaro --

6          THE DEFENDANT:  Yes.

7          THE COURT:  -- before accepting your waiver of

8    indictment and guilty plea, there are many questions that I

9    have to ask you and many things that I have to explain to you.

10   It is very important that you understand everything that I ask

11   and everything I explain.  So if there is anything at all that

12   you do not fully understand, just stop me and I will express

13   myself differently until you do understand it.

14         All right?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Dennis, would you please swear

17   Mr. Asaro?

18         THE COURTROOM DEPUTY:  Yes.

19         (Defendant sworn.)

20         THE COURTROOM DEPUTY:  Please state your name for

21   the record.

22         THE DEFENDANT:  Vincent Asaro.

23         THE COURTROOM DEPUTY:  Thank you.

24         THE COURT:  Again, Mr. Asaro, do you understand that

25   having been sworn, now that you are under oath, your answers

1    would be subject to another prosecution for perjury to a false

2    statement if you did not answer truthfully?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  Okay.  Now, I believe you told me you

5    were 82 years old, is that correct?

6            THE DEFENDANT:  82, yes.

7            THE COURT:  82, okay.  And we have discussed your

8    schooling, that you left school at approximately the age of

9    16?

10           THE DEFENDANT:  Yes.

11           THE COURT:  Okay.  We have also discussed the fact

12   that you are on a number of medications for a number of health

13   problems, and let me simply find out, again, from you, are

14   either any of the medications that you are taking or the side

15   effects from those medications or the underlying physical

16   conditions that have caused you to take those medications

17   affected your ability to understand the proceeding or your

18   ability to make a choice about how you want to proceed in the

19   proceeding?

20           THE DEFENDANT:  Yes, yes.

21           THE COURT:  Have they affected it?

22           THE DEFENDANT:  No, no.

23           THE COURT:  Oh, okay.

24           All right, and apart from those medications you have

25   not had any alcoholic beverages or narcotic drugs, is that

Proceedings                                    16

1   right?

2              THE DEFENDANT:  No.

3              THE COURT:  Have you ever been hospitalized or

4   treated for narcotic addiction?

5              THE DEFENDANT:  When I was 20, 21 I was in

6   Lexington, Kentucky.

7              THE COURT:  And did you complete that program?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Did you overcome the addiction?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  Are you in any way feeling the effects

12  of that addiction now?

13             THE DEFENDANT:  No.

14             THE COURT:  Okay.  Is your mind clear?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Do you understand what is going on?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Have you reviewed the charges in the

19  Superseding Information that the United States Attorney

20  proposes to file against you in this case?

21             THE DEFENDANT:  Yes, I have.

22             THE COURT:  Did you discuss it with Ms. Macedonio?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Do you understand it?

25             THE DEFENDANT:  Yes.

```
                        Proceedings                    17

 1          THE COURT:  Okay.  I am going to go through it with
 2   you again right now.
 3          THE DEFENDANT:  Yes.
 4          THE COURT:  If you have any question as to what any
 5   aspect of it means, I want you to ask me or ask Ms. Macedonio.
 6   All right?
 7          THE DEFENDANT:  Yes.
 8          THE COURT:  It charges that between approximately
 9   April 1st and April 4th of 2012 in this district and elsewhere
10   you, together with others, knowingly and intentionally used
11   one or more facilities in interstate commerce with the intent
12   to promote or facilitate the promotion and carrying on of an
13   unlawful activity; and that that unlawful activity was arson
14   in violation of New York State law; and after you did that you
15   performed and attempted to perform a crime of violence,
16   specifically arson affecting interstate commerce in violation
17   of federal law.
18          Do you understand that charge?
19          THE DEFENDANT:  Yes, Your Honor.  The only -- the
20   only question I have, it was one other person.  There weren't
21   others.
22          THE COURT:  Okay.  But it was one other person?
23          THE DEFENDANT:  One other person, right.
24          THE COURT:  Okay.  Right now we are just
25   ascertaining that you understand what the charge is.
```

SAM     OCR     RMR     CRR     RPR

1          THE DEFENDANT:  Yes.

2          THE COURT:  Okay.  Do you understand that you have

3    the right under the Constitution of the United States to be

4    charged by an Indictment by a grand jury?

5          THE DEFENDANT:  Yes.

6          THE COURT:  And do you understand that instead of an

7    Indictment, the United States Attorney proposes to bring this

8    charge against you simply by filing this piece of paper that

9    is called a Superseding Information with the Court, which

10    contains one charge, which is the charge that I just described

11    to you?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Okay.  Do you understand that unless you

14    gave up your right to be indicted by a grand jury, you could

15    not be charged with this crime because it is a felony offense,

16    unless a grand jury determined that there was probable cause

17    to believe that you committed this crime?  Do you understand

18    that?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Okay.  Do you understand that a grand

21    jury is composed of, at least, 16, but not more than 23

22    persons and that, at least, 12 grand jurors would have to

23    determine that there was probable cause to believe that you

24    committed this crime before you could be indicted for this

25    crime?

Proceedings 19

1          THE DEFENDANT:  Yes.

2          THE COURT:  Okay.  Do you understand that if the

3    prosecutor presented the case to the grand jury, the grand

4    jury might or might not indict you?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Okay.  And do you understand that if you

7    give up your right to indictment by a grand jury, this

8    prosecution will proceed against you simply by virtue of the

9    prosecutor filing this piece of paper, even though you had

10   never been indicted?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Okay.  Have you discussed the matter of

13   waiving your right to indictment by the grand jury with

14   Ms. Macedonio?

15         THE DEFENDANT:  Yes, I have.

16         THE COURT:  Do you understand that right?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Have any threats or promises been made

19   to induce you to give up that right?

20         THE DEFENDANT:  No.

21         THE COURT:  Do you want to give up that right and

22   proceed instead on this Information?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Okay.

25         Ms. Macedonio, do you know of any reason why your

Proceedings                                    20

1  client should not waive indictment?

2          MS. MACEDONIO:  I do not.

3          THE COURT:  Okay.  Have you an executed Waiver of

4  Indictment form down there?

5          MS. MACEDONIO:  I think I handed it to you.

6          THE COURT:  Oh, it is back in front of me, sorry.

7          Okay, I am going to hand down a Waiver of

8  Indictment.

9          Mr. Asaro, is that your signature on the Waiver of

10  Indictment?

11          THE DEFENDANT:  Yes, it is, Your Honor.

12          THE COURT:  Okay.  Before you signed it, did you

13  read it?  Did you read the document?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Did you discuss it with Ms. Macedonio?

16          THE DEFENDANT:  Yes, I have.

17          THE COURT:  Do you understand it?

18          THE DEFENDANT:  Yes.

19          THE COURT:  The record should reflect that

20  Ms. Macedonio has also executed the waiver and I am witnessing

21  it and I make a finding that the waiver is knowingly and

22  intelligently and voluntarily made.

23          Ms. Macedonio, have you discussed the matter of

24  pleading guilty thoroughly with your client?

25          MS. MACEDONIO:  I have, Your Honor.

1          THE COURT:  Does he understand the rights that he

2     would be waiving by pleading guilty?

3          MS. MACEDONIO:  Yes, he does.

4          THE COURT:  Is he capable of understanding the

5     nature of the proceedings?

6          MS. MACEDONIO:  Yes, he is.

7          THE COURT:  Do you have any doubt as to his

8     competence to plead at this time?

9          MS. MACEDONIO:  No, I don't.

10          THE COURT:  Have you advised him of the maximum

11     sentence and fine that may be imposed and discussed with him

12     the advisory sentencing guidelines and the other statutory

13     sentencing factors?

14          MS. MACEDONIO:  I have, Your Honor.

15          THE COURT:  Okay.

16          Mr. Asaro, have you had plenty of time to discuss

17     your case with Ms. Macedonio?

18          THE DEFENDANT:  Yes, I have.

19          THE COURT:  Okay.  And are you satisfied to have her

20     represent you in this proceeding?

21          THE DEFENDANT:  Yes, I am.

22          THE COURT:  Now, we have already reviewed the

23     Information that sets forth the charge against you, and as I

24     recall you fully understood the charge, is that correct?

25          THE DEFENDANT:  Yes.

1          THE COURT:  Okay.  Do you understand that you have

2     the right to plead not guilty to that charge?

3          THE DEFENDANT:  Yes, I do.

4          THE COURT:  And if you did, under the Constitution

5     and under the laws of the United States you would be entitled

6     to a speedy and public trial by a jury with the assistance of

7     your attorney, Ms. Macedonio.

8          Do you understand that?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Okay.  And you would be entitled to have

11     her assistance throughout every aspect of the criminal

12     proceeding against you?

13          THE DEFENDANT:  Yes.

14          THE COURT:  Okay.  At a trial, if you chose to go to

15     trial, you would be presumed to be innocent and the Government

16     would have to overcome that presumption and prove you guilty

17     by competent evidence beyond a reasonable doubt.  You would

18     not have to prove that you were innocent.  If the Government

19     were to fail to prove you guilty beyond a reasonable doubt,

20     the jury would have the duty to find you not guilty.

21          Do you understand that?

22          THE DEFENDANT:  Yes, I do.

23          THE COURT:  Okay.  Now in the course of the trial,

24     the witnesses for the Government would have to come into court

25     and testify in your presence.  Ms. Macedonio would have the

1   right and opportunity to cross-examine the Government's

2   witnesses, to object to any evidence the Government offered,

3   and to offer evidence on your behalf.  And in that connection

4   she would have the right to compel the attendance of witnesses

5   to testify on your behalf.

6           Do you understand all of that?

7           THE DEFENDANT:  Yes, I understand.

8           THE COURT:  Okay.  At a trial, while you would have

9   the right to testify if you chose to do so, you could not be

10  required to testify.  Under the Constitution of the United

11  States you cannot be compelled to incriminate yourself.  You

12  cannot be required to say anything that would in any way

13  indicate your guilt of the crime with which you are charged.

14  If you chose not to testify, I would instruct the jury that

15  they could not hold that against you in any way.

16          Do you understand that?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  Okay.  Now, if you plead guilty and your

19  guilty plea is accepted, you are going to be giving up your

20  constitutional right to a trial and all of the other rights

21  that I just discussed.  There would be no further trial of any

22  kind and no right to appeal from a judgment of guilty.  I

23  would simply enter a judgment of guilty on the basis of your

24  guilty plea.

25          Do you understand that?

1              THE DEFENDANT:  Yes, Your Honor.

2              THE COURT:  Also if you plead guilty, I am going to

3      have to ask you questions about what it was that you did in

4      order to satisfy myself that you actually are guilty of the

5      crime to which you seek to plead guilty.  You will have to

6      answer my questions and acknowledge your guilt.  And in doing

7      that, you are going to be giving up one of the rights that I

8      just described, which is the right not to say anything that

9      would in any way indicate your guilt.

10             Do you understand that?

11             THE DEFENDANT:  Yes, Your Honor.

12             THE COURT:  Okay.  Are you willing to give up your

13     right to a trial and all the other rights that I have just

14     described?

15             THE DEFENDANT:  Yes.

16             (Pause.)

17             THE COURT:  Okay, turning to the last page of your

18     agreement with the government, which is Government Exhibit

19     Number 1, is that your signature on the agreement?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  Okay.  Before you signed it, did you

22     read it?

23             THE DEFENDANT:  Yes.

24             THE COURT:  Did you discuss it with Ms. Macedonio?

25             THE DEFENDANT:  Yes.

1          THE COURT:  Do you understand it?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Is there anything at all in the entire

4   written agreement that you do not fully understand?

5          THE DEFENDANT:  No.

6          (Lindsay Gerdes, Esq. entered the courtroom.)

7          THE COURT:  Do you understand that that written

8   agreement sets forth your whole agreement with the government

9   relating to your guilty plea in this case?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  Okay.  Do you know the longest prison

12  term that could be imposed upon your guilty plea under the

13  statute?

