

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

NS:KDE/LKG

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 9, 2020

<u>By ECF and Email</u>

The Honorable Allyne R. Ross
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Vincent Asaro
     <u>Criminal Docket No. 17-127 (S-1) (ARR)</u>

Dear Judge Ross:

  The government respectfully submits this response in opposition to the defendant Vincent Asaro's motion to reduce his sentence of imprisonment to time-served or, in the alternative, to modify it to home detention based on "extraordinary and compelling" circumstances, namely, his advanced age and health concerns particularly in light of the COVID-19 pandemic. (ECF No. 168, the "Petition").[1] For the reasons set forth below, the government concurs with the Probation Department and respectfully submits that the defendant's motion should be denied.

---

  [1] The government notes that there exists a conflict of interest issue regarding the defendant's representation by the Federal Defenders of New York ("FDNY"), which filed the Petition. The FDNY suffered from a conflict of interest that precluded its representation of the defendant in prior proceedings because the FDNY represented a grand jury witness related to the government's investigation. Because the Petition does not directly relate to those allegations, and because the defendant seeks emergency relief and is also represented by Margaux Poueymirou of Constantine Cannon LLP, the government does not move for FDNY's disqualification.

I.      Background

    A.      The Crime of Conviction[2]

In March 2017, Vincent Asaro, a long-time member of the Bonanno organized crime family of La Cosa Nostra (the "Bonanno family"), was charged with conspiracy to commit arson and arson, in violation of 18 U.S.C. § 844(n) and (i), related to a road range incident in Howard Beach, New York. Specifically, the defendant was traveling in a car that was cut off by another individual ("John Doe"). For ten minutes, Asaro's car aggressively followed Doe's car through the neighborhood, trying to drive Doe off the road. Doe was so fearful that he tried to call the police and intentionally circled the same intersections trying to set off red light cameras in an attempt to alert the police to his location. Shortly after the incident, Asaro contacted an associate of the Gambino organized crime family (the "Associate"), whom Asaro knew had access to local law enforcement databases. On April 3, 2012, a local law enforcement database accessed the license plate information for Doe's car, including his address, which the Associate gave to Asaro. Asaro later met with a then-Bonanno family associate ("CW-1") at a delicatessen and directed CW-1 to set fire to John Doe's car. Asaro took CW-1 to Doe's address and pointed out the car that had cut him off.

In the early morning hours of April 4, 2012, CW-1, along with Asaro's co-defendants John J. Gotti and Matthew Rullan, fulfilled Asaro's directive by returning to John Doe's house and setting his car on fire. CW-1 poured gasoline on the hood of Doe's car as Rullan threw lit matches on top. At that moment, a police officer happened to be across the street and saw the car go up in flames. CW-1 and Rullan ran back to Gotti's car, and Gotti led the officer on a high-speed chase through Queens. Given the high rate of speed, the officer eventually stopped pursuit and the perpetrators avoided arrest and got away.

After the arson, CW-1 and Asaro reconvened at the delicatessen, and CW-1 advised Asaro that he had burned the car as directed. As a result of the arson, John Doe's car was declared a total loss, with the actual cash value estimated at $21,276.00. Although Doe's car was parked feet from his residence, where he slept as his car was burned, there was luckily no further damage to Doe's house, or injury to Doe or any first responders.

    B.      The Guilty Plea

On June 13, 2017, Asaro pleaded guilty pursuant to a plea agreement to a single-count superseding information charging him with using a telephone to facilitate an arson, in violation of the Travel Act. This crime carried no mandatory minimum sentence and a maximum sentence of 20 years' imprisonment. See 18 U.S.C. § 1952(a)(3)(B).

---

[2] The facts of the defendant's crime of conviction are not in dispute and are taken from his Presentence Investigation Report.

      C.      <u>Sentencing</u>

This Court sentenced Asaro on December 28, 2017 to an above-Guidelines sentence of 96 months' imprisonment for his violation of the Travel Act. (See Dkt. Entry No. 131 (Judgment)). The government requested a sentence above the agreed-upon Guidelines range of 33 to 41 months' imprisonment based on (1) the serious "nature and circumstances of the offense," particularly the fact that Asaro used his influence in the Bonanno family to set fire to the car of an unsuspecting civilian whose only misdeed was to cut off Asaro in traffic; (2) Asaro's "history and characteristics," including his long-time membership in the Bonanno family, his participation in the murder of Paul Katz, the robbery of the Lufthansa terminal and loansharking, crimes which were the subject of a 2015 racketeering trial at which Asaro was acquitted; and (3) the need for general deterrence, and specifically the need to send a message to other members and associates of organized crime. (See Dkt. Entry Nos. 108, 124 (government's sentencing submissions)). Asaro requested a sentence of time served (approximately nine months' incarceration), primarily relying on his advanced age and poor health. (See Dkt. Entry No. 120 (defendant's sentencing submissions)).

In pronouncing its sentence, the Court stated that the "nature and circumstances of the offense and the history and characteristics of the defendant . . . [b]oth weigh heavily toward granting the upward variance requested by the Government." (Sentencing Tr., Dkt. Entry No. 164, at 18:25-19:3). It observed that the crime was "a senseless act of violence that suggests that the defendant poses a significant and ongoing threat to the general public," even at his age, because "he also had the ability to carry out his threats and the desire to carry out revenge after the heat of the moment had passed." (Id. at 19:24-20:13). With respect to Asaro's "history and characteristics," the Court addressed the conduct at issue in his 2015 racketeering trial:

> The testimony and other evidence introduced at his 2015 trial showed not only just by a preponderance of the evidence but by overwhelming evidence that Mr. Asaro has lived a life of violence. As trial judge, I had the opportunity to observe the demeanor of the witnesses and to make first-hand assessments of their credibility. And I have since reviewed my notes and the transcript from the trial. I was particularly impressed by the testimony of [a cooperating witness whose] testimony was forthright, credible, and corroborated in numerous details. I also note that the testimony of the Government's witnesses in the 2015 trial were corroborated not only by other witnesses, but also by audio recordings of the defendant by [the witness] who wore a wire, among other things.

(Id. at 20:18-21:7).

3

The Court then recounted the evidence presented at trial relating to the murder of Paul Katz and the Lufthansa terminal robbery. It concluded that Asaro and Jimmy Burke, a notorious organized crime associate, "strangled Paul Katz to death because Katz was cooperating with law enforcement," noting that Asaro's son, Jerome Asaro, pleaded guilty to moving Katz's body and that forensic evidence proved that Katz's body was found where the cooperating witness described. (Id. at 21). The Court concluded that Asaro "played a leading role" in the Lufthansa robbery and also that he "remained involved in loansharking up until 2013." (Id. at 22). With these findings, the Court explained that although it was "mindful of the weight that I must give to the jury's verdict of acquittal," the acquitted conduct was highly relevant to its § 3553(a) balancing analysis:

> I can imagine few things that are more relevant to the factors that I must consider under Section 3553(a) than the defendant's lifelong history of violent crime. This conduct also shows that the guidelines significantly underestimate Mr. Asaro by assigning him to a criminal history category of 2.

(Id. at 23). The Court then gave "considerable weight" to Asaro's "poor health and advanced age [as they] are significant mitigating personal characteristics," and consideration to the letters submitted by friends and family. (Id. at 23-24). Ultimately, the Court concluded that "the seriousness of the offense, promoting respect for the law, general deterrence, and protecting the public from the defendant's crimes" all required an upward variance and imposed a sentence of 96 months' imprisonment.[3] (Id. at 26).

D.  Asaro's Direct Appeal

The Second Circuit affirmed Asaro's 96-month sentence on direct appeal. United States v. Gotti, 767 F. App'x 173 (2d Cir. 2019). On February 24, 2020, the Supreme Court denied his certiorari petition. Asaro v. United States, --- S. Ct. ---, No. 19-107, 2020 WL 871696.

E.  Motion for Reduction in Sentence to the Bureau of Prisons

On September 30, 2019, Asaro filed a motion with the Bureau of Prisons ("BOP") for a reduction in sentence ("RIS") pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and BOP Program Statement ("PS") 5050.50. In a memorandum dated January 24, 2020, the BOP concluded that Asaro met the criteria for RIS[4] given his age and medical prognosis but

---

[3]  Consistent with the parties' expectations, the BOP credited Asaro for the 22 months he spent incarcerated awaiting his 2015 racketeering trial, which yielded an effective sentence of 74 months' imprisonment.

[4]  Section 4(b) of PS 5050.50 provides that an inmate who meets the following criteria may be considered for a RIS: (1) is age 65 and older; (2) suffers from chronic or serious medical conditions related to the aging process; (3) is experiencing deteriorating

4

denied the request for release "in light of the nature and circumstances of Mr. Asaro's offense and his criminal and disciplinary histories," concluding "his release at this time would minimize the severity of his offense and pose a danger to the community."[5]

    F.    <u>The Petition</u>

On April 3, 2020, Asaro filed the Petition pursuant to the First Step Act ("FSA") and § 3582(c)(1)(A)(i). Asaro asserts that "extraordinary and compelling circumstances" justify his request that this Court modify his sentence to time-served—effectively a 50% reduction of the sentence this Court imposed on him—or, in the alternative, to modify it to home detention. (<u>See</u> Pet. at 1). Asaro offers two primary reasons that he believes qualify as compelling and extraordinary. First, he points to his advanced age and declining health, which he asserts shows that he is no longer a danger to others. Second, he asserts that the COVID-19 pandemic exacerbates his circumstances and puts him at risk of death in the institution where he is housed, MCFP Springfield, a federal medical facility in Springfield, Missouri. (<u>Id.</u>). Recognizing that the Court must still assess the § 3553(a) factors in analyzing his Petition, Asaro asserts that keeping him in prison "is no longer 'necessary to protect the public,'" and that releasing him "would not undermine the seriousness of the offense nor respect for the law." (Pet. at 16).

    G.    <u>The Defendant's Current Medical Condition</u>

The government does not dispute that the defendant has a considerable health history and, most recently, suffered a stroke in August 2019. In evaluating Asaro's RIS motion, the BOP outlined his health history, which includes a variety of ailments. As of January 2020, based on information provided by the BOP, Asaro used a wheelchair in his housing unit and required the assistance of a walker when traveling outside of his unit. Asaro also required assistance with activities of daily living ("ADL") such as toileting, bathing, grooming and navigating the correctional environment. At that time, the BOP indicated that Asaro was too weak to ambulate independently, and that the medical staff was recommending physical therapy to improve his mobility, strength and speech, but that he refused six of his most recent visits. Given his medical and physical needs, as of January 2020, Asaro was housed on the inpatient unit, with no plans to transition to the general population, and BOP indicated that he was experiencing deteriorating mental and physical

---

mental or physical health that substantially diminishes his ability to function in a correctional facility; (4) conventional treatment promises no substantial improvement to his mental or physical condition; and (5) has served as least 50% of his sentence.

[5] Because more than 30 days have elapsed since the BOP's denial of the defendant's compassionate release request, the defendant has exhausted his administrative remedies and, pursuant to the First Step Act, can petition the Court for relief. <u>See</u> 18 U.S.C. § 3582(c)(1)(A).

health that substantially diminished his ability to function in a correctional facility within the meaning of Section 4(b) of PS 5050.50.

That is no longer the case.  The defendant was evaluated earlier this week on April 7, 2020, and his prognosis has improved dramatically.  Asaro's need for assistance with ADL have improved.  See Exhibit A (clinical encounter – administrative note dated April 7, 2020).[6]  While Asaro initially needed to use a wheelchair after the stroke and needed assistance with bathing and eating, he now "ambulates without assistive devices," is "able to dress, toilet, and feed [him]self independently, and only needs "minimal set-up assistance with showering/shaving."  (Id.)  He does, however, continue to have "expressive aphasia" and "often uses 1-2 word responses to questions."  (Id.)

II.     Applicable Law

"A district court may not generally modify a term of imprisonment once it has been imposed," except pursuant to a statutory grant of authority.  United States v. Savoy, 567 F.3d 71, 72 (2d Cir. 2009) (internal quotation marks omitted).  Section 3582(c) is one source of such authority.  Specifically, 18 U.S.C. § 3582(c)(1)(A)(i), referred to as the "compassionate release" statute, permits a court to modify an already imposed sentence upon a showing of "extraordinary and compelling reasons."  If a court finds such "extraordinary and compelling reasons," it may "modify a term of imprisonment" when, "after considering the factors set forth in § 3553(a) to the extent that they are applicable," and to the extent a reduction is consistent with the applicable policy statement in the Sentencing Guidelines, the court "finds that extraordinary and compelling reasons warrant such a reduction."  Id.; see also United States v. Gotti, 2020 WL 497987, at *2 (S.D.N.Y. Jan. 15, 2020) ("It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification.  He is simply eligible for a sentence modification.  The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.").

The Application Notes to § 1B1.13, in turn, describe multiple ways that a defendant can show an "extraordinary and compelling reason," but only one is relevant here:

(A)(i)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.

---

[6] Given the personal identifying and health information described in Exhibit A, the government has not publicly filed this document but will provide a copy to the Court and defense counsel.

6

> Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(A)(ii)    The defendant is—

    (I)    suffering from a serious physical or medical condition,

    (II)    suffering from a serious functional or cognitive impairment, or

    (III)    experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide selfcare within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13, app. n.1.

As the proponent of the motion, Asaro bears the burden of proving "extraordinary and compelling reasons" exist under the above criteria to justify early release. See United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); see also United States v. Greenhut, No. 18-CR-00048 (CAS), 2019 WL 6218952, at *1 (C.D. Cal. Nov. 21, 2019) (stating that a defendant seeking relief under § 3582(c)(1)(A) "bears the initial burden to put forward evidence that establishes an entitlement to a sentence reduction").

III.    Argument

The defendant does not meet the requirements for relief under § 3582(c)(1)(A)(i) because he has not demonstrated the existence of "extraordinary and compelling reasons" to justify early release. To the contrary, and despite his refusal to attend physical therapy, the defendant's health has dramatically improved to the point where he is able to ambulate without assistance and can care for himself. Moreover, his potential exposure to COVID-19 at a facility that has no known (or suspected) positive cases of the virus is neither a compelling nor extraordinary circumstance that would warrant release. And even if the defendant could establish "extraordinary and compelling reasons" —which he cannot— the motion must be denied because Asaro remains a danger to the community and the § 3553(a) factors all counsel in favor of his continued service of the sentence the Court previously imposed.

    A.    Asaro's Health Issues Do Not Constitute Extraordinary and Compelling Reasons Warranting Compassionate Release

In his Petition, the defendant asserts that his advanced age and extensive medical issues coupled with his inability to independently perform ADL constitute

7

extraordinary and compelling reasons for release. But the defendant's Petition relies on outdated medical information from January 2020, or, at times, even older records. The defendant acknowledges as much in claiming that "both Springfield and the BOP have failed to provide Mr. Asaro with current medical records to present to the Court, despite over 100 requests by family members[.]" (Pet. at n.15). Apparently counsel (rather than family members) never once attempted to obtain the defendant's medical records from BOP, nor did counsel request a subpoena from the Court or ask the government for its assistance in obtaining the records.

Asaro's condition is not what it was at the time of BOP's review of his RIS application in December 2019 and January 2020. Then, he was using a wheelchair and the assistance of a walker to get around his unit and requiring assistance with ADL such as toileting, setting up for meals, bathing, grooming and navigating the correctional environment. That is not the case anymore. Despite Asaro's continued refusal to participate in physical or speech therapy, and even at his advanced age, his condition is improving. See Ex. A. He was most recently evaluated on April 7, 2020. The nursing staff indicated that Asaro has had improvement since his stroke. Initially needing the wheelchair and walker, he now ambulates without assistance devices. He now is able to dress, toilet and feed himself and only requires minimal setup assistance with showering and shaving. His short responses—often one or two words—are the result of expressive aphasia caused by the stroke. None of his conditions appear to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, app. n.1.

Moreover, the Court was aware of Asaro's significant medical history when it sentenced him, and, given his age, likely expected Asaro to decline like anyone else would in the aging process.[7] (See Sentencing Tr. at 23-24 (recognizing that the defendant's "poor health and advanced age are significant mitigating personal characteristics" such that "each year of imprisonment will be harder on him than they would be on a younger and healthier man," and summarizing his health issues)). Although the defense argued that any substantial period of incarceration would be a "death sentence," the Court nonetheless concluded that a sentence of 96 months was warranted. Therefore, Asaro's progressing health condition was contemplated and considered by the Court at sentencing – it is not "extraordinary or compelling" and therefore does not justify early release.

---

[7] The defendant does not appear to allege that he is currently receiving inadequate treatment or care by the BOP for any of these conditions. In addition, although he alleges that he requires regular care for what appear to be significant ailments, the defendant does not allege that he suffers from a "terminal illness," i.e., "a disease or condition with an end-of-life trajectory." 18 U.S.C. § 3582(d)(1); see also U.S.S.G. § 1B1.13 app. note 1(A)(i) (noting examples of "terminal illness" include "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia").

> B. <u>Potential Exposure to COVID-19 Does Not Constitute An Extraordinary or Compelling Reason Warranting Compassionate Release</u>

Nor does the COVID-19 pandemic, standing alone, present an "extraordinary and compelling reason[]" to release Asaro. Based on information provided by legal counsel at MCFP Springfield, there are no positive cases (or suspected cases) of the virus at the facility, and relatively few cases in the county where the facility is located.[8] MCFP Springfield has confirmed that, as has been done across the BOP, it has planned for a possible exposure. And unlike many other BOP institutions, MCFP Springfield is a medical facility, so it can address short term COVID-19 concerns there. Additionally, it has a contract with a local hospital where it can send anyone in need of additional care or testing. Being a medical facility, MCFP Springfield has an ample supply of soap and other cleaning supplies, and the units are regularly cleaned.

Additionally, as the Court is aware, in light of the seriousness of the current crisis, the BOP has taken significant measures in an effort to protect the health of the inmates in its charge. The BOP began planning for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control and Prevention, including by reviewing guidance from the World Health Organization.

On March 31, 2020, BOP announced that it was implementing the COVID-19 Phase Two Action Plan in order to minimize the risk of COVID-19 transmission into and inside its facilities. The Phase Two Action Plan comprises many preventive and mitigation measures, including the following: all incoming inmates are screened, and staff are regularly screened; contractor visits are limited to essential services, while nearly all attorney, social, and volunteer visits have been suspended; inmate movements between facilities have been extremely limited; and institutions are taking additional steps to modify operations to maximize social distancing. As recently as April 1, 2020, the BOP began implementing its Phase Five Action Plan to decrease the spread of COVID-19, which provides for securing each inmate in every BOP institution to his or her assigned cells/quarters for a period of fourteen days, while still providing inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education. Additional details about the steps being taken by the BOP are available at the BOP website, www.bop.gov.

---

[8] In fact, transferring Asaro from a medical center in Springfield, Missouri – located in a county that, as of April 8, 2020, has had a total of 76 confirmed cases of COVID-19, <u>see</u> https://www.springfieldmo.org/covid-19 – to a private residence in Queens, which, as the most-infected borough in New York City, the epicenter of the outbreak in the United States, has had over 26,000 cases, <u>see</u> https://www1.nyc.gov/site/doh/covid/covid-19-data.page, will likely increase Asaro's chance of contracting COVID-19.

9

Therefore, Asaro cannot sustain his burden that the COVID-19 pandemic constitutes an "extraordinary and compelling reason[]" warranting his immediate release in these circumstances.

## C. The Section 3553(a) Factors Weigh Against Release

### 1. Asaro Remains a Danger to the Community and Should Not Be Released

While the BOP and the government recognize the seriousness of COVID-19, the risk of potential exposure to COVID-19 in a BOP facility even for an older inmate in declining health cannot form the basis to release a prisoner like Asaro— a life-long member of the Bonanno family who participated in a brutal murder and is serving a sentence for a violent crime he committed at the age of 77. Because Asaro remains a danger to the community, the instant motion must be denied. See U.S.S.C. § 1B1.13, app. n.1 (compassionate release only warranted where the court first determines that the defendant "is not a danger to the safety of any other person or to the community as provided in 18 U.S.C. § 3142(g)."); see also Gotti, 2020 WL 497987, at *2 ("It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification. He is simply eligible for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the § 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because § 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.").

Title 18, United States Code, Section 3142(g) sets out the following factors that the Court shall consider in determining whether the defendant is a danger to the safety of any other person or to the community:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse,

> criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Asaro's ability to enlist and order—at the age of 77—an associate of the Bonanno family to torch an innocent civilian's car shows Asaro's ability to use others to commit serious acts of violence. (See Sentencing Tr. at 20 ("I also find concerning that, despite his relatively advanced age and supposed infirmities, the defendant continued to wield the power to direct or request other people to carry this act out.")). That Asaro did so solely because the victim had cut him off in traffic further demonstrates his dangerousness. (See id. at 19-20 ("The arson was a senseless act of violence that suggests that the defendant poses a significant and ongoing threat to the general public.")).

This conclusion is reinforced by his lifelong history of crime, outlined in more detail below. (See id. at 20 ("None of this is surprising, however, when viewed in the context of the history and characteristics of the defendant.")). Given Asaro's decades-long commitment to crime and continued violent behavior into his late 70s, there is every reason to believe Asaro would resume his position in the crime family. Indeed, the Bonanno family continues to exist and to commit crimes, including crimes of violence. Members of the Bonanno family, like those of other La Cosa Nostra ("LCN") organized crime families, take an oath to put the crime family above everything else and, barring cooperation, that oath remains effective until death. Accordingly, individuals involved in LCN continue to commit crimes even as they grow elderly. Even when they become infirm, LCN members in leadership positions rely upon other members and associates to commit crimes on their behalf and with the benefit of the elder's name, position and reputation for violence. The risk of danger as to Asaro is particularly great given the recent arrests and convictions of the leadership of the Howard Beach based faction of the Bonanno family, including Asaro's nephew, Ronald Giallanzo. See United States v. Giallanzo, et al., Criminal Docket No. 17-155 (DLI) (E.D.N.Y.).

Considering all of the 18 U.S.C. § 3142(g) factors, the government respectfully submits that Asaro remains a danger to the community and therefore should not be released.

11

> 2. The Other Applicable § 3553(a) Factors Also Counsel Against Release

The other applicable § 3553(a) factors also weigh heavily against granting Asaro early release. As the Court described at sentencing, Asaro was convicted of using his position within the Bonanno family to exact revenge on an innocent motorist whose only misdeed was to cut Asaro off in traffic. Asaro endangered the motorist and the community when he had an associate burn the motorist's car "to a crisp." (Sentencing Tr. at 20). The nature and circumstances of the crime of conviction therefore favor denying the motion. (See id. at 19 ("I see no mitigating circumstances to this crime.")).

Asaro's other offenses – which, in part, justified the Court's substantial upward variance – are even more heinous and further counsel against release. (See Sentencing Tr. at 19, 23 (recounting the defendant's "lifelong history of violent crime" as a "high-level member of the Bonanno Family who has been active in mob-related activities for over forty years")). As described above, Asaro and Jimmy Burke murdered Paul Katz, who was suspected of cooperating with law enforcement, by strangling him, burying the body and pouring lime and cement over the hole.[9] (See id. at 21). Moreover, upholding respect for the law requires that someone who murdered a suspected cooperating witness – a crime that, if proven at trial, would likely carry a mandatory life sentence if not the death penalty – serve the entirety of his 96 months in prison. And in addition to this murder, the defendant also participated in the notorious Lufthansa robbery and was a loanshark as recently as 2013. (See id. at 22). Therefore, the nature and circumstances of Asaro's offenses, as found by the Court to have been proven by "overwhelming evidence" (id. at 20), all counsel against release. See 18 U.S.C. § 3553(a)(1).

For many of the same reasons, Asaro's history and characteristics also require that he serve the remainder of his prison sentence. See 18 U.S.C. § 3553(a)(1). In addition to his life of crime, Asaro has an "explosive temper" and "anger [that] does not always subside" and makes him prone to committing crimes. (Sentencing Tr. at 20). This also militates against release.

As Asaro is a danger, continued incarceration is required to specifically deter him from committing other crimes. See 18 U.S.C. § 3553(a)(2)(C) (requiring that the Court consider the need "to protect the public from further crimes of the defendant"). As the Court accurately described at sentencing:

> I have no illusions that Mr. Asaro will be rehabilitated by a prison stint. Nor do I believe that a prison sentence, however long, will deter him from future criminal acts, given his life-long career as

---

[9] Although not statutorily defined victims under the Crime Victims' Rights Act because Asaro was not convicted of Katz's murder (and instead the Court found this crime proven at sentencing), the family of Paul Katz has informed the government that it opposes the instant request.

12

> a member of the mafia. If he had not aged out of violent crime
> by the age of 77, I see little hope that he will ever do so.

(Sentencing Tr. at 25; see also id. at 26 ("[M]ost importantly, a substantial prison sentence is necessary to protect the public. I see no other way to do so.")). Finally, the need for general deterrence is as strong as it was at the time of sentencing, when the Court explained that "[i]t is necessary to send a message that members of organized crime cannot threaten members of the general public or destroy their property with impunity. It is necessary to deter others from a life of crime by showing that there will be real consequences to their crimes." (Id. at 26).

Accordingly, the applicable § 3553(a) factors strongly outweigh any "extraordinary and compelling" circumstances (if any) and require that the motion be denied.

### D. The Probation Department Opposes Release

In his Petition, Asaro asserts that the United States Probation Department ("Probation") has "investigated and approved" the residence he proposes to reside in if the Court releases him. (Pet. at 17). In light of his representations, the government consulted with Probation about his release plan. Notably, Probation opposes Asaro's compassionate release request because, similar to the government, it believes that Asaro still poses a danger to the community. Moreover, in light of Asaro's medical condition and the COVID-19 pandemic, Probation is not able to safely monitor the defendant. For example, Probation indicated that Asaro would have difficulty wearing a transmitter on his ankle because of his medical issues. And based on Asaro's communication difficulties, alternative means of location monitoring, such as voice verification technology, would also not be an option. Nevertheless, Probation is opposed to Asaro's early release.

IV.     Conclusion

        For the reasons set forth above, the defendant's request for compassionate release should be denied.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:     /s/
Lindsay K. Gerdes
Keith D. Edelman
Assistant U.S. Attorneys
(718) 254-6155/6328

cc:    Clerk of Court (ARR) (by ECF and Email)
      Counsel of Record (by ECF and Email)
      Senior U.S. Probation Officer Joanmarie Langone (by Email)