UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | 17-cr-127 (ARR) |
| — against — | |
| | **Not for print or electronic publication** |
| VINCENT ASARO, | |
| Defendant. | **Opinion & Order** |

ROSS, United States District Judge:

Defendant Vincent Asaro, through counsel, moves for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i). *See* Def.'s Mot. to Reduce Sentence or for Compassionate Release, ECF No. 168 ("Def.'s Mot."). The government opposes. Asaro's motion is granted, subject to the conditions set forth below.

## FACTUAL BACKGROUND

In June 2017, the defendant, Vincent Asaro, pleaded guilty to a violation of the Travel Act, 18 U.S.C. § 1952(a)(3)(B). *See* Min. Entry, June 27, 2017, ECF No. 62; Superseding Information, ECF No. 61. In 2012, Asaro—a high-level member of the Bonanno crime Family—was driving in Howard Beach when another driver cut him off in traffic. Sentencing Tr. Def.'s Ex. E at 19:5–6, 16–21, ECF No. 168-1. Asaro followed the other driver, obtained his license plate information, and subsequently either asked or directed Bonanno Family associates to determine the driver's home address and set the car on fire. *Id.* 19:7–19. His associates did indeed burn the car. *See id.* 19:16–19. Asaro was 77 years old when he committed this crime and 82 years old at sentencing. *Id.* 23:15–16. On December 28, 2017, I sentenced Asaro to 96 months' imprisonment to be

followed by 3 years of supervised release. Min. Entry, Dec. 28, 2017, ECF No. 130.

At sentencing, in considering Asaro's history and characteristics, I took into account conduct for which he was acquitted after a jury trial—over which I presided—in 2015. Sentencing Tr. 20:16–23, 23:1–7. I found "not only just by a preponderance of the evidence but by overwhelming evidence that Mr. Asaro ha[d] lived a life of violence." *Id.* 20:19–21. Specifically, I gave "particular weight" to Asaro's participation in the murder of Paul Katz—whom, testimony showed, he strangled because Katz had cooperated with law enforcement—and the Lufthansa heist at John F. Kennedy airport. *Id.* 21:11–16. I also considered "Asaro's poor health and advanced age," which I found to be "significant mitigating personal characteristics." *Id.* 23:17–19. At the time of his sentencing, Asaro suffered from "serious health conditions." *Id.* 23:25–24:7. Ultimately, however, I concluded that the sentencing factors "militate[d] in favor of a substantial prison sentence." *Id.* 25:18–25.

Asaro is currently serving his sentence at MCFP Springfield ("Springfield"), a federal medical detention facility in Springfield, Missouri. Since his sentencing proceeding, his condition has worsened. In particular, Asaro asserts, and the government does not dispute, that he had a stroke in August 2019. *See* Government's Resp. to Def.'s Mot. 5, ECF No. 171 ("Gov't Resp."); Def.'s Mot. 6; *see also* Hyle Letter Def.'s Ex. A at 2, ECF No. 168-1 (referring to a "cerebrovascular accident"); Carollo Letter Def.'s Ex. L, ECF No. 168-1. After his stroke, in September 2019, Asaro had "extensive healthcare needs"; he required "ongoing and chronic care" and "remain[ed] in bed the majority of the time." Progress Report Def.'s Ex. J at 1–2, ECF No. 168-1. He also "ha[d] trouble speaking." *Id.* at 2.

Before filing the instant motion, Asaro petitioned the warden at Springfield for a reduction in his sentence. In January 2020, the Assistant Director and General Counsel of the Bureau of

Prisons ("BOP"), Ken Hyle, found that Asaro satisfied the BOP's definition of "an elderly inmate with medical conditions"—a designation that makes an inmate eligible for consideration for a sentence reduction by the BOP. Hyle Letter 1–2. Hyle based this determination on the fact that Asaro was 84 years old and had served 58 percent of his prison sentence. *See id.* at 2. He found that Asaro suffered from an extensive list of medical conditions that included "status post cerebrovascular accident (CVA) with right-side hemiplegia and expressive aphasia." *Id.* Asaro had been working with a physical therapist but had refused to participate in the majority of his most recent sessions. *See id.* Asaro "use[d] a wheelchair and require[d] assistance with transfers and, when traveling outside of his housing unit, the assistance of a pusher." *Id.* In addition, Asaro was determined "to be at a high risk of falling" and needed "assistance with the majority of his activities of daily living (ADLs) and instrumental ADLs such as toileting, transferring, setting up for meals and snacks, bathing, grooming, doing laundry, shopping, managing his medication, and navigating the correctional environment." *Id.* He was "housed on the inpatient unit with no plans to transition to the general population." *Id.* In sum, Asaro was "experiencing deteriorating mental and physical health that substantially diminishe[d] his ability to function in a correctional environment[.]" *Id.* Nonetheless, because of "the nature and circumstances of Mr. Asaro's offense and his criminal and disciplinary histories," Hyle determined that "his release at this time would minimize the severity of his offense and pose a danger to the community." *Id.* Thus, he denied Asaro's petition.

The government asserts that between January 2020 and the present, Asaro's condition has improved. *See* Gov't Resp. 6. Indeed, the record from an April 7 medical evaluation shows that Asaro "[h]as had improvement since CVA" and that he "[c]urrently requires minimal set-up assistance with shower/shaving," "[a]mbulates without assistive devices," and is "[a]ble to dress, toilet, and feed self independently." Clinical Encounter Gov't Ex. A, Apr. 7, 2020, at 1 ("April 7

3

Record").[1] Still, he "[c]ontinues to have expressive aphasia and often uses 1-2 word responses to questions." *Id.* Other, more extensive medical records show that Asaro has remained substantially impaired between January and now. For example, in April alone, Asaro has received assistance with feeding on numerous occasions—including on April 7.[2] A monthly nursing assessment dated February 9, 2020 states that although Asaro "requires some assistance with tray set up, showering," he "[is] independent with dressing, getting up to toilet by himself and performing his own grooming such as combing hair and brushing teeth," suggesting some ability to care for himself. *Id.* at 117. Nonetheless, he remained "a high fall risk" at that time. *Id.* As recently as March 24, he was "encouraged to use his rolling walker or wheelchair when ambulating" after he incurred his "second wound within [the] last 2 weeks," presumably from falling. *Id.* at 13. He has also been prescribed numerous medications to treat various health conditions, including "blood pressure," "chronic pain," "cholesterol," and "prostate." *Id.* at 27.

Asaro has a limited ability to speak—but exactly how impaired his speaking ability is, on an ongoing basis, is not clear. In his motion papers, Asaro's counsel asserts that "[h]e is able to say 'Hello' and 'How are you' but nothing much beyond that, and he often stutters to the point of incomprehensibility." Def.'s Mot. 7. The April 7 Record confirms that Asaro has expressive aphasia and "often" responds to questions with one or two words. April 7 Record. However, the more extensive records show that he has been speaking beyond basic phrases like "hello" and

---

[1] This medical record has not yet been filed on the docket because of the sensitive information that it contains.

[2] Citations to "Medical Records" refer to the more extensive set of medical records that the government submitted at my direction. *See* Order, Apr. 10, 2020. These medical records have not yet been filed on the docket because of the sensitive information that they contain. For clarity, I cite to specific documents within the set of medical records by reference to their page number within the entire packet of records. Upon the release of this opinion, the government is directed to file the medical records on the docket under seal.

4

"how are you," and beyond one-to-two words at a time. For example, documentation of a March 24, 2020 injury assessment includes an entry described as "Inmate's Statement of how injury occurred" and shows Asaro stating "I just don't know what happened. It hurts." Medical Records at 12. He also stated "[i]t was bleeding." *Id.* Documentation of a February 7, 2020 consultation notes that Asaro's "expressive aphasia makes understanding difficult" but that he intelligibly commented "you're not doing anything for me[.]" *Id.* at 31. Certainly, these remarks are not complex, but they do belie any assertion that he cannot express himself beyond a basic greeting.

In short, from reviewing Asaro's medical records, it is difficult to determine exactly how independently he is able to speak, move, and care for himself on an ongoing basis. Undoubtedly, though, he is 85 years old and suffers from an extensive list of medical conditions, and his abilities are limited.

The COVID-19 crisis poses an additional risk to Asaro. Asaro does not contest the government's assertion that as of today, no confirmed cases of COVID-19 have emerged within Springfield. Gov't Resp. 9; Def.'s Reply 5, ECF No. 175. Still, absent more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility. The virus is spreading in the state of Missouri. *Coronavirus in Missouri: Map and Case Count*, The New York Times (last updated Apr. 16, 2020, 5:09 PM), https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html. It has also been spreading through other prisons and jails nationwide. *See, e.g.*, Timothy Williams *et al.*, *'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, The New York Times (last updated Mar. 31, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html. COVID-19 poses an increased risk to elderly individuals, especially those with pre-existing health conditions. *See* Order, *United States v. Webb et al.*, No. 15-cr-00252-PKC-RML-8 (E.D.N.Y. Mar.

5

30, 2020) (reducing sentence for prisoner of advanced age with "significantly deteriorating health" amidst COVID-19 outbreak); *Coronavirus Disease 2019 (COVID-19) People Who Are At Higher Risk for Severe Illness* (last updated Apr. 15, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html ("Based on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID-19.").

Asaro now moves for compassionate release pursuant to the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i), citing his medical conditions, combined with the risk that the COVID-19 pandemic poses to him.

## DISCUSSION

### I. The First Step Act governs compassionate release.

Under 18 U.S.C. § 3582(c)(1)(A)(i),

> the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A)(i). Thus, there are four prerequisites to a court's granting compassionate release under the First Step Act. First, the defendant must have exhausted his administrative rights. § 3582(c)(1)(A). Second, the court must find that "extraordinary and compelling reasons warrant" release. § 3582(c)(1)(A)(i). Third, the court must consider the factors set forth in § 3553(a). Fourth, the court must find that release is consistent with the Sentencing Commission's policy statements.

6

A. Exhaustion

As to the first prerequisite—exhaustion of administrative rights—a denial of a request for compassionate release by the BOP's General Counsel "constitutes a final administrative decision," and, as such, "an inmate may not appeal the denial[.]" 28 C.F.R. § 571.63(b), (d); *see United States v. Johnson*, No. 4:00-cr-40023, 2020 WL 1434367, at *2 (W.D. Ark. Mar. 24, 2020) (citing § 571.63(b–c)). The inmate has thus exhausted his administrative rights. *Johnson*, 2020 WL 1434367 at *2. In this case, the BOP's General Counsel denied Mr. Asaro's request for compassionate release. *See* Hyle Letter 1. Thus, Asaro has exhausted his administrative rights.

B. Extraordinary and Compelling Reasons

In order for a court to grant compassionate release, it must find that "extraordinary and compelling reasons warrant" such release. 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission has issued a Policy Statement that defines "extraordinary and compelling reasons." U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018) ("USSG"); *see United States v. Ebbers*, No. (S4) 02-CR-1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020); *United States v. Bellamy*, No. 15-165(8) (JRT/LIB), 2019 WL 3340699, at *2 (D. Minn. July 25, 2019). Under this Policy Statement, in relevant part, "extraordinary and compelling reasons exist" based on the defendant's "medical condition" when "[t]he defendant is . . . suffering from a serious physical or medical condition, . . . suffering from a serious functional or cognitive impairment, or . . . experiencing deteriorating physical or mental health because of the aging process[.]" USSG § 1B1.13 cmt. n.1(A)(ii). That medical condition must "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," and it must be one "from which [the defendant] is not expected to recover." *Id.* Further, extraordinary and compelling reasons may instead exist based on the defendant's age, if "[t]he

7

defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." *Id.* cmt. n.1(B). Finally, extraordinary and compelling reasons may exist if, "[a]s determined by the Director of the Bureau of Prisons, there exists . . . an extraordinary and compelling reason other than, or in combination with," the other listed reasons in the Guideline. *Id.* cmt. n.1(D). "[A]n extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *Id.* cmt. n.2.

This Policy Statement is "anachronistic" because it pre-dates the First Step Act itself. *Ebbers*, 2020 WL 91399, at *4. Some district courts have concluded that the court may make an "independent assessment" of whether "extraordinary and compelling reasons" for release are present, looking to the Policy Statement only for "guidance." *United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *see also United States v. Young*, No. 2:00-cr-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[T]he district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release."). *But see Ebbers*, 2020 WL 91399, at *4 (deeming Policy Statement "helpful in defining a vague standard" and concluding that its "descriptions of 'extraordinary and compelling reasons' remain current.").

C. The § 3553(a) Factors

The First Step Act requires that the court consider the factors set forth in 18 U.S.C. § 3553(a) in deciding whether to grant compassionate release. *See* § 3582(c)(1)(A). Thus, the court must consider what is "sufficient, but not greater than necessary, to comply with the purposes of [sentencing]." § 3553(a). In particular, the court must consider:

8

Case 1:17-cr-00127-ARR Document 176 Filed 04/17/20 Page 9 of 16 PageID #: 1368

 (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
 (2) the need for the sentence imposed—
   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B) to afford adequate deterrence to criminal conduct;
   (C) to protect the public from further crimes of the defendant; and
   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
 (3) the kinds of sentences available;
 (4) [the kinds of sentences and sentencing range provided for in the USSG]
 (5) any pertinent [Sentencing Commission policy statement]
 (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
 (7) the need to provide restitution to any victims of the offense.

*Id.* In considering these factors, the court "should assess whether [they] outweigh the 'extraordinary and compelling reasons' warranting compassionate release[.]" *Ebbers*, 2020 WL 91399, at *7.

### D. Sentencing Commission Policy Statements

Finally, the court must consider whether release is consistent with the Sentencing Commission's policy statements. *See* § 3582(c)(1)(A)(i). In particular, it must determine that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" USSG § 1B1.13(2). The § 3142(g) factors are largely duplicative of those in § 3553(a). *See* § 3142(g). In addition, they require the court to consider "whether the offense is a crime of violence," "the weight of the evidence against the [inmate]," and "the nature and seriousness of the danger to any person or the community that would be posed by the [inmate's] release." *Id.* § 3142(g)(1)–(4).

## II. Extraordinary and compelling reasons warrant Asaro's release.

Looking to the Sentencing Commission's Policy Statement for guidance, I find that Asaro's medical condition constitutes an extraordinary and compelling reason for his release. The record

9

shows that Asaro is either "suffering from a serious physical or medical condition" or "experiencing deteriorating physical or mental health because of the aging process[.]" USSG § 1B1.13 cmt. n.1(A)(ii)(I), (III). His condition "substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility," and recovery does not seem likely. *Id.* cmt. n.1(A). Asaro is 85 years old. Even on the government's view of Asaro's condition—that he "has improved dramatically" since his stroke last year, Gov't Resp. 6—he still has "expressive aphasia and often uses 1-2 word responses to questions," April 7 Record. His medical records show that as recently as two months ago, he remained "a high fall risk[.]" Medical Records at 117. Toward the end of March, he incurred his second wound in two weeks while "ambulating." *Id.* at 13. Despite the assertion in the April 7 Record that he can feed himself independently, he received assistance with feeding on numerous occasions this month. *See* Medical Records at 86–88. Moreover, he has an extensive and significant medical history and has been prescribed numerous medications to treat his various conditions. *See id.* at 27; Hyle Letter 2.

Asaro's age, in combination with his deteriorating health, also constitutes an extraordinary and compelling reason for his release. Again, looking to the Sentencing Commission's Policy Statement for guidance, I note that Asaro is older than 65 and, as discussed, "experiencing a serious deterioration in physical or mental health," likely at least partly because of "the aging process[.]" USSG § 1B1.13 cmt. n.1(B). While he has not quite served 75 percent of his prison sentence, he has nearly reached 75 percent, taking into account the good-time credit that I assume he would receive, as the government has offered no indication that he does not qualify. *See id.*[3]

---

[3] I sentenced Asaro to 96 months' imprisonment understanding that he would receive credit for the time he spent in detention prior to his 2015 acquittal—between 22 and 23 months. The Probation Department has assured me that he will, in fact, receive that credit. He will also receive credit for the time he spent in detention prior to his sentencing in the instant case—approximately 9 months. Since his sentencing date of December 28, 2017, he has served between 27 and 28

10

In addition, the combination of the COVID-19 health crisis and Asaro's age and pre-existing conditions constitutes an extraordinary and compelling reason for his release. *See United States v. Smith*, No. 12 Cr. 133 (JFK), 2020 WL 1849748, at *1, *4 (S.D.N.Y. Apr. 13, 2020) (finding extraordinary and compelling reasons for release of defendant serving 120-month sentence when he was 62 years old and had multiple medical conditions, placing him at higher risk of complications from COVID-19); *United States v. McCarthy*, Nos. 3:17-CR-0230 (JCH), 3:92-CR-0070 (JCH), 2020 WL 1698732, at *1, *5 (D. Conn. Apr. 8, 2020) (finding extraordinary and compelling reasons for release of inmate convicted of armed bank robbery because he was 65 years old and had health conditions that increased COVID-19 risk); Order at 1, 3, *United States v. Harris*, No. 18 Cr. 364 (PGG) (S.D.N.Y. Apr. 8, 2020), ECF No. 414 (finding extraordinary and compelling reasons for release of inmate with asthma and Crohn's disease, which made him particularly vulnerable to COVID-19); *United States v. Zukerman*, No. 16 Cr. 194 (AT), 2020 WL 1659880, at *1, *5 (S.D.N.Y. Apr. 3, 2020) (finding extraordinary and compelling reasons for release of 75-year-old inmate with diabetes, hypertension, and obesity "because of the great risk that COVID-19 poses to an elderly person with underlying health problems"); *United States v. Hernandez*, No. 18 Cr. 834-04 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020) (finding extraordinary and compelling reasons for release of inmate at high risk of serious illness from COVID-19 because of his asthma and acknowledging difficulties that high-risk inmate would face

---

months in prison. Thus, he has served approximately 58 months, or between 60 and 61 percent of a 96-month sentence. Factoring in a 15 percent good-time credit would reduce his total prison term to 81.6 months, of which he has served approximately 71 percent. In arriving at this calculation, I have taken into consideration both parties' assertions regarding what percentage of his total prison sentence that Asaro has served. *See* Gov't Sentence Calculation 1–2, ECF No. 172; Def.'s Sentence Calculation 1, ECF No. 173. I also note that, as the Sentencing Commission Policy Statement is not binding on me, I do not need to find that Asaro has served exactly 75 percent of his total sentence in order to find that extraordinary and compelling reasons justify his release.

in caring for self if contracted COVID-19 in detention); Order, *United States v. Webb et al.*, No. 15-cr-00252-PKC-RML-8 (E.D.N.Y. Mar. 30, 2020) (reducing sentence under § 3582(c)(1)(A) for prisoner of advanced age amidst COVID-19 outbreak based on "elevated risk of dire health consequences").[4] If Asaro were to contract COVID-19, given his age and current state, it is not unlikely that the consequences would be dire. While I acknowledge that, as of this writing, no confirmed cases of COVID-19 are present at Springfield, I cannot conclude that no cases are, in fact, present, without assurances that the BOP is routinely testing everyone within the facility.

### III. The § 3553(a) and Sentencing Commission considerations, while significant, do not outweigh the extraordinary and compelling reasons for release.

In evaluating Asaro's application, I must consider the § 3553(a) factors and the Sentencing Commission Policy Statement set forth in USSG § 1B1.13. *See* § 3582(c)(1)(A)(i); *Ebbers*, 2020 WL 91399, at *4. The Sentencing Commission Policy Statement requires that I determine "[t]hat the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" USSG § 1B1.13(2). Because the factors set forth in § 3553(a) and § 3142(g) overlap, I will consider those provisions together. *See* §§ 3142(g), 3553(a).

Undoubtedly, these considerations largely militate against Asaro's release, and they weigh heavily. The nature and circumstances of his offense of conviction—to which he pleaded guilty—

---

[4] Several courts have applied similar reasoning in granting the release of inmates who were detained pre-trial or pre-sentencing and were particularly vulnerable to COVID-19 because of pre-existing health conditions. *See, e.g.*, Order at 3, 5–6, *United States v. McKenzie*, No. 18 Cr. 834 (PAE) (S.D.N.Y. Mar. 30, 2020), ECF No. 443 (finding exceptional reasons justified release under 18 U.S.C. § 3145(c) of defendant with asthma detained in facility with multiple confirmed cases of COVID-19); Order at 2–4, *United States v. Roman*, No. 19 Cr. 116 (KMW) (S.D.N.Y. Mar. 27, 2020), ECF No. 155 (finding exceptional reasons justified release under § 3145(c) of defendant when he had hypertension and history of brain aneurysm and was detained in facility with COVID-19 cases); *see also* Order at 1, *United States v. Padin*, No. 20-CR-135-5 (JMF) (S.D.N.Y. Apr. 8, 2020), ECF No. 84 (finding "compelling reason" justified temporary release on bail under § 3142(i) because defendant's asthma placed him at heightened risk from COVID-19).

are serious. As I stated at Asaro's sentencing proceeding, his actions amounted to "a senseless act of violence." Sentencing Tr. 19:24. I reasoned that

> Asaro nursed enough of a grudge from simply being cut off in traffic that he not only followed a member of the public for an extended period, terrorizing him, but also had an associate find out his home address and then ordered the man's car to be burned to a crisp days later.

*Id.* 20:1–6. I expressed concern that, even at a relatively old age and already suffering from some health conditions, Asaro "continued to wield the power to direct or request other people to carry this act out." *Id.* 20:6–9. Asaro's history and characteristics also weighed heavily in favor of a substantial prison sentence. As the judge who presided over Asaro's 2015 trial, which resulted in acquittal, I determined that "overwhelming evidence" showed "that Mr. Asaro has lived a life of violence." *Id.* 20:18–23. In particular, testimony showed that he, along with another individual, "strangled Paul Katz to death because Katz was cooperating with law enforcement." *Id.* 21:11–16. He also "played a leading role" in the Lufthansa heist. *Id.* 22:7–19. In addition, he "remained involved in loansharking up until 2013" and "remained a powerful player within the Bonanno Family" as of at least 2012. *Id.* 22:22–25. I did not believe that time in prison would rehabilitate him or deter him from committing crimes in the future, considering his life-long membership in the mafia. *See id.* 25:17–21. I found "that the seriousness of the offense, promoting respect for the law, general deterrence, and protecting the public from the defendant's crimes, all require[d] me to impose a significant period of imprisonment." *Id.* 26:1–4. Thus, an above-Guidelines sentence was warranted. *See id.* 18:13–20, 26:21–27:5.

Although these considerations are largely the same today, the analysis has changed to some extent. While I do not know whether Asaro currently has the ability or the power to command others in his organization to carry out criminal acts at his will, I do not believe that, given Asaro's current state, his release would put the public at a significantly increased risk of danger. His most

13

recent offense stemmed from "a road rage incident" that set off his "explosive temper." *Id.* 19:5–6, 20:9–10. With his current medical needs—and under a strict order of home incarceration, to be monitored by the Probation Department—he will have little, if any, opportunity to have the kinds of encounters that would set off his temper. Further, his more serious crimes occurred decades ago. *See id.* 18:5–8, 21:14–21, 22:7–19. And, considering his impairments—including expressive aphasia—he is not likely to be orchestrating complex criminal schemes.

Ultimately, I must determine whether the extraordinary and compelling reasons militating in favor of release outweigh the significant factors that militate in favor of continued detention. *See Ebbers*, 2020 WL 91399, at *7. I conclude that they do. At sentencing, I intended to impose an above-Guidelines sentence—not a death sentence. The 58 months that Asaro has already spent in prison exceeds the high end of his Guidelines range, which was 41 months. *See* Sentencing Tr. 18:19–20. If Asaro were to remain in detention, he would face a significant risk of contracting—and suffering severe complications from, and perhaps even dying from—COVID-19. I do not believe that continued detention, in light of this risk, is an appropriate or proportionate way to further the purposes of sentencing. *See* § 3553(a)(2).

Thus, I grant Asaro's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), subject to the conditions set forth below. It is hereby ordered that:

1. Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), I hereby reduce defendant Vincent Asaro's term of incarceration such that he is released from the custody of the Bureau of Prisons effective as soon as the terms of this order can be implemented;

2. The warden of MCFP Springfield shall forthwith release from custody the person of defendant Vincent Asaro;

3. Defendant Vincent Asaro shall be on supervised release status, with home incarceration,

for a period of 23 months;

4. For that 23-month period, and for 3 years thereafter, defendant Vincent Asaro shall abide by all the terms and conditions of supervised release that were previously imposed on him and are memorialized in the Judgment dated December 28, 2017, ECF No. 131;

5. Defendant Vincent Asaro shall be released from MCFP Springfield into the custody of Michele Carollo and Noreen Asaro. Defendant Vincent Asaro, Carollo, and Noreen Asaro shall proceed immediately to Carollo's residence (the "Residence"), where the defendant shall reside for the duration of his period of home incarceration and supervised release;

6. Michele Carollo or Noreen Asaro must notify the Probation Department for the Eastern District of New York both upon the release of defendant Vincent Asaro into their custody and upon their arrival at the Residence. Defendant Vincent Asaro, Carollo, and Noreen Asaro are directed to follow the instructions of the assigned Probation Officer. Defendant Vincent Asaro is further directed to follow the conditions of supervised release imposed at the time of his sentence;

7. For 23 months from the date of his release from prison, defendant Vincent Asaro shall be under 24-hour home incarceration to be enforced by location monitoring, using specific technology to be determined by the Probation Department. The defendant may only leave the Residence for necessary medical services with advanced notification, and approval if time permits, from the Probation Department. All other leave from the Residence must be submitted through defense counsel for the court's approval;

8. To ensure that location monitoring can be effectively implemented given the defendant's medical conditions, a responsible, adult individual approved by the Probation Department must be present in the Residence with defendant Vincent Asaro at all times, on a 24-hour

basis, unless excused from that requirement by the Probation Department; failure to comply with this requirement will constitute a violation of the terms of the defendant's home incarceration;

9. Upon entry of this Order, defense counsel shall immediately contact Probation Officer Joanmarie Langone and coordinate with her to facilitate enforcement of the defendant's electronic monitoring and other release conditions;

10. Defendant Vincent Asaro shall not spend 14 days in quarantine at MCFP Springfield prior to his release, but shall be released as soon as the terms of this Order can be implemented;

11. While traveling from MCFP Springfield to the Residence, defendant Vincent Asaro will isolate himself to the best of his ability, and, beginning as soon as he arrives at the Residence, defendant Vincent Asaro will quarantine himself for 14 days; and

12. Although the court assumes that defense counsel will notify the BOP of the issuance of this order, the court directs that the United States Attorney's Office for the Eastern District of New York formally notify the BOP so that this order can be put into effect as quickly as possible.

SO ORDERED.

Dated:   April 17, 2020            \_\_\_\_\_/s/_____
         Brooklyn, New York         Allyne R. Ross
                                    United States District Judge