14         THE DEFENDANT:  Twenty years.

15         THE COURT:  That is right.

16         Do you understand that you would also be subject to

17  a term of supervised release of up to three years?

18         THE DEFENDANT:  Yes, Your Honor.

19         THE COURT:  Do you know what a term of supervised

20  release is?

21         THE DEFENDANT:  Yes.

22         THE COURT:  So you understand that is a period of

23  time that you serve after you are released from prison; you

24  are not in prison, but there are many restrictions that are

25  placed on your liberty, so many I cannot not even begin to

1   review all of them for you now?

2          THE DEFENDANT:  I understand.

3          THE COURT:  If you were to breach any of your

4   conditions of supervised release while you were out on

5   supervised release, you could be sent back to prison for up to

6   two years without any credit for any of the time that you may

7   have spent out on supervised release.

8          THE DEFENDANT:  I understand.

9          THE COURT:  Okay.  Do you understand that under the

10  statute you could be fined up to $250,000?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Okay.  Do you understand that you will

13  be required to make restitution in the full amount of each

14  victim's losses as I determine them?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Okay.

17         Finally, do you understand that I must impose a

18  special assessment, which is like a fine, of $100?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Okay.

21         Now, the United States Sentencing Commission has

22  issued advisory sentencing guidelines that I must consider,

23  along with a great number of other statutory sentencing

24  factors in determining a sentence.

25         Have you and Ms. Macedonio discussed how all of

Proceedings                                                      27

1    these matters might affect your sentence?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Do you understand that I am not going to

4    be able to determine your sentence until after the Probation

5    Department has prepared a pre-sentence report and you and

6    Ms. Macedonio and the government had an opportunity to review

7    the report and object to any of the findings made by the

8    probation officer?  Do you understand that?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  Okay.  Do you understand that if you are

11   sentenced to a prison term, you will be required to spend the

12   entire period of that prison term in prison?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Okay.

15             Ms. Argentieri --

16             MS. MACEDONIO:  Your Honor --

17             THE COURT:  -- can you estimate for me --

18             MS. MACEDONIO:  Your Honor, let me just clarify the

19   last point.  I understand what the Court is trying to express,

20   that there is no parole in the federal system and, therefore,

21   he would be required to serve his prison term, but there would

22   also be certain deductions for good time or he could be

23   designated to a halfway house at some point?

24             THE COURT:  But I do not know that any of those

25   things are going to happen.

SAM        OCR        RMR        CRR        RPR

1          MS. MACEDONIO:  Correct.

2          THE COURT:  I do not know if he is going to get good

3   time or I do not know if they will designate him to a halfway

4   house.

5          MS. MACEDONIO:  Understood.

6          THE COURT:  So that is why he has to be prepared

7   that the full-time could be prison time.

8          MS. MACEDONIO:  May I have a moment, Your Honor?

9          THE COURT:  Yes.

10          (Ms. Macedonio confers with the defendant.)

11          MS. MACEDONIO:  Thank you, Your Honor.

12          THE COURT:  Okay.

13          Ms. Argentieri, can you estimate for me the

14   anticipated advisory guideline range in the case?

15          MS. ARGENTIERI:  Sure, Judge.  As set out in the

16   agreement, we think that he is at a base offense level of 20

17   for the arson and travel act; with an aggravating role

18   adjustment of 2 and an impeding administration of justice

19   enhancement of 2 points, that puts him at a 24.  Less 3 points

20   for acceptance of responsibility, which ends up being a

21   guidelines range of 41 to 51 months.

22          MS. MACEDONIO:  Your Honor, if I may add, the

23   agreement that we have come to with the government does not

24   include stipulation to the guideline calculation.  The parties

25   are not stipulating to that.  That is simply the government's

1   estimate as to what they believe.

2          THE COURT:  That is fine.  That is fine.  In fact,

3   Mr. Asaro, it is an estimate.  The government is guessing.

4   They could be wrong, but it could turn out that the advisory

5   guideline that applies in your case is even higher than what

6   the government is now estimating it will be.  And it could

7   turn out that because of all those other statutory sentencing

8   factors I might choose to impose a sentence that is more

9   severe than the one called for by the advisory sentencing

10  guidelines; and if any of those things were to happen, you

11  would not be permitted to withdraw your guilty plea simply

12  because no one could tell you in advance what your sentence

13  would be.

14         Do you understand that?

15         (Ms. Macedonio confers with the defendant.)

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  Okay.  And do you understand that in

18  paragraph four of the agreement you have agreed, among other

19  things, not to file an appeal or otherwise challenge your

20  conviction or sentence by habeas corpus petition or any other

21  provision of law if I impose a prison term of 46 months or

22  less?  Do you understand that?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  And do you also understand that the

25  government's agreement is conditioned upon the entry of guilty

Proceedings                                          30

1   pleas and the acceptance of those pleas by John Gotti, as well

2   as Matthew Rullan; and if not everyone does that or if any of

3   the defendants subsequently seek to withdraw his guilty plea,

4   the United States Attorney's office has the sole discretion to

5   elect whether or not to void any or all of the pleas covered

6   by the agreements and proceed to trial?  Do you understand

7   that?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Okay.  And when that happens no

10  defendant is going to have the right to withdraw his plea in

11  any of those circumstances, it is just going to be up to the

12  government as to what it wishes to do.

13             THE DEFENDANT:  Yes.

14             THE COURT:  Okay.

15             Anything else?

16             MS. ARGENTIERI:  Yes, Judge.  Just two provisions I

17  wanted to highlight.  Number one, the defendant is also

18  waiving any applicable statute of limitation --

19             THE COURT:  Yes.

20             MS. ARGENTIERI:  -- by pleading to this Information.

21  And number two, in paragraph two the defendant is agreeing to

22  waive any challenge under Johnson or its progeny that arson is

23  a crime of violence.

24             THE COURT:  Okay.

25             MS. ARGENTIERI:  And further, he is agreeing that if

SAM      OCR      RMR      CRR      RPR

1    he does challenge his conviction, any statement that he makes

2    at this proceeding may be used against him at trial.

3              THE COURT:  Okay.

4              Let's go through those one at a time, Mr. Asaro.  Do

5    you know what the statute of limitations is?

6              THE DEFENDANT:  (No response.)

7              THE COURT:  You know what a statute of limitations

8    is?

9              THE DEFENDANT:  Yes.

10             THE COURT:  Do you understand that you are giving up

11   your right to assert the statute of limitations as a defense

12   to this charge?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Okay.  Do you understand that the

15   calculation of the sentencing guidelines is affected by

16   whether or not the crime to which you are pleading guilty is,

17   in fact, a crime of violence and that in this agreement you

18   are giving up your right to challenge whether or not the

19   charge arson is a crime of violence?

20             Do you understand that?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  Okay.  And do you also understand

23   that -- is it the last sentence of the same paragraph,

24   Ms. Argentieri?

25             MS. ARGENTIERI:  Yes, Judge.

1    THE COURT:  Okay.

2         -- that you have agreed that if you do challenge the

3    validity of your conviction, any statements made at this

4    guilty plea proceeding may be used against you in connection

5    with that?

6         THE DEFENDANT:  Yes, Your Honor.

7         THE COURT:  Okay.  Anything else, Ms. Argentieri?

8         MS. ARGENTIERI:  No, Judge.

9         THE COURT:  Okay.

10        Do you have any questions that you want to ask me

11   about the charge against you or your rights or anything

12   relating to this proceeding?

13        THE DEFENDANT:  No.  May I have a moment, Your

14   Honor?  I would like to talk --

15        THE COURT:  Yes, go ahead.

16        (The defendant confers with Ms. Macedonio.)

17        MS. MACEDONIO:  Your Honor, if I might.  As I

18   stated, the parties have not stipulated as to what the

19   guideline calculation is going to be.

20        THE COURT:  Right.

21        MS. MACEDONIO:  And so what I have explained to

22   Mr. Asaro is that until the Court receives the probation

23   report and all the arguments from the parties, that Your Honor

24   will not be able to make your own calculation as to what the

25   appropriate guideline range would be --

SAM      OCR      RMR      CRR      RPR

```
                        Proceedings                         33

1            THE COURT:  I hope I just said that.

2            MS. MACEDONIO:  I just want to make sure his

3    concerns are addressed.

4            -- and that, thereafter, the Court would address the

5    3553(a) factors and then, ultimately, determine what the

6    appropriate sentence was going to be.  So when Mr. Asaro asks

7    me what is the absolute calculation of his guidelines I can't

8    give him an answer to that --

9            THE COURT:  Absolutely.

10           MS. MACEDONIO:  -- because there are things that we

11   are still litigating.

12           THE COURT:  All of that really is going to be open

13   until the time of your sentencing.

14           Do you understand?

15           THE DEFENDANT:  Okay, Your Honor, thank you.

16           THE COURT:  Are you ready to enter a plea?

17           THE DEFENDANT:  Yes.

18           THE COURT:  Ms. Macedonio, do you know of any reason

19   why your client should not plead guilty to the charge?

20           MS. MACEDONIO:  No, Your Honor, I do not.

21           THE COURT:  Okay.

22           Mr. Asaro, how do you plead to the charge in the

23   Superseding Information, do you plead not guilty or do you

24   plead guilty?

25           THE DEFENDANT:  Guilty, Your Honor.
```

1          THE COURT:  Are you making the guilty plea

2   voluntarily and of your own free will?

3          THE DEFENDANT:  Yes, I am.

4          THE COURT:  Has anyone threatened, forced or coerced

5   you in any way to plead guilty?

6          THE DEFENDANT:  No, Your Honor.

7          THE COURT:  Other than the agreements with the

8   government that are set forth in this written agreement that

9   has been marked as Government Exhibit Number 1 in your case,

10  has anyone made any promise to you that has caused you to

11  plead guilty?

12         THE DEFENDANT:  No.

13         THE COURT:  Has anyone made any promise to you as to

14  what your sentence will be?

15         THE DEFENDANT:  No.

16         THE COURT:  Did you on sometime between April 1st

17  and 4th of 2012 in this district, that is the Eastern District

18  of New York, and elsewhere, together with another person,

19  knowingly and intentionally use what is called in the

20  Information as a facility in interstate commerce, but probably

21  turns out to be a telephone, intending to promote and

22  facilitate the carrying on of an unlawful activity,

23  specifically arson in violation of New York law; and

24  thereafter, perform and attempt to perform a crime of

25  violence, which is arson, affecting interstate commerce in

 1   violation of federal law?  Did you do that?

 2              THE DEFENDANT:  Hold on a minute.

 3              THE COURT:  That is fine.

 4              (Defendant confers with Ms. Macedonio.)

 5              THE DEFENDANT:  Yes, Your Honor.

 6              THE COURT:  Okay.  You tell me in your own words

 7   what you did that makes you think you are guilty to this.

 8              THE DEFENDANT:  In or about April --

 9              THE COURT:  Would you speak directly into the

10   microphone?

11              THE DEFENDANT:  Oh.

12              THE COURT:  Thank you.

13              THE DEFENDANT:  In or about April 2012 in Queens,

14   New York I used a phone in interstate commerce to promote an

15   arson.  Thereafter, that arson was performed.  Specifically on

16   April 4th, 2012 another person burned the car at my request to

17   further the arson.

18              The only thing I would like to add to that, Your

19   Honor, is that I don't know the other person.  I never have

20   met him.

21              THE COURT:  But did you make arrangements for that

22   other person to commit the arson?

23              THE DEFENDANT:  No, not with him, only --

24              THE COURT:  Did you ask someone to make arrangements

25   for the other person --

Proceedings                                          36

1          THE DEFENDANT:  Yes.

2          THE COURT:  -- to commit the arson?

3          THE DEFENDANT:  Yes.  I didn't, I asked him to take

4   care of it.

5          THE COURT:  You asked another person to take care of

6   it?

7          THE DEFENDANT:  Yes.

8          THE COURT:  And by take care of it, you meant to

9   find someone to commit that particular arson?

10          THE DEFENDANT:  No, Your Honor.  The person that was

11  gonna testify against me --

12          MS. MACEDONIO:  Can I have a moment, Judge?

13          (Ms. Macedonio confers with the defendant.)

14          MS. MACEDONIO:  Judge, go ahead.

15          THE DEFENDANT:  Your Honor, I made arrangements for

16  someone -- with this person to take care of it and it was

17  done.

18          THE COURT:  So you made arrangements with a person

19  to either himself or find someone to commit the arson that you

20  wanted committed and that arson was, in fact, committed?

21          THE DEFENDANT:  I asked one person, him, him to take

22  care of it.

23          THE COURT:  I did not ask how many people you asked.

24          THE DEFENDANT:  Oh, all right.

25          THE COURT:  I want to go through it with you again.

```
                    Proceedings                        37
```

1          THE DEFENDANT:  Okay.

2          THE COURT:  You made arrangements with one person --

3          THE DEFENDANT:  Yes.

4          THE COURT:  -- to commit an arson?

5          THE DEFENDANT:  Yes.

6          THE COURT:  And it was either you made arrangements

7    with that person that he would either commit it himself or

8    find someone else to commit the arson that you wanted to be

9    committed, is that right?

10         THE DEFENDANT:  Yes, Your Honor.

11         THE COURT:  And, in fact, he did?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Someone did commit the arson --

14         THE DEFENDANT:  Yes.

15         THE COURT:  -- that you wanted to be committed?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Okay.

18         Anything further?

19         MS. ARGENTIERI:  Yes, Judge.  Can we have a second?

20         (Pause.)

21         MS. ARGENTIERI:  So, Judge, I think Mr. Asaro

22   already said this in his initial allocution, I just want it to

23   be clear that he used a telephone --

24         THE COURT:  Right.

25         MS. ARGENTIERI:  -- in interstate commerce to

Proceedings                                                    38

1    further the arson.

2              THE COURT:  To further the arson.  As I understand

3    it, he used the telephone to contact a particular individual

4    to make arrangements to commit the arson.  Is that right?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  Okay.  And the arson was an arson of a

7    motor vehicle?

8              THE DEFENDANT:  Yes, Your Honor.

9              MS. ARGENTIERI:  And I just want to make clear that

10   the car was burned by fire.

11             THE COURT:  Was the car, in fact, burned by fire?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  Anything else?

14             MS. ARGENTIERI:  And, Judge, I don't think that he

15   has to allocute to this, but merely agree that at trial the

16   government would be prepared to show that the vehicle that was

17   burned was in and effecting commerce, it was a leased vehicle?

18             THE COURT:  Based on the information that you have

19   given to me, I find that you are acting voluntarily, that you

20   fully understand your rights and the consequences of your

21   plea, and that there is a factual basis for your plea and I,

22   therefore, accept your guilty plea to the charge in the

23   Superseding Information.

24             THE DEFENDANT:  Thank you are, Your Honor.

25             THE COURTROOM DEPUTY:  Sentencing set for October

1    24th at 11 a.m.

2              MS. MACEDONIO:  Your Honor, can we ask for an

3    expedited sentencing in this matter?  Nicole?

4              MS. ARGENTIERI:  Yes, agreed.

5              THE COURT:  I do not have any problem with that, it

6    is a question of how quickly the Probation Department can do

7    it.  So we will request the Probation Department to do that

8    and as soon as the report is out.

9              MS. ARGENTIERI:  What was the date that Mr. LaSalle

10   gave?

11             THE COURTROOM DEPUTY:  October 24th at 11 a.m.

12             MS. MACEDONIO:  And will that prompt the Probation

13   Department to prepare --

14             THE COURTROOM DEPUTY:  It is just the control date.

15             MS. MACEDONIO:  Okay.

16             THE COURT:  I do not see any reason why the

17   Probation Department cannot do it with some speed, so --

18             MS. ARGENTIERI:  We are happy to facilitate that on

19   our end if we can.

20             MS. MACEDONIO:  And we will, as well.  Your Honor,

21   may I have a copy of the transcript of today's proceedings?

22             THE COURT:  Yes.

23             MS. MACEDONIO:  Thank you, Judge.

24             THE COURT:  Okay.

25             (Matter adjourned.)

# Exhibit B

EAG:NMA:LKG/KDE
F. # 2017R00242

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA                    PLEA AGREEMENT

      - against -

                                    17 CR 127 (ARR) (S-1)

VINCENT ASARO,

            Defendant.

– – – – – – – – – – – – – – – – X



        Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United

States Attorney's Office for the Eastern District of New York (the "Office") and VINCENT

ASARO (the "defendant") agree to the following:

        1.     The defendant will waive any applicable statute of limitations and

indictment and plead guilty to an information to be filed in this District, charging a violation

of 18 U.S.C. § 1952.  The count carries the following statutory penalties:

        a.     Maximum term of imprisonment: 20 years
              (18 U.S.C. § 1952).

        b.     Minimum term of imprisonment: 0 years
              (18 U.S.C. § 1952).

        c.     Maximum supervised release term: 3 years, to follow any term
              of imprisonment; if a condition of release is violated, the
              defendant may be sentenced to up to 2 years without credit for
              pre-release imprisonment or time previously served on post-
              release supervision
              (18 U.S.C. § 3583 (b) & (e)).

d.  Maximum fine:  $250,000
(18 U.S.C. § 3571).

e.  Restitution:  Mandatory in the full amount of each victim's
losses as determined by the Court.
(18 U.S.C. §§ 3663A and 3664).

f.  $100 special assessment
(18 U.S.C. § 3013).

2.  The defendant understands that although imposition of a sentence in

accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G.")

is not mandatory, the Guidelines are advisory and the Court is required to consider any

applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a)

to arrive at an appropriate sentence in this case.  The Office will advise the Court and the

Probation Department of information relevant to sentencing, including criminal activity

engaged in by the defendant, and such information may be used by the Court in determining

the defendant's sentence.  See 18 U.S.C. § 3661 ("No limitation shall be placed on the

information concerning the background, character, and conduct of a person convicted of an

offense which a court of the United States may receive and consider for the purpose of

imposing an appropriate sentence.").  The Office estimates the likely adjusted offense level

under the Guidelines to be 24, which is predicated on the following Guidelines calculation:

| | |
|---|---|
| Base Offense Level (§ 2K1.4(a)(2)) | 20 |
| Plus: Aggravating Role (§ 3B1.1(c)) | +2 |
| Plus: Impeding the Administration of Justice (§ 3C1.1) | +2 |
| Total: | 24 |

If the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 22 and a range of imprisonment of 46-57 months, assuming that the defendant falls within Criminal History Category II. Furthermore, if the defendant has accepted responsibility as described above, to the satisfaction of the Office, and if the defendant pleads guilty on or before June 27, 2017 an additional one-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(b), resulting in an adjusted offense level of 21. This level carries a range of imprisonment of 41-51 months, assuming that the defendant falls within Criminal History Category II. The defendant agrees to waive any challenge, whether pursuant to Johnson v. United States, 135 S. Ct. 2551 (2015), and/or its progeny or otherwise, that arson, in violation of 18 U.S.C. § 844(i), is a "crime of violence." The defendant also agrees that if he challenges the validity of his conviction, any statements the defendant makes at the guilty plea proceeding may be used against him.

3.      The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

4.      The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in

3

the event that the Court imposes a term of imprisonment of 46 months or below. This waiver is binding without regard to the sentencing analysis used by the Court. The defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this agreement is signed in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the defendant's plea is later withdrawn. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum. The defendant waives any right to additional disclosure from the government in connection with the guilty plea. The defendant agrees that with respect to all charges referred to in paragraphs 1 and 5(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law. The defendant agrees to pay the special assessment by check payable to the Clerk of the Court at or before sentencing.

     5.     The Office agrees that:

          a.     no further criminal charges will be brought against the defendant for his role in the arson of a Kia on or about April 4, 2012, and conspiracy to do the same (as alleged in Counts One and Two of the underlying indictment), it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 et seq., and at the time of sentence, it will move to dismiss the underlying indictment with prejudice.

Should it be judged by the Office that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including but not limited to: (a) moving

4

for the additional one-level downward adjustment for timely acceptance of responsibility described in paragraph 2 above; and (b) the provisions of paragraph 5(a).

6. This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

7. This agreement is conditioned upon the following: (a) the defendants listed below (the "covered defendants") entering guilty pleas, pursuant to plea offers dated June 23, 2017, on or before June 27, 2017, and (b) acceptance of those pleas by a United States District Court Judge at the time of the plea allocution. The covered defendants are:

     i. Vincent Asaro,

     ii. John J. Gotti and

     iii. Matthew Rullan.

If fewer than all of the covered defendants satisfy conditions 7(a) and 7(b), or if any of the covered defendants subsequently seeks to withdraw his or her guilty plea, the Office, in its sole discretion, may elect to void any or all of the covered defendants' plea agreements and proceed to trial. No covered defendant will have the right to withdraw his or her guilty plea in any of those circumstances.

8. Apart from any written proffer agreements, if applicable, no promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. Apart from any written proffer agreements, if applicable, this agreement

5

supersedes all prior promises, agreements or conditions between the parties.  To become

effective, this agreement must be signed by all signatories listed below.

Dated: Brooklyn, New York
_____, 2017

                                       BRIDGET M. ROHDE
                                        Acting United States Attorney
                                        Eastern District of New York

By:        _____
                                          Nicole M. Argentieri, Lindsay K. Gerdes & Keith
                                        D. Edelman
                                        Assistant United States Attorneys

                                        Approved by:

                                        _____
                                        Elizabeth A. Geddes
                                        Supervising Assistant U.S. Attorney

I have read the entire agreement and discussed it with my attorney.  I understand all of its
terms and am entering into it knowingly and voluntarily.

_____
VINCENT ASARO
Defendant

Approved by:

_____
Elizabeth Macedonio, Esq.
Counsel to Defendant

# Exhibit C

September 19th, 2017

United States District Court
For Eastern District of New York
Attn: Judge Allyne R. Ross
225 Cadman Plaza East
Brooklyn, New York 11201

Your Honor,

    I, Maxie Boccio, am writing this letter on behalf of Vincent Asaro. Vincent is my grandfather; however, he has been the closest thing I have ever had to a real father. My mom and dad got divorced when I was in fourth grade. Since then, my grandfather has been a father figure to me by often providing guidance. He always stressed to me the importance of doing the right thing and being a good person, and continues to remind me of these virtues in my adulthood. Regardless of the circumstances, my grandfather has always been there for me and my family.

    From as early as I can remember, my grandfather has shown me nothing but love and kindness. Each time we are together I am greeted with constant affirmations of his love and reminders that my sister and I are his favorite grandchildren. Though these fond memories have a special place in my heart, they dull in comparison to the immeasurable support he has selflessly given to our family and myself.

    My grandfather has always taken care of me. When I was sick, he took me to the doctor; one of the many things that he has done for me. During the entire trip there he had me laughing from his jokes. I almost forgot I was sick because I was having so much fun. Even more, the effort in which he used in his attempts to alleviate my pain conveyed to me his profound support and caring nature. When it comes to great personalities, my grandfather is a prime example that age is solely a number.

    I feel exceptionally lucky to have Vincent as a grandfather. He is truly one of a kind and easily the funniest individual I've met. His ability to crack jokes with ease or his talent to create a delicious masterpiece effortlessly in the kitchen are a few of the many reasons I enjoy being around my grandfather more than anyone.

    Holidays, and every day in general, are not the same with my grandfather gone. His absence places an enormous strain on our family. I am living in a constant state of unbearable upset knowing he is alone in a cell without even sunlight, while my family and I enjoy life without him, but never moving on. My grandfather has always been a man with an ardor for life, a lover of the outdoors, but above all, a family man. In addition to my inner turmoil over his absence, I fear he may never return home due to his health and old age, an outcome that would imprison my family for the rest of our lives.

    I pray that there is a light at the end of this dark tunnel. Please have some compassion when sentencing my grandfather. He is more than just an inmate. He is a father, grandfather, great-grandfather, brother, and a friend. The effect of my grandfather's sentence will extend far beyond him and impact my close-knit family every day. I hope that in our future, the days of speaking on a collect call or across from one another will be no more.

    I believe that he does not get the of quality care needed to adequately care for his health conditions while in jail. Please take his health and age into account, and the fact that he may never return home to his family, a family that loves and cares for him very deeply, if he is given a lengthy sentence. My family and I are now at mercy to your decision, a decision that we cannot influence but by which we will be impacted. Please consider the grandfather I know and have just described as you make your decision. I thank you for your time.

    Respectfully,
    Maxie Boccio

August 1, 2017

Dear Honorable Allyne R. Ross,

My name is Michele Carollo.  I am Mr. Asaro's girlfriend for over 15 years some of those in which we have lived together.

You have heard stories about Vinny through court testimonies.  Please allow me to tell you about the Vinny that I and his family and friends know.

When I first started going out with Vinny I was in awe of the relationship he had with his children and especially his grandchildren.  Even though they were young girls they constantly called to talk with him on the phone.  Not only were there phone calls but he was always driving to Long Island to pick up one of the girls from school and/or take them to afterschool activity.   Holidays are a big thing to him and he always spent it with his family.  He loved to do the cooking and planning Easter egg hunts.  His love for them is amazing and their close relationship has continued as they are now mature young women.  He has a wonderful relationship with his sisters.  They are a constant presence in each other's life.

As for his friendship – you could not have a better person to call friend.  He is very caring and concerned in their well being.  He enjoys cooking and having friends over for dinner.  If you mention that you like something, he will bring it to your house the next day.   A few years ago his neighborhood was destroyed by Superstorm Sandy.  He worked tirelessly to help his neighbors.  His apartment was on the second floor and his landlord's apartment was totally destroyed by the storm.  He offered his apartment to them and he stayed at my house since my neighborhood was not affected. Every day he went  to help bring supplies and food to many residents.  Vinny is a good and loyal friend and would do what he can to help you.

His relationship with my children has been exceptional.  My boys have looked to him for guidance and support through all the years we have been together.  He has helped them when they were job hunting, with their first car and the responsibility   to own a vehicle.  This love and affection is now passed to my son's children.  They look forward to their visits with Grandpa Vinny and his magic and card tricks.  They love his silliness and doing anything to make them laugh.  He is gentle and loving with them. He has become a very special member of my family.  My relatives look forward to his holiday cooking and laughter.  My mother was ill and lived with us for awhile.  While I was at work Vinny took care of her and made sure she had her breakfast and lunch every day.  He also tended to the household chores so that I did not have to worry about it.  He made dinner for us.  My mom was 94 years old and had the onset of dementia and was not very mobile.  The stress of seeing her decline was a lot for me.  But Vinny tried to help me by taking care of the mundane things so that when I came home I could tend to her.  Unfortunately she passed away in June and he was not able to attend her wake or funeral .  This hurt him very much. . He was very close to my brother.  My brother had cancer and a week before he passed he called to have his last good conversation with Vinny.  They laughed about all the things they did together, the meals they cooked together and the fun they had.  My brother also asked him to be a pallbearer at his funeral.  I have never seen Vinny so distraught.  He was also honored to be asked. In one year I have lost my brother and my mother – two very special people in mine and Vinny's life.    Please don't let me lose him too.

My life with Vinny has been wonderful.  It is filled with love and affection. It is the little things in life are what make us both happy.  Whether it is having the kids over for breakfast or taking a drive or a movie that is what makes us both happy.  I feel I have been very blessed to have him in my life. He is a loving, supportive and devoted partner.  He has endured many health issues within the last years.. At 82 years of age, his days are now filled with doctor appointments, tests etc.  We try to make the best of the time we have together.  I just want him to come home and spend whatever time God grants him surrounded by family and friends.

I humbly ask you to please take his health and age into consideration as you decide his fate.

Respectfully,
Michele Carollo

Dear Honorable Allyne Ross

I am writing to you today for my dad Vincent Asaro. I am asking for your leniency in his sentencing so he can spend the last years of his life with his family all of who love him very much.

My dad is a caring family man. He has always been a great support to me and my 2 daughters. He has been there to encourage them to listen to them and always giving them love and support. He has always let them know how much they mean to him.

We have all seen his outbursts. That's just part of his personality. Your Honor heard a lot of recordings in which my father was carrying on. But just as soon as he started yelling, he stopped and he was on to the next topic. Often he says things in the heat of the moment which he doesn't mean at all. I too have been told calm down at work or from people who don't really know me. It's just the way he expresses himself. My dad has the kindest heart and shows empathy to all.

My older Darla daughter was an athlete he always went out his way to get her from her practices which where 60 miles away. Whenever possible he attended her tournaments. Always showing his support. She is a beautiful responsible young women. He has taken them fishing and played all sports with them when he was able. Still coming over so he can give Darla gardening tips. It is difficult for those two to share the hose!

My younger daughter Maxie is on the gold honor roll with a 3.85 GPA @Farmingdale. She has worked since she's 15 years old putting herself though school. Her grandfather has always told her how proud he is of her. This means so much to both of them. They both have a special bond with their Gramps.

We love having Sunday dinners holidays together and any chance to share a meal. My dad is usually the one cooking with the rest of us helping. These are long time family traditions for us. It's great for us to all be together.

Although they are divorced my dad still took my mom to the doctor the store shoveled her snow and cleans her yard when he was home. He brings her food and bagels. My mom suffers from macular degeneration so she cannot drive and get around alone.

He loves dogs when he comes to my house my dogs immediately jump up to sit on their Gramps lap. They do that for no one they usually run under the table and hide. Whenever anyone has a problem with their dog he's always there to help. He has found homes for many homeless dogs.

He shares a quiet life with Michele. Basically hosing the yard and visiting family, going to doctor's appointments and spending time with his dog who has recently passed. He goes out of his way to have a kind ear to listen to people with a compassionate ear.

He has 2 great-grandchildren that love their Grampy too. Telling them the same stories he told his other grandchildren growing up. His 3 sisters love him very much they are all elderly and still look forward to speaking to their brother and worry about his health everyday. Not having access

to healthy food is a very big health concern.

My dad had many health issues that fact that he is 82 years old he needs to have access to immediate medical attention when needed.  I'm am sure your Honor is aware of the inability of the jails to provide this especially to someone of his age. He saw his doctors on a regular basis when he was home.

I am asking you from my heart to take all of this into consideration. Thank you for taking the time to read my letter and I hope this gives you a better insight to who my dad really is a kind loving sometimes pesty family man. A man who is loved deeply by his family and worried about his health on a daily basis.

As of Sept 25 my dad has been sick.  They are giving him over the counter medication mucinex. He is on many other medications and the interaction can be dangerous. I'm not sure if they are aware. He needs to be seen by a real doctor for diagnostic testing. I know you are aware of the horrific conditions when it comes to medical care in any of the prisons.

His pleas for medical attention are ignored when your 82 that is a death sentence. We call the facility we are hung up on and NO ONE will give their name.


Best regards

Noreen Asaro

The Honorable Allyne R. Ross,

I am writing this letter on behalf of Vincent Asaro to ask the Court for leniency when he appears before you for sentencing.

I have known Vincent Asaro my whole life. He is actually a very kind and generous man. Vincent is a wonderful and loving father, grandfather, and friend. Vinny is also a very smart man. He has always guided me in the right direction and has given me some of the best advice of my life. I remember when I had switched jobs and realized it was a big mistake. It was Vinny that said to me "Lu, call your old boss and tell her you want to come back. You always worked hard and left on good terms. Explain to her that you regret your decision to leave. I bet you they'll take you back." I listened to him and I am happy to say I am back at my old desk. This is just one of many pieces of great advice he has given me.

I will also never forget how he saved my Father's life many years ago. They were together at the racetrack and my Daddy's heart stopped and he collapsed to the floor. Vinny literally picked him up in his arms and ran my Father to the doctor on call at the track. If he had not acted so quickly, my family would have lost my Father that day. A few years later my Father passed away in Florida. Vinny took the time to write a beautiful letter in a Mass card to my Mother. He told her how much my Father loved his family and he had never known a man to love his wife the way he did. His words were extremely comforting to us all.

When my Mother became sick with Alzheimer's and I was caring for her, it was Vinny (not my own siblings) that offered to sit with her so that I could go out and have some fun. I remember his exact words, "Lu, you're young and you need to go out once in a while. Pick a night and I will sit with your Mother."

Then when my sister, Antoinette Gennaro was so sick with cancer and she didn't have the strength to get up out of my car, it was Vinny that I called and without hesitation he was on his way to my house. He lifted her out of that car and carried her to the couch. This is the kind of man Vinny is.

I hope when he stands before you for his sentencing you will see Vincent Asaro as the kind and loving man that he is and not a criminal. There are so many bad people in this world, Vinny is not one of them.

Sincerely,

Lucille Gennaro

August 17th 2017

United States District Court

For Eastern District of New York

Attn: Judge AAllyne R.Ross

225 Cadman Plaza East

Brooklyn, New York 11201


The Honorable Allyne R.Ross,


I Amanda Asaro am writing this letter on behalf of Vincent Asaro. I am the second oldest granddaughter of Vincent Asaro, and for the past thirty two years of my life I have been lucky enough to call him my grandfather. My grandfather was and still is always such a loving kind man. I have nothing but the ultimate love and respect for my grandfather.

Growing up I was fortunate enough to spend a lot of quality time with my grandfather. It was always very important to my grandfather to spend time with his grandkids, whether it was at his house in Tudor Village Queens, or out east at the house in the Moriches. We would spend all weekend long laughing. My grandfather would make it his business to make sure when we were with him on the weekends the fun would never stop. Whether it was his scary stories that kept us up all night or his hilarious stories and practical jokes that would have us bent over crying from laughing to hard. These are just some of the qualities that make him such a loving caring family man that he is. Now at eighty-two years old that amazing fun loving grandfather is the same amazing fun loving great grandfather too my two nieces ages two and four. They adore him in the same way that we did growing up. He tells them the same stories that he told me at their age and they laugh and look at him the same way I did with nothing but love and trust in their eyes. My Grandfather is an amazing person, and excellent family man, and at the age of eighty two is completely harmless. I learned so much from my grandfather, and he always taught me the value of family. Family is always the most important thing to us, and my grandfather is a big part of this family.

I hope that you can find the heart to provide some leniency when sentencing him. My grandfather is after all eighty two years old and not in the best of health. I would everything to me to have him be able to enjoy the rest of his life surrounded by the people who love him. I would like for him to be able to get the proper care to help him extend his life. I do not want my grandfather to die in prison, I don't want to see him for a few short hours in a small visiting room where we cannot even embrace him with love an affection. Please if you could consider his health and his family when sentencing him it would mean the world to me and my family.


Thank You

Respectfully,

Amanda Asaro

August 9th, 2017

United States District Court
For Eastern District of New York
Attn: Judge Allyne R. Ross
225 Cadman Plaza East
Brooklyn, New York 11201

Your Honor,

I, Gia Asaro, am writing you this letter on behalf of Vincent Asaro. For the past 26 years of my life, I have been lucky enough to call him my grandfather. My grandfather is a very important part of my life. Being that my mother's father died when I was only nineteen month's old so I couldn't form a relationship with him. I was lucky enough to have my grandfather Vincent, or as we call him Gramps and grow up with him around. I feel nothing but love and respect for my grandfather.

Growing up I learned the most important values from my grandfather, love and respect. He has always shown nothing but love to me and always taught me to respect everyone no matter how they treat you. My grandfather also taught me no matter what age you are humor and imagination never leave. He is one of the funniest people that I have ever known. His imagination and humorousness have always given him the ability to create such elaborate stories to tell us when while we were growing up. Now twenty-something years later he shares the same stories with my nieces whom are 4 and 2. Whether they are stories that are meant to scare our pants off or stories to have our bellies ache of laughter we've always enjoyed them. My grandfather is a great person, an excellent family man and at the age of 82 is completely harmless.

I hope that you can find the heart to provide some leniency when sentencing him. After all, he is 82 years old and not in the best condition health wise. I want him to be able to enjoy whatever years he has remaining surrounded by the people who love him. I want him to be able to get the proper care to extend his life. I don't want to die in prison, I don't want to only be able to spend a few short hours with him during visits and not be able to show him affection. Please if you could consider his health and his family when sentencing him it would mean the world to me.

Thank you.

Respectfully,

Gia Asaro

August 19, 2017

United States District Court
For Eastern District of New York
Attn: Judge Allyne R.Ross
225 Cadman Plaza East
Brooklyn, New York 11201


The Honorable Judge Allyne R. Ross

I Kristen Allen, am writing to you on behalf of Vincent Asaro. I am a very close friend to
his granddaughters and have known him for over 25 years.  In that time, I have always
thought of Vincent and looked up to him as if he was my own grandfather.  In fact I call
him gramps. Being that I lost my grandparents at a very young age he would at all times
treat me as one of his own.  Always making sure to include me in everything he did with
his granddaughters.

My fondest memories are of him & his family, who I am lucky to also call my own.  I have
nothing but love & respect for Vincent and he has always shown me the same.  He is also
one of the funniest people I have ever met.  We could laugh for hours. He sure does know
how to put a smile on your face no matter the situation.

My only wish is that he will be able to spend his years with all of us and his now 2
beautiful great grandchildren, who eyes light up when he walks into the room.  Seeing how
much he adores them and they adore him could melt your heart.  I can truly say I am
beyond blessed to have had Vincent in my life and I am grateful for the kindness he has
shown me over the years.


Thank you.

Respectfully,

Kristen Allen

August 1, 2017

Dear Honorable Allyne R.Ross,

My name is Susan Apicella. I am a retired N.Y.C. public school teacher and personal friend of Vincent Asaro. I understand that Vincent will be appearing before you for sentencing, so I am writing this letter to provide you with my personal history with Vincent, and to ask you for leniency.

I have known Vincent for the past 15 years as he is a devoted partner to my very good friend Michele Carollo. Vincent has always been a kind, generous and compassionate individual. He is trustworthy, dependable and willing to offer help in any given situation. In interacting with both young and old, Vincent is well liked. Vincent helped with the homecare of Michele's mom who lived with them for a short while. He assisted with her daily routines and enjoyed cooking special meals for her as well. He has a special relationship with his grandchildren and great grandchildren and enjoys their company immensely.

We have vacationed together often and Vincent has always been a pleasure to be with. He interacts with people easily and comfortably. He is committed to his family and friends, who in turn, are extremely supportive of him. I know given the opportunity, Vincent will be the upstanding person I know him to be.

Thank you for your consideration.

Respectfully,

Susan Apicella

# EXHIBIT G



*The Law Office of*
**Elizabeth E. Macedonio**

<div align="right">

40 Fulton Street – 23rd Floor – New York, NY 10038
Office: 212-235-5494 • Fax: 212-480-4444 • Email: Elizabeth@MacedonioLaw.com

</div>

<div align="right">

December 13, 2017

</div>

Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

<div align="center">

Re:  <u>United States v. Vincent Asaro</u>
17 Cr. 00127 (ARR)

</div>

Dear Judge Ross:

This letter is submitted for Your Honor's consideration in the sentencing of Vincent Asaro in the above-referenced matter. This letter is written to supplement Mr. Asaro's initial submission dated October 30, 2017.

## I.      The Guideline Calculation

On December 4, 2017, the government advised the Court that it no longer intended to prove Mr. Asaro's alleged participation in conduct amounting to obstruction of justice. Accordingly, the parties are now in agreement that the following guidelines calculation applies in this case:

| | |
|---|---|
| Base Offense Level (§ 2K1.4 (a)(2)) | 20 |
| Aggravating Role (§ 3B1.1(c)) | +2 |
| Acceptance of Responsibility (§ 3E1.1) | -3 |
| Total Adjusted Offense Level | 19 |

With a Criminal History Category of II, Mr. Asaro's range of incarceration is 33-41 months' imprisonment.

## II.      The Government's Sentence Submissions

On or about November 20, 2017, the government submitted its sentencing submission in which it asked for "a sentence in excess of fifteen years' imprisonment." Despite the wordsmith nature of the request, given Mr. Asaro's age, the government is clearly seeking a sentence of life.  The government repeated this request in its December 4, 2017, submission to the Court.

A reading of these documents, and a review of the case overall, however, clearly demonstrates that the government is not seeking a sentence for the crime of conviction. Rather, it is plain that the government is seeking to usurp the jury's verdict in Mr. Asaro's previous case, and have him sentenced to crimes for which the jury unanimously voted "not guilty."

Honorable Allyne R. Ross
United States District Judge
December 13, 2017

On November 12, 2015, Mr. Asaro was acquitted in this District after a jury trial. (*US v. Asaro*, 14 Cr. 26 (EDNY) (ARR)). The crimes alleged in that case included the murder of Paul Katz in 1969, and the Lufthansa Heist in 1978. During the trial, the government attempted to prove these charges in large part through the use of cooperator testimony, which was outright rejected by the jury after only a short period of deliberations. The case captured national attention and was an embarrassing loss for the United States Attorney's Office for the Eastern District of New York.

Thereafter, on March 22, 2017, at the age of eighty-two, Mr. Asaro was again arrested in the same District for a crime that was committed five years earlier. What is most telling, is that this case is being prosecuted by the same case agents and the same prosecution team.

Though Mr. Asaro has accepted responsibility for his conduct, it is clearly not enough for the government. In an effort to capture an illicit victory, and thereby turn the American justice system upside down, the government is asking this Court to impose a life sentence for Mr. Asaro's participation in the arson of a vehicle; a crime in which no one was injured.

One need only look at the first paragraph of the government's submission to ascertain the vengeful nature of this prosecution. The language used is unprecedented. The requested sentence relies not only on crimes which Mr. Asaro was acquitted of, but also a crime the government now concedes it cannot prove – obstruction of justice.

## III.   **The Obstruction of Justice Allegation**

The government's allegation of obstruction of justice perhaps best illustrates its vengeful blindness in the prosecution of this case. Clearly without properly vetting its cooperator, the government relied upon faulty information in its bail submission and argument before this Court, in its recitation of the facts to the Probation Department in preparing the Presentence Report and in its sentencing submission. The government now summarily states "the Court should not rely upon the information provided by CS-1 at sentencing." (Gov't letter of December 4, 2017).

Notably, on Thursday November 30, 2017, the Court held a telephone conference to specifically address the issue of the *Fatico* hearing. During this call, counsel for the government persisted that a hearing was going to take place and the Court set it down for December 12, 2017. Less than twenty-four hours later, the government indicated that a hearing was not going to be necessary. This assertion was memorialized in its December 4, 2017 letter to the Court. The timing of these events clearly indicates that the government withheld information regarding the veracity of the cooperator until the very last minute when the die had already been cast.

In its original submission dated November 20, 2017, the government's request for a 15-year sentence was in large part based upon allegations made by an inmate (CS-1) that Mr. Asaro plotted to kill an AUSA. After securing defendant's remand based upon the allegations of CS-1, the government argued in its sentence memo that Mr. Asaro should receive a 2-point enhancement for obstruction of justice and be deprived of the 3 acceptance of responsibility points reflected in the plea agreement's guidelines analysis, based upon information provided by this untrustworthy informant. Indeed, the claim that Mr. Asaro

2

Honorable Allyne R. Ross
United States District Judge
December 13, 2017

threatened to kill his prosecutor is referenced repeatedly throughout the memorandum on at least five occasions (pg. 1 "extensive participation in heinous criminal acts, including murder and obstruction of justice") (pg. 2 "threats of violence directed at a prosecutor") (pg. 13 "enlisting a co-defendant in a plot to murder a prosecutor") (pg. 14 "defendant made numerous threats about his prosecutor") ("given both the crime of conviction and the defendant's decision post - arrest to attempt to obstruct his prosecution for a violent offense by harming his prosecutor, a sentence of less than fifteen years' imprisonment will not deter this defendant…"). After Mr. Asaro had been remanded for months, in large part upon the alleged assertions of CS-1, immediately prior to having to turn over *Brady* and other material disclosures regarding CS-1, the government filed its December 4 letter claiming that it "discovered additional information regarding CS-1 that has cast doubt on his reliability" and retracted its request for the obstruction of justice enhancement.

Blindly following CS-1's faulty information, however, did not pass without consequences to Mr. Asaro.[1] Based upon CS-1's allegations, on April 12, 2017, Mr. Asaro was placed in administrative detention at the MDC. On or about April 23, 2017, counsel visited with Mr. Asaro in the Special Housing Unit ("SHU"). When Mr. Asaro entered the attorney visiting area he was distraught. He had collapsed in the shower and was unable to get up. He was not coherent and was unable to effectively communicate. He clearly had lost a significant amount of weight and reported that he was having pain urinating. The temperature in the SHU was far below comfortable and Mr. Asaro was not provided with appropriate clothing. Upon consistent urging, Mr. Asaro was taken to the nurse and ultimately to the hospital. He was suffering from dehydration, dangerously high blood pressure and extreme weakness.

He was returned to the MDC and the SHU on April 25, 2017, without any further medical intervention. Remarkably, since Mr. Asaro was in 24-hour lockdown, if an emergency had occurred, he would have had no assistance whatsoever. While staff is on the floor, the inmates are routinely ignored. Had counsel not gone the MDC on this particular day, it is likely that Mr. Asaro would not have received any medical attention. Mr. Asaro was finally released from the SHU on or about May 2, 2017, after having spent nearly three weeks in the SHU based solely on CS-1's allegation. While the MDC is ordinarily quick to issue disciplinary tickets for even the most minor infractions, no ticket of any kind was issued against Mr. Asaro.

## IV.    The Government's Clear Efforts to Usurp the Jury's Verdict

The government improperly requests this Court to sentence Mr. Asaro to over a decade more than the agreed upon guidelines range, based solely upon the charges Mr. Asaro was tried and acquitted of in his 2015 EDNY trial. The sentence "in excess of fifteen years" requested by the government entirely disregards the fact of Mr. Asaro's acquittal of these crimes and abrogates the jury's verdict. The government has failed to provide a single analogous case wherein a Court relied upon an acquittal from a previous case to impose

---

[1] Not only did it make case-shaping decisions in reliance on the unreliable information regarding alleged threats to a prosecutor such as arguing for remanding Mr. Asaro, it continues to cavalierly advance questionable and untested theories. For example, without any evidence or explanation, the government concluded that "cracking an egg" means "murder" and claims that Asaro "acknowledged that he has earned his spot in organized crime by doing "everything," including stealing and murder ('cracking an egg')." Gov. Nov. 20 submission at 8.

Honorable Allyne R. Ross
United States District Judge
December 13, 2017

a sentence that is not even double or triple the guidelines sentence but nearly five times as high. Under no test can such a sentence be viewed as substantively reasonable.

> A.     <u>The government's cases where sentences are imposed upon acquitted conduct found by a preponderance of the evidence are distinguishable</u>

While it is long settled that a "wide range of facts" may be considered pursuant to 18 U.S.C. 3553 in sentencing, the government asks this Court to take an unprecedented step and impose a sentence in excess of *five times* the agreed upon guidelines range based upon conduct alleged in a prior case that resulted in Mr. Asaro's acquittal. Though the government cited cases providing for an increased guidelines calculation based upon the Court's finding that relevant conduct was proven by a preponderance of the evidence, none of the cases involved a Court's use of acquitted conduct adduced at a trial occurring years earlier to impose a sentence far above the agreed upon guidelines range. *C.f. United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) (Court permitted to calculate guidelines range based upon its finding by a preponderance of the trial evidence that the conduct involved 544 kilos of marijuana even though jury convicted defendants of conduct involving 50-100 kilos); *United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012) (Court considered conduct underlying acquitted charge at sentencing in calculating guidelines range but imposed a substantial downward variance from the guidelines because the defendant had been acquitted of the count alleging the conduct); *United States v. Watts*, 519 U.S. 148 (1997) (no error for district court to calculate guidelines offense level based upon acquitted conduct that was proven at trial by a preponderance of the evidence).

In *Pica*, though the District Court included acquitted conduct in its guidelines calculation, at sentencing it imposed a sentence far below the guidelines specifically to sentence the defendant for the charges he was convicted of and not the more serious acquitted charges that were included in the guidelines calculation. *See id.* at 89 ("the court explicitly 'declined to impose a sentence at the level called for by the guidelines…based on a finding made by a preponderance of the evidence,' and stated that Antico was convicted of less serious offenses, and it is for those offenses that he is and should be sentenced."); *see also Vaughn* 430 F.3d at 527 (district courts not required to take into account acquitted conduct in calculating a defendant's guidelines range, and when they do they should consider the acquittal when assessing the weight and quality of the evidence).

Unlike the instant case, each of the government's cases involved an increase to the guidelines calculation based upon relevant conduct that the defendant was acquitted of that was charged in the same Indictment as the charge for which the defendant was being sentenced. The resulting sentences in these cases were at or below the calculated guidelines range and in none of the cases was acquitted conduct from a prior jury trial considered to impose a sentence far beyond the agreed upon guidelines. Indeed, the only case the government cited where the Court departed above the guidelines range was *United States v. Uvino*. 07 CR 725 (JBW). This case is plainly distinguishable. In citing *Uvino*, the government failed to note that Mr. Uvino, a Captain in the "Colombo family" at the time of his arrest, was being sentenced for his conviction after trial of a racketeering conspiracy involving "the brutal assault of two individuals," illegal gambling, and bookmaking. Mr. Asaro, unlike Uvino, comes before the Court for sentencing on an arson that he pleaded guilty to. The government's request that Mr. Asaro receive a sentence far greater than Uvino's sentence for a post-trial racketeering conspiracy for the crime of arson does not add up.

4

Honorable Allyne R. Ross
United States District Judge
December 13, 2017

Moreover, though this Circuit permits a sentencing court to consider acquitted conduct that was proven by a preponderance of the evidence,[2] because of the extraordinary departure from the guidelines requested by the government, here Due Process would require the higher clear and convincing standard of proof were the Court to consider the acquitted conduct from Mr. Asaro's prior case in sentencing Mr. Asaro for the arson. In the novel request to consider prior acquitted conduct from a different case, where such conduct would "dramatically increase the sentence," Due Process implications would require the more stringent "clear and convincing" standard rather than the lower "preponderance" standard. *See United States v Watts*, 519 US 148, 156 n2 (1997) citing (*McMillan v Pennsylvania*, 477 US 79, 91 (1986)); *United States v Cordoba-Murgas*, 233 F3d 704, 708-709 (2d Cir 2000) (quoting *United States v Gigante*, 94 F3d 53, 56 (2d. Cir. 1996)) ("The preponderance standard is no more than a threshold basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures. With regard to upward adjustments, a sentencing judge should require that the weight of the factual record justify a sentence within the adjusted Guidelines range . . . . Where a higher standard, appropriate to a substantially enhanced sentence range, is not met, the court should depart downwardly.")(emphasis omitted)). Here, this Court heard the witness testimony over two years ago; the government has offered no authority for its claim that the Court can engage in a weighing of evidence from a prior case after a substantial period of time has passed and after memories of witness demeanor and other credibility indicators have naturally faded and morphed over time.

There is no requirement that the Court consider acquitted conduct and it is respectfully submitted that the Court should not do so here. The Government's requested sentence of approximately five times the agreed upon guidelines range based on acquitted conduct from another case, which allegedly occurred decades ago, is without any precedent in fact or law. Like the District Court recognized in *Pica*, Asaro comes before the Court for sentencing on the arson; a sentence should be imposed pursuant to the guidelines for this offense and not based on conduct from Asaro's prior case because the government is dissatisfied with the verdict.

B. <u>Due to the procedural history of this case, sentencing Mr. Asaro to a sentence far in excess of the guidelines range would create perverse prosecutorial incentives and is not in the spirit of a fair and effective plea-bargaining process</u>

After having been charged with and acquitted of a stunningly broad spanning racketeering conspiracy charging predicate acts relating to the Bonanno LCN spanning from January 1, 1968 to June 30, 2013, in the Eastern District of New York, Mr. Asaro was charged with an arson that occurred in April of 2012 in the EDNY, during the charged timeframe of the 2014 racketeering conspiracy alleged in Mr. Asaro's prior EDNY prosecution. As the Government noted, the arson was carried out by at least one associate of the "Bonanno crime family" and the Government claims it was carried out to further the goals of this organization. See Gov. Letter dated November 20, 2017 ("Defendant approached CW-1 to commit the charged arson because he was aware of CW-1's status as an associate around Giallanzo, CW-1's desire to be inducted into the Bonanno family and CW-1's willingness to be involved in criminal activity."). It

---

[2] *See United States v Berrios*, 1998 U.S. App. LEXIS 31790, at *3 (2d Cir 1998) citing *United States v. Zagari*, 111 F.3d 307, 322-23 (2d. Cir. 1997).

Honorable Allyne R. Ross
United States District Judge
December 13, 2017

was only after Mr. Asaro was acquitted of the racketeering conspiracy that the Government prosecuted him on the instant charge.

Though the case law provides that Double Jeopardy protections do not prohibit successive prosecutions for racketeering conspiracies and their predicate acts,[4] the government's ability to re-prosecute an individual repeatedly for conduct occurring during and arguably comprising part of a racketeering conspiracy is disquieting. The Second Circuit has long recognized "the ease with which prosecutors can draft indictments that allege what appear to be separate conspiracies but may actually be parts of an overall conspiracy." *United States v. Lopez,* 356 F.3d 463, 467 (2d Cir. 2004) *quoting United States v. Abbamonte*, 759 F.2d 1065, 1068 (2d Cir. 1985). Moreover, courts have expressed concern regarding subsequent prosecutions particularly with racketeering conspiracies due to the particularly broad nature of these prosecutions:

> with the expansion of federal jurisdiction, the U.S. Code has become a sprawling compendium of technically distinct though factually overlapping statutory offenses, which enables prosecutors to repackage and re-allege stale and already-prosecuted conduct...the Court shares this concern--particularly in the context of the RICO organized crime prosecutions cycled through this courthouse and the one across the East River, involving the same players and often, it seems, the same crimes.

*United States v. D'Amico,* 734 F. Supp. 2d 321, 343 (S.D.N.Y. 2010).

It was only after Mr. Asaro was acquitted of a broad spanning racketeering conspiracy, that arguably could have included the instant offense, that Mr. Asaro was prosecuted once again by the same office. While it does not run afoul of bright line double jeopardy law as it is currently stands, it raises serious issues of fundamental fairness and the use and abuse of prosecutorial charging powers. Sentencing Mr. Asaro for the far more serious acquitted conduct charged in the 2014 case abrogates the jury's verdict while at the same time incentives prosecutors to omit a predicate act and save it for later in the case of an acquittal.[5]

---

[4] *See United States v Tomero*, 473 F Supp. 2d 609, 614 (SDNY 2007) (citing (*United States v Russotti*, 717 F2d 27, 34 (2d Cir. 1983))("A double jeopardy violation occurs only if the subsequent charge is based on conduct that was part of the same pattern of racketeering activity that supported the prior RICO conviction.")

[5] *See Russotti*, 717 F.2d at 34 ("we are not insensitive to appellants' concern that the government may be free to pursue successive prosecutions under RICO by merely alleging two predicate acts -- sufficient to establish a pattern of racketeering activity under 18 U.S.C. § 1916(5) -- and, by holding in reserve other predicate acts, bring future RICO prosecutions against participants in the same enterprise. Indeed, appellants contend, an example of just that is presented here with the government's inclusion of the Massaro homicide as a predicate act in the 1982 indictment when the government in fact knew or should have known of that homicide at the time it filed its 1976 indictment. Thus, appellants submit, the Massaro homicide should have been included in the 1976 RICO indictment or not at all.")

Honorable Allyne R. Ross
United States District Judge
December 13, 2017

## V.    The Instant Offense

In its sentencing submission, the government advances for the first time that 1) John Doe believed a second car arrived on the scene to coordinate with Asaro's car and to try to box him in, 2) that others were involved in the incident, and 3) that there were four guys in the car. (Gov't memo at page 5)

While Mr. Asaro accepts responsibility for his conduct in this matter, he categorically denies that any other person or vehicle was involved in this incident. Indeed, the spontaneous nature of the crime indicates that John Doe is mistaken. This is supported by the fact that the government has no evidence to support John Doe's assertions that there were additional participants. Notably, at the time, Mr. Asaro was driving a car that only accommodated two people, thus there could not have been four people in his car. Moreover, the government is in possession of Mr. Asaro's phone records and there is no indication that he reached out to anyone during this time period to request assistance. Plainly stated, these facts are entirely inaccurate.

## VI.    Mr. Asaro's Continued Health Issues

As advanced in Mr. Asaro's previous submission, Mr. Asaro suffers from several life-threatening ailments. Given his advanced age, and the degenerative nature of several of these conditions, his short-term prognosis is poor. These ailments, both individually and collectively place his life in jeopardy every day. While the government claims that the Bureau of Prisons can adequately address Mr. Asaro's medical condition, his most recent hospitalization establishes this is not the case.

On October 20, 2017, Mr. Asaro was taken for what he had described as cardiac testing. He was not returned to the MDC until November 1, 2017. While in the hospital, he was shackled to a bed the entire time. As the days passed, Mr. Asaro was given little information as to his medical condition. Then on October 31, 2017, he was taken into the operating room and ostensibly a stent was placed in one of his heart valves. However, he was advised the he also requires additional surgeries as his arteries remained clogged. After only a few hours in intensive care, Mr. Asaro was returned to the MDC where he was placed in the SHU with no medical care whatsoever. To assert that this is proper medical care is barbaric.

During this entire time, once again, Mr. Asaro's family was provided with no information and was unable to communicate with Mr. Asaro. Given his advanced age, and his health concerns, this practice is entirely unacceptable and a violation of his Due Process rights. Currently Mr. Asaro is on stroke alert as his blood pressure is consistently testing at alarming rates. Knowing this to be true, the MDC has not provided Mr. Asaro with any special diet or preventative exercise. This wait and see practice of medicine in not proper medical care.

Honorable Allyne R. Ross
United States District Judge
December 13, 2017

## VII.    Conclusion

The sentence imposed upon Mr. Asaro for the crime of arson must be one that is "sufficient, but not greater than necessary." It is clear that the sentence requested by the government is far greater than that required to satisfy Section 3553(a) and, if imposed will undoubtedly create an unwarranted disparity in sentencing.

I thank Your Honor for her consideration in this matter.

Respectfully submitted,

***Elizabeth E. Macedonio and Carla Sanderson***
*Counsel for the Defendant*
*Vincent Asaro*

cc:  All Parties Via ECF

8

# EXHIBIT H



*The Law Office of*
**Elizabeth E. Macedonio**

40 Fulton Street – 23rd Floor – New York, NY 10038
Office: 212-235-5494 • Fax: 212-480-4444 • Email: Elizabeth@MacedonioLaw.com

December 19, 2017

**<u>Via ECF</u>**

Honorable Allyne R. Ross
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  <u>United States v. Vincent Asaro</u>
17 Cr. 00127 (ARR)

Dear Judge Ross:

We write to advise the Court of Mr. Asaro's current medical condition and to request that the matter be put on the Court's calendar for sentence.

As Your Honor may recall, on October 20, 2017, Mr. Asaro was taken from the MDC for "cardiac testing." He was not returned to the MDC until November 1, 2017. While in the hospital, he was shackled to a bed the entire time. As the days passed, Mr. Asaro was given little information as to his medical condition. Then on October 31, 2017, he was taken into the operating room and ostensibly a cardiac stent was inserted. He was advised, however, that he requires additional surgeries as his arteries remained clogged. After only a few hours in the Intensive Care Unit, Mr. Asaro was returned to the MDC where he was placed in the SHU with no medical care whatsoever.

Since that time, Mr. Asaro's blood pressure has continued to test at very high levels indicating an impending heart attack or stroke. On December 15, 2017, counsel requested that Mr. Asaro be seen by a doctor as there had been no follow-up care to his heart surgery six weeks earlier.

Shortly after this request, Mr. Asaro's cell was searched and his preapproved medications were taken from him. He was told that he would be given replacement medication when the medical cart came to his unit later that day. Thereafter, Mr. Asaro attended a social visit along with the other inmates on his unit. Apparently, during the time scheduled for the social visits, the medical cart came to the unit. As Mr. Asaro was not on the unit, he received no medication and was told he would not be getting any for the weekend. Currently Mr. Asaro depends upon approximately 14 different medications to address his various ailments.

On Saturday December 16, 2017, Mr. Asaro was taken to the hospital as his pressure continued to test at alarmingly high levels and he was in distress. He was returned to the MDC on

Honorable Allyne R. Ross
United States District Judge
December 19, 2017

Sunday, December 17, 2017. It is unclear if any further medical tests were conducted while he was in the hospital.

On Monday, December 18, 2017, counsel had paralegal Sam Tureff visit with Mr. Asaro to check on his well-being. Your Honor may recall that Mr. Tureff assisted the undersigned during Mr. Asaro's 2015 trial. Mr. Tureff reported that he had never seen Mr. Asaro in such poor physical and mental condition. Similar reports have come from other inmates incarcerated with Mr. Asaro as well as Mr. Asaro's family members.

This morning I visited with Mr. Asaro. Upon entering the visiting room, Mr. Asaro was noticeably unsteady on his feet. In fact, he was so physically weak that he was unable to effectively communicate despite his best efforts. We met for only a brief period of time as Mr. Asaro continuously stated that he did not feel well. When the meeting was over, two guards had to hold Mr. Asaro up as he exited the visiting room because he was unable to leave under his own power. In the four years that I have known this defendant, I have never witnessed him in such a state.

As this case is fully briefed for sentencing, and as I am fearful for Mr. Asaro's health should he remain at the MDC, I respectfully request that this matter be put on the Court's calendar as soon as possible.

I thank Your Honor for her consideration in this matter.

Respectfully submitted,

*__Elizabeth E. Macedonio__*
Elizabeth E. Macedonio and Carla Sanderson
*Counsel for the Defendant*
*Vincent Asaro*

cc:    All Counsel – Via ECF

2

# EXHIBIT I

# RLangone

Langone & Associates, PLLC
**ATTORNEYS AT LAW**

TEL: 516.795.2400
FAX: 516.795.2425
www.rlangone.com

**Richard M. Langone**
MA JD LLM

**Patrice Langone**
Paralegal

*Peter J. Tomao*
Of Counsel

*Daniel J. Costello*
Of Counsel

*It is requested that the Bureau of Prisons immediately designate Mr. Asaro to an appropriate medical facility.*

s/ ARR

January 29, 2018    USDJ    1/30/18

cc: Bureau of Prisons

Service by ECF
Honorable Allyne R. Ross
District Court Judge
E.D.N.Y.
225 Cadman Plaza East
Bklyn, NY 11201

Re: *United States v. Vincent Asaro* (17-CR-127 [ARR])

Dear Judge Ross:

I am representing Mr. Asaro on his direct appeal from this Court's sentence.

Because of Mr. Asaro's poor health, this Court offered to recommend, as part of the sentence, that BOP place this 83-years old octogenarian in an appropriate medical facility. Despite his frail health, Mr. Asaro declined the Court's compassionate offer, because he was worried he would be transferred to a facility far from his family, especially his beloved grandchildren.

Mr. Asaro is still being held at the MDC awaiting transfer to a designated facility. However, since the sentencing, the authorities have had to rush him by ambulance to the hospital on several occasions. His recent history of emergency room visits (to be treated for well-documented life-threatening health problems) establishes that his health is too precarious to place him in a general population facility. Mr. Asaro now realizes that he is too ill to be in general population.

Accordingly, we beseech this Court to recommend that the BOP place Mr. Asaro in the Butner, North Carolina, a medical facility, and/or for such other and further relief as this Court deems just and proper.

Respectfully,

*/s/ Richard M. Langone*
RICHARD M. LANGONE

Cc:    All Parties
        (Service by ECF)

600 Old Country Road, Suite 328 Garden City, New York 11530

# EXHIBIT J



## Summary Reentry Plan - Progress Report

Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: ASARO, VINCENT 83223-053

SEQUENCE: 00133481
Report Date: 09-25-2019



| | |
|---|---|
| Facility: | SPG SPRINGFIELD USMCFP |
| Name: | ASARO, VINCENT |
| Register No.: | 83223-053 |
| Quarters: | N02-061L |
| Age: | 84 |
| Date of Birth: | 03-03-1935 |

| | |
|---|---|
| Custody Level: | IN |
| Security Level: | LOW |
| Proj. Rel Date: | 05-21-2022 |
| Release Method: | GCT REL |
| DNA Status: | BRO11468 / 01-24-2014 |

### Contact Information

**Release contact & address**
Michelle Carollo, FRIEND
107-35 111th St. Richmond Hill, Queens, NY 11419
US
phone (home) : 718-843-7229

### Offenses and Sentences Imposed

| Charge | Terms In Effect |
|---|---|
| 18:1952(A)(3)(B) INTERSTATE TRAVEL OR TRANSPORTATION IN AID OF A RACKETEERING ENTERPRISE. | 96 MONTHS |

Date Sentence Computation Began: 12-28-2017

Sentencing District: NEW YORK, EASTERN DISTRICT

| Days FSGT / WSGT / DGCT | Days GCT or EGT / SGT | Time Served | + Jail Credit - InOp Time |
|---|---|---|---|
| 0 / 0 / 0 | 216 | Years: 4 Months: 3 Days: 28 | + 940 JC - 0 InOp |

### Detainers

| Detaining Agency | Remarks |
|---|---|
| NO DETAINER | |

### Program Plans

The inmate was received at USMCFP Springfield on August 6, 2019

### Current Work Assignments

| Facl | Assignment | Description | Start |
|---|---|---|---|
| SPG | MED UNASSG | MEDICALLY UNASSIGNED | 09-17-2019 |

### Work Assignment Summary

Due to his extensive healthcare needs the inmate is Medically Unassigned. Thus, he has no substantial work history while in the Federal Bureau of Prisons. Likewise, the inmate has not enrolled in any skill program during his incarceration.

### Current Education Information

| Facl | Assignment | Description | Start |
|---|---|---|---|
| SPG | ESL HAS | ENGLISH PROFICIENT | 02-05-2018 |
| SPG | GED SAT | GED PROGRESS SATISFACTORY | 09-20-2018 |
| SPG | GED TN | EXEMPT/TEMP GED NON-PROMOTABLE | 09-13-2019 |

### Education Courses

| SubFacl | Action | Description | Start | Stop |
|---|---|---|---|---|
| LOR | W | GED 1 12:30-2:30 M-F | 02-23-2018 | 08-26-2019 |
| LOR | W | GED 1 8:30-10:30 M-F | 02-12-2018 | 02-23-2018 |

### Education Information Summary

Due to the inmate's health he has been unable to participate in program at USMCFP Springfield.

### Discipline Reports

| Hearing Date | Prohibited Acts |
|---|---|
| | |

01/27/2020 07:05 4178371777 MEDSURG PAGE 05/08



## Summary Reentry Plan - Progress Report
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: ASARO, VINCENT 83223-053

SEQUENCE: 00133481
Report Date: 09-25-2019

| Hearing Date | Prohibited Acts |
|---|---|
| 10-02-2018 | 316 : BEING IN UNAUTHORIZED AREA |
| 02-04-2015 | 307 : REFUSING TO OBEY AN ORDER |
| | 398 : INTERFERING W/STAFF-MODERATE |

### Discipline Summary

The inmate received an incident report in 2018 for being in an unauthorized area

### ARS Assignments

| Facl | Assignment | Reason | Start | Stop |
|---|---|---|---|---|
| SPG MS | A-DES | OTHER AUTH ABSENCE RETURN | 09-17-2019 | CURRENT |
| SPG MS | A-DES | OTHER AUTH ABSENCE RETURN | 08-28-2019 | 09-17-2019 |
| SPG MS | A-DES | TRANSFER RECEIVED | 08-06-2019 | 08-26-2019 |
| LOR | A-DES | OTHER AUTH ABSENCE RETURN | 07-31-2019 | 08-06-2019 |
| LOR | A-DES | OTHER AUTH ABSENCE RETURN | 06-27-2019 | 07-31-2019 |
| LOR | A-DES | OTHER AUTH ABSENCE RETURN | 05-09-2019 | 05-08-2019 |
| LOR | A-DES | OTHER AUTH ABSENCE RETURN | 04-28-2019 | 05-03-2019 |
| LOR | A-DES | US DISTRICT COURT COMMITMENT | 02-02-2018 | 04-21-2019 |

### Current Care Assignments

| Assignment | Description | Start |
|---|---|---|
| CARE1-MH | CARE1-MENTAL HEALTH | 02-12-2018 |
| CARE4 | MRC CARE REQUIRED | 05-10-2019 |

### Current Medical Duty Status Assignments

| Assignment | Description | Start |
|---|---|---|
| LOS | LENGTH OF STAY | 08-06-2019 |
| LOWER BUNK | LOWER BUNK REQUIRED | 08-07-2019 |
| NO DUTY | NO DUTY DUE TO MEDICAL COND | 08-07-2019 |
| NO F/S | NO FOOD SERVICE WORK | 08-07-2019 |
| NO PAPER | NO PAPER MEDICAL RECORD | 02-02-2018 |

### Current PTP Assignments

| Assignment | Description | Start |
|---|---|---|
| NO ASSIGNMENTS | | |

### Current Drug Assignments

| Assignment | Description | Start |
|---|---|---|
| ED NONE | DRUG EDUCATION NONE | 02-06-2018 |

### Physical and Mental Health Summary

The inmate is a care level 4 inmate with ongoing and chronic care required and remains in bed the majority of the time. And has trouble speaking.

### FRP Details

Most Recent Payment Plan

| FRP Assignment: | PART | FINANC RESP-PARTICIPATES | Start: 02-04-2018 |
|---|---|---|---|
| Inmate Decision: | AGREED | $25.00 | Frequency: QUARTERLY |
| Payments past 6 months: | $50.00 | Obligation Balance: $21,151.00 | |

**Financial Obligations**

| No. | Type | Amount | Balance | Payable | Status |
|---|---|---|---|---|---|
| 1 | ASSMT | $100.00 | $0.00 | IMMEDIATE | COMPLETEDZ |
| | | ** NO ADJUSTMENTS MADE IN LAST 6 MONTHS ** | | | |
| 2 | REST FV | $21,276.00 | $21,151.00 | IMMEDIATE | AGREED |

| | Adjustments: | Date Added | Facl | Adjust Type | Reason | Amount |
|---|---|---|---|---|---|---|
| | | 09-10-2019 | SPG | PAYMENT | INSIDE PMT | $25.00 |
| | | 06-08-2019 | LOR | PAYMENT | INSIDE PMT | $25.00 |

Archived as of 09-25-2019 | Summary Reentry Plan - Progress Report | Page 2 of 4



## Summary Reentry Plan - Progress Report
Dept. of Justice / Federal Bureau of Prisons
Plan is for inmate: ASARO, VINCENT  83223-053

SEQUENCE: 00133481
Report Date: 09-25-2019

**Financial Responsibility Summary**

The inmate is currently making commensurate payments on his obligations to the court. He continues to participate in the Inmate Financial Responsibility Program.

**Release Planning**

The inmate's long term girlfriend Michelle Corollo is the anticipated release address. The address has been investigated by the United States Probation Office and approved.

**General Comments**

None

# EXHIBIT K



**U.S. Department of Justice**
Federal Bureau of Prisons

U.S. Medical Center for Federal Prisoners
1900 W. Sunshine Street

---

*Office of the Warden*                                             *Springfield, Missouri 65807*

October 22, 2019

Representative Kathleen Rice
229 7th Street, Suite 300
Garden City, NY 11530

Attention: Stephen Komisarjevsky

Re: Vincent Asaro
Reg. No. 83223-053

Dear Representative Rice:

Thank you for your inquiry received on October 17, 2019, regarding Vincent Asaro, an inmate
currently incarcerated at the U.S. Medical Center for Federal Prisoners (USMCFP) in
Springfield, Missouri.

Mr. Asaro arrived at USMCFP Springfield on August 6, 2019.  Mr. Asaro was placed in the
Nursing Care Center (NCC) Unit due to his increased need for Activities of Daily Living (ADL)
assistance following his right femur fracture surgical repair (ORIF) which occurred in May 2019.
His physical assessment conducted by the medical provider included a full medical history, a
routine physical, laboratory work-up, medications, and a physical therapy consult.  In addition, he
was educated on how to access the facility's dental clinic and mental health care, should he
require it.

Since his arrival at USMCFP Springfield, he has been assessed by medical providers to include:
physical therapy with an initial consult date of August 8, 2019; occupational therapy with an
initial consult date of September 24, 2019; speech therapy with an initial consult date of
October 4, 2019; and dieticians with an initial consult date of August 9, 2019.  He has continued
to receive therapies at USMCFP Springfield and has received ten visits with physical therapy.
The Physical Therapist has provided bedside therapy to encourage Mr. Asaro to participate in
physical therapy.  Occupational therapy has evaluated, treated, and provided adaptive equipment
to assist him with routine dressing, bathing, grooming and mobility in his room.  Additionally,
Mr. Asaro is routinely assessed by his medical providers for changes in his current medical
status.

In regards to a compassionate release, on September 4, 2019, a request for Debilitative,
Reduction in Sentence (RIS) was received.  The application process was initiated on
September 30, 2019. The completed application is currently being reviewed with the Office of
the General Counsel (OGC). When a decision has been made by OGC regarding Mr. Asaro's RIS
request, he will be notified immediately.

Although the Federal Bureau of Prisons strives to house inmates as close to their release residence as possible, there are situations which preclude this accommodation.  Mr. Asaro's medical needs are being appropriately addressed at this facility; therefore, a transfer closer to home will not be considered at this time.  I trust this response addresses your request for review and will assist your office in responding to his daughter's concerns.  Please contact me if you need any further assistance in this matter.

Sincerely,

M. D. Smith
Warden

# EXHIBIT L

March 6, 2020


Honorable Judge Allyne R. Ross
U.S. District Court
Eastern Division of New York

Re:  Vincent Asaro

Dear Judge Ross,

My name is Michele Carollo.  I have been Vincent Asaro's partner for over 20 years.   I am writing this to appeal to you in support of Vincent's compassionate release. for Mr. Asaro.  He is 85 years old, has served over 75% of his time, and most importantly, his health has taken a drastic turn for the worst since he last appeared before you.

His decline began in Loretto, Pennsylvania, where he fell and broke a bone in his leg which needed an operation. He was transferred to Springfield Medical Center in Missouri due to his medical condition and recovery.  When he arrived at Springfield, he was placed in administrative detention.  Three days after he was released, he suffered a severe stroke which affected his brain.  On a good day, he can make out two legible sentences.  He has hardly any mobility and limited mental function.  He cannot read or write or fill out forms.  He needs help with everything that he does. It has been very difficult—given his inability to speak or answer questions to obtain any information on how he is doing.

We, his family, have been trying since October to get his medical records and we still have not gotten them. To reach someone in the facility is nearly impossible.  You leave messages and weeks can go by before someone calls back, but with no real answers to your questions. Based on my limited discussions with him (which are almost impossible to follow) and the few occasions that I have been able to get through to someone at Springfield, I can tell you that Vincent is not the man he once was.  He is declining every day towards death.

If you will permit me, I would like to explain the support system he would have under home confinement.  I own my home and have lived there since 1983.  I have been employed by the same company since 1993.  I work for a church St. Helen Church.  I have the means, time, and dedication to provide a proper home and care for Vincent.  His insurance would cover his medical needs and he has a network of doctors for his general care, including Dr. Santi DiFranco, Dr. Bach, a cardiologist. His children and grandchildren are also able and willing to help provide care with the dignity and love any human being deserves when faced with such terrible health.  I cannot begin to tell you how heartbroken I am over that fact that in all the years we have been together he has not missed an anniversary, or birthday, or holiday.  Now he doesn't even know the day, date or year we are in or who he is talking to.   We are all heartbroken about his decline.


I am humbly asking that you consider an early release for him to have his family around him to love and support him and help him get the medical attention he needs.

I am happy to follow up on anything you would like.

Thank you,

Michele Carollo
Michele Carollo

April 1,2020

Honorable Allyne R. Ross
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

**Re: Vincent Asaro 83223-053**
**Compassionate Release**

Dear Honorable Ross:

I am writing this letter on behalf of my 85 year dad Vincent Asaro in the above-referenced matter. I am pleading with you to grant my dad compassionate release. He will go back home where he will be cared for by his fiancé and family. As COVID -19 continues to spread across the country and in prisons, he has even a greater risk of dying.

My dad has been severely injured from falling in prison. He has suffered broken bones and on the last fall Suffered a major stroke, he is without words, memory and has many other complicated medical issues. He continues to be a major fall risk.

In light of COVID-19 he is even more at risk. He is even more at risk. He is so far away and with his diminished mental capacity we as a family have no access to him. We have written many many letters which are mostly unanswered. We request he be moved so we can see him, as 2400 miles is too far for us to visit. He is an 85 very sick frail man without any family as he cannot communicate and we cannot visit.

I don't know what else to say but he continues to deteriorate. We are begging for him to come home. He will only go to doctor appointments. He is of no danger to the community and has served most of his time.

His family will take full responsibility for his care. Please please show compassion towards him during this frightening time. I have reached out to Warden Smith about COVID-19 and my dads health and safety without reply. I have written and called everyone for help but circumstances continue to get worse.

He is a very sick 85 year old man who cannot be cared for safely in the BOP. We are begging for compassion at this scary time in the world.

Best Regards

Noreen Asaro

# EXHIBIT M

01/27/2020  07:09   4178371777                     MEDSURG                     PAGE  08/08

Before completing this application, please review Program Statement 5050.49, Compassionate Release/Reduction in
Sentence (RIS), available in the law library. Detailed instructions for the application are on TRULINKS.

## REDUCTION IN SENTENCE APPLICATION

NAME: Vincent ASARO    REG No. 8 3223-053 Date: _____

WHO IS YOUR PHYSICIAN (circle):  Lear   Moose   Pearson   Patel   Wells   Satterly   Zimmer   Corsolini

### Choose One Criteria: You can only apply under one criteria.

Extraordinary/Compelling Circumstances:
- [✓] Medical Circumstances:
  - [ ] Terminal Medical Condition – Terminal Diagnosis with 18 months or less life expectancy
  - [✓] Debilitated Medical Condition – Illness that has you partially (50%) or completely (100%) disabled

- [ ] Elderly Inmates with a Medical Condition:
  - [ ] "New Law" Elderly Inmates – Have to have served 30 years of a sentence
  - [ ] Elderly with Medical Conditions – 65 yrs. old or older, a deteriorating medical condition, served 50% of your sentence.

- [ ] Elderly Inmates without a Medical Condition: - 65 yrs. old or older, Served 10 yrs. or 75% of your sentence (which is greater)

### To be filled out by Inmate:

Briefly describe your medical condition:

Heart problems, prostate, blood pressure. Has fallen three times.
After last fall had stroke lost speech cannot walk or care for himself

If you have applied before, has anything changed in your medical condition since your last application?  N/A

Proposed Release Plan (must have ALL of the following):

Name and contact information of who you will live with: Michele Carollo - 718 406 3595

When was the last time you spoke to this person concerning your release plan? August 2019

Address of where you will be living: 107-35 111th St. Richmond Hill NY 11419

Where will you receive your medical treatment? DR. Santi Di Franco & other DRS.

How will you pay for your treatment? Medicaid Medicare Insurance

Additional Comments: Application was not previously processed at FCI Loretto.
Condition has gotten worse since transfer.

### For Staff Use Only:

Elderly Inmate with Medical Conditions:
  Age: 84  (Must be 65 or older)
  Have you served more than 50% of your imposed sentence?   YES [✓]   NO [ ]
  Sentence Computation: 53.7%

Elderly Inmates with NO Medical Conditions:
  Age: _____  (Must be 65 or older)
  Have you the greater of 10 years or 75% of your federal sentence?
    [ ] YES    [ ] NO
  Sentence Computation

# EXHIBIT N



**U.S. Department of Justice**
Federal Bureau of Prisons

_U.S. Medical Center for Federal Prisoners_
_1900 W. Sunshine_

_Office of the Associate Warden_                    _Springfield, MO 65807_

October 23, 2019

MEMORANDUM FOR M. D. SMITH, WARDEN

FROM:                    Reduction in Sentence (RIS) Committee

SUBJECT:              Asaro, Vincent
                            Register No. 83223-053

The RIS Committee met on October 22, 2019, to discuss Mr. Asaro's RIS request. The Committee reviewed his medical conditions and all factors listed in Section 7 of Program Statement 5050.50. Mr. Asaro meets the medical criteria for RIS consideration. He has been recovering from a May 2019 hip fracture. Other medical diagnoses are coronary artery bypass graft, hepatitis, hypertension, and cerebrovascular accident. Please see his medical summary for a full explanation of his complicated medical status. Mr. Asaro received 1 out of 6 on the PSMS and 3 out of 9 on the IADL. On both scales, a lower score indicates a higher need for assistance.

Mr. Asaro is serving a 96-month sentence for Racketeering and Interstate Travel or Transportation in Aid of Racketeering Enterprise. He was 82 at the time of his sentencing and is now 84 years old. He has served over 4 years (53.9%) of his sentence.

The recommended release plan is to his fiancée, Michelle Carrolla, in Queens, NY. This plan has been forwarded to U.S. Probation for review. Approval of a plan by US Probation has proven to take time. As a result, in an effort to expedite Mr. Asaro's application, we are recommending the packet be submitted to Central Office pending U.S. Probation's response.

Considering Mr. Asaro meets the medical criteria to be considered for Reduction in Sentence, it is the Committee's opinion that the application be referred to the Office of General Counsel for further consideration